UNITED STATES v. GREENE et al.

(District Court, S. D. Georgia. April 13, 1906.)

1. CONSPIRACY—CRIMINAL PROSECUTION—FACTS TO BE CONSIDERED BY JURY.

Upon the trial of a charge of conspiracy, where the prosecution depends upon inferences to be drawn from facts to prove the conspiracy, great latitude of proof must be allowed, and the jury should have before them, and are entitled to consider, every fact which has a bearing upon and a tendency to prove the ultimate fact in issue.

2. CRIMINAL LAW—INSTRUCTIONS—REASONABLE DOUBT.

A reasonable doubt in a criminal case is not a mere possible doubt, but exists where, after the entire comparison and consideration of all of the evidence, the minds of the jurors are left in such a condition that they cannot say they feel an abiding conviction, to a moral certainty of the truth of the charge. By reasonable doubt is not meant a strained

or whimsical conjecture, but an actual sincere mental hesitation, caused either by insufficient evidence or by unsatisfactory evidence.

[Ed. Note.—For cases in point, see vol 14, Cent. Dig. Criminal Law, §§ 1267, 1268, 1904–1922.]

3. SAME—CIRCUMSTANTIAL EVIDENCE—WEIGHT AND SUFFICIENCY.

Direct and circumstantial evidence differ merely in their logical relation to the fact in issue. Evidence as to the existence of the fact is direct. Circumstantial evidence is composed of facts which raise a logical inference as to the existence of the fact in issue. A conviction may well be had upon circumstantial evidence, but to warrant such conviction the proven facts must not only be consistent with the hypothesis of guilt, but must clearly and satisfactorily exclude every other reasonable hypothesis save that of guilt.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, §§ 1262–1269, 1883–1888.]

4. CONSPIRACY—CRIMINAL PROSECUTION—EVIDENCE OF INTIMACY BETWEEN PARTIES CHARGED.

Previous intimacy between persons charged with conspiracy is competent and important proof on the trial, and proof of close intimacy is especially important, if the duties of the parties respectively were intended to be in opposition, and should the occasion arise might forbid such intimacy, as where the conspiracy charged was to defraud the government in respect to contracts for public work, and the alleged conspirators were respectively contractors for such work and the government engineer officer in charge of the same.

5. CRIMINAL LAW—FACTS RELEVANT TO ISSUE—FLIGHT OF ACCUSED.

It is always competent to prove the flight of the accused as having a tendency to establish guilt; but such fact, if shown, is not conclusive, nor does it raise a legal presumption of guilt, but is to be given the weight to which the jury think it entitled, under the circumstances shown. In this connection they may take into consideration the defendant's age, intelligence, and financial ability to make a defense.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, §§ 779–780, 1257.]

6. SAME—LIMITATION OF PROSECUTION—PERSONS FLEEING FROM JUSTICE.

Where a person charged with crime against the United States in the courts of one federal district, when found elsewhere, resists removal to such district, with intent to avoid the jurisdiction and process of the court therein, such action constitutes a fleeing from justice, which, under Rev. St. § 1045 [U. S. Comp. St. 1901, p. 726], takes away from him the privilege of pleading the statute of limitations, and, until he submits himself to such jurisdiction, the statute does not run in his favor as against prosecution for any offense charged to have been previously committed in said district.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, § 278.]

7. SAME.

Although, under the extradition treaty of 1890 between Great Britain and the United States and the laws of Canada, a person whose extradition is sought by the United States from the Dominion of Canada has the right to oppose his extradition by legal proceedings, he is nevertheless, during the pendency of such proceedings, a person fleeing from justice, within the meaning of Rev. St. § 1045 [U. S. Comp. St. 1901, p. 726].

8. CONSPIRACY—CRIMINAL PROSECUTION—INSTRUCTIONS—REVIEW OF EVIDENCE.

Evidence reviewed in the charge to the jury on trial of consolidated indictments and counts severally charging conspiracy to defraud the United States between contractors for public work and the government

engineer officer in charge of the same, the presentation of fraudulent claims against, and embezzlement from, the United States.

See 115 Fed. 343.

Marion Erwin, U. S. Atty., Samuel B. Adams and Thomas F. Barr, Sp. Assts. to U. S. Atty., and Alexander Akerman, Asst. U. S. Atty.

William Garrard, Peter W. Meldrim, William W. Osborne, and Alexander A. Lawrence, for defendants.

SPEER, District Judge (charging jury). A grand jury drawn conformably to law from the judicial division and district having jurisdiction has presented three indictments against the prisoners. The indictments are numbered 322, 371, and 476. The first was returned December 8, 1899, the second February 28, 1902, and the third November 18, 1905. The accused indicted in the three indictments are Benjamin D. Greene, John F. Gaynor, William T. Gaynor, Edward H. Gaynor, Michael A. Connolly, and Oberlin M. Carter. Of the persons named, Benjamin D. Greene and John F. Gaynor are on trial. The indictments have been consolidated, the accused have pleaded not guilty to the charges made, and thus the issues are formed which you are to determine. The indictments will be before you. They have been read or sufficiently explained. It is, however, proper that the court shall direct your attention to the substance of the charges made in the several counts.

Conspiracy to defraud the United States is one of the alleged crimes. It is made in indictments 322 and 371. It is made punishable by section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676]:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than $1,000, and not more than $10,000, and to imprisonment not more than two years."

Before this statute becomes applicable two or more persons must conspire to commit an offense against the United States, or to defraud the United States in some manner, or for some purpose. Having thus conspired, if one or more of such parties do an act to effect the object of the conspiracy, all the parties to the conspiracy shall be liable to the penalty. While this statute denounces conspiracy, it does not define it. It is an agreement of two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful means. The essence of this offense is the unlawful combination. In union there is strength. This is true of combinations to do wrong as of combinations to do right. One man may desire, and even plan, to commit crime; but, where several agree to a common criminal design, the probability of their success, and therefore of injury to society, is largely enhanced. For this reason the mere act of conspiracy, the mere unlawful agreement, was indictable by the common law and is indictable in many, if not all, of the states. It is, however, true that the legislation of Congress, to which we must look exclusively for the definition of crimes of which we have jurisdiction here, provides that

one or more of the parties to the conspiracy must do some act to effect its object before it becomes punishable by national law.

Your inquiry as to this charge will be: First, was there the conspiracy as charged? If you find there was, you will next inquire: Was any act done by one or more of the parties to such conspiracy to effect its object? Such acts need not be the acts of the alleged conspirators actually on trial, but finding the conspiracy you may consider such acts of either one or more, or all the persons indicted, to ascertain if any act to effect the object of the conspiracy was done.

Now, why does Congress require something to be done before an unlawful agreement is indictable? It is because of the humanity of our laws. Under the English law, the mere conspiracy was indictable; but by the law of our general government, quoted, the conspirators may conspire all they please, provided that none of them do anything to carry out the object about which they conspire. In other words, it was the purpose of Congress to give them what is termed the locus penitentiæ; that imports an opportunity or point at which they may repent and abandon their unlawful purpose. But when anything is done by one of the conspirators to effect its object, it is regarded by our law as such an aggravation of the conspiracy that there is no longer a place for repentance, and the penalties of the statutes attach.

How may a conspiracy be proved? By witnesses to the agreement itself, or by proof of facts from which the jury may infer it. Rare indeed are the cases where a conspiracy can be proven by witnesses who heard it made. From its very nature, it is a secret or furtive agreement. Indeed, a famous writer upon criminal law, Mr. Archibald, declares that:

"A case cannot be easily imagined in which a conspiracy can be expressly proven, unless where one of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution."

A conspiracy, however, is more dangerous to the public on this very account. It follows, in nearly all cases, that the charge of conspiracy is supported by proof of facts from which the jury may fairly infer it. You have already gathered from what I have said that, where several parties conspire or combine together in conspiracy, each is criminally responsible for any act of his associate, or associates, done to effect the object of the crime. In such cases, in contemplation of law, the act of one is the act of all. One person alone cannot be convicted of conspiracy. Two may be. One may be; provided that another or others also indicted are shown to be guilty with him. It is also true that, upon the trial of charges of this character, where the prosecution depends upon inferences to be drawn from facts, great latitude of proof must be allowed. "The jury," said the Supreme Court of the United States, "should have before them every fact which will enable them to come to a satisfactory conclusion, and it is no objection that the evidence covers a great many transactions and extends over a long period of time, provided, however, that the facts have some bearing upon and tendency to prove the ultimate fact in issue.

Having, as I think, sufficiently for the purposes of your inquiry explained the crime of conspiracy in general, it now becomes my duty

to attempt to make plain the particular conspiracy with which the prisoners are here charged. While there are three indictments and many counts, all of which you must consider, for the purposes of condensation and brevity, at present I direct your attention to indictment No. 371. This indictment, in language appropriate in a legal sense, charges that on the 1st day of January, 1897, Benjamin D. Greene, John F. Gaynor, William T. Gaynor, Edward H. Gaynor, Michael A. Connolly, and Oberlin M. Carter did conspire to defraud the United States of large sums of money. It is alleged that persons indicted had devised a fraudulent scheme for this purpose. This scheme, the indictment recites, on or about the year 1891, was first concocted and put in operation, and had been "continuously in process of execution," until renewed in the conspiracy entered into at the date mentioned in 1897. It is further charged that the conspiracy and acts done to effect its object continued thereafter in process of execution by the alleged conspirators.

The charge of conspiracy is, in substance, as follows: Oberlin M. Carter was an officer of the corps of engineers of the United States Army. From about 1888 until about the 20th of July, 1897, he was, as such engineer officer, in charge of what is called the Savannah district. His duty involved the execution of river and harbor improvements in the district mentioned. In this capacity he was vested with power, duty, and discretion to propose projects for the improvement of rivers and harbors, and projects for the expenditure of money appropriated by Congress for this purpose. It was his duty to devise and draft specifications for contracts for such improvements. His was the duty and discretion to recommend the acceptance of such contracts by his superior officers, to draft and suggest forms of advertisements, and to fix the period in which these should be published, and thus to give notice to the public that competitive bids would be received by him for the construction of the works proposed. His also was the power of suggesting and fixing the period in such contract specifications, within which a successful bidder would be required to commence work. He had the duty to give out information in regard to contracts to be let, to receive proposals for contracts, to recommend the award of the same, to approve or reject the bonds required of contractors, to superintend their work, to approve or reject the same as it might be in accordance with the requirements of the contract or otherwise, to suggest and recommend modifications of such contracts to be made by the Secretary of War, in certain cases without competitive bids and without public advertisement. He had also power and duty to approve or reject the accounts rendered to him by contractors for work done or claimed to have been done by them. It was his duty to approve such accounts if they were fair and honest, and to reject them if they were false or fraudulent. He was the disbursing officer of the government for all the purposes of his work, and, when the funds therefor had been appropriated and set apart for the work of his district, he was vested with the power, duty, and discretion to pay the contractors, if their claims for work done were

honest and fair, and to refuse to pay them if such claims were false and fraudulent.

It is further charged that it was comprehended in the fraudulent scheme and device that Carter should misuse the official powers, duties, and discretion above enumerated; that he should do this so fraudulently that competitive bidding, for contracts to be let for the government by him, should be cut off, so that his co-conspirators would be the only successful bidders for the contract work of the district. In this manner it was contemplated that all such contract work would be secured by one or the other of the alleged co-conspirators, or by some other person for their benefit, with the result that the works constructed for the United States on such contracts would be let at high and exorbitant cost.

In furtherance of this project, it is also charged that Carter, as engineer officer, would frame the specifications of contracts for constructing jetty works and training walls with a specified fraudulent intent. This consisted in the contrivance of specifications in certain contracts of three designs of "mattresses" to be used as a part of the projected improvements. For these the contractors were to be paid by the United States at a certain price per square yard. Such contract, with its specifications, would provide that the engineer in charge might, at his option, require the contractor to put in the works a large number of square yards of a particular design of what is called a "log and brush mattress," and other specifications provided that the engineer at his option and at the same price to be paid by the United States, in lieu of the log and brush mattress, might require the same number of square yards of another specified design of what is usually called a "brush mattress." The log and brush mattress was costly in its character, and was therefore expensive to the contractor. The cost of the brush mattress was not only much cheaper to the contractor, but of much less value to the United States. By a vague description in the specification of the cheaper and inferior, that is to say the brush mattress, the engineer, by a fraudulent and strained construction, would accept and approve large numbers of square yards thereof at very much less cost to the contractor, and of a value much less to the United States than would be the same number of square yards of the log and brush mattress which might under the specifications be exacted by the engineer.

It is charged that the scheme comprehended that such specifications should be so devised and drafted by the engineer officer that all persons not parties thereto should have no information as to which design of mattress would be required until after the bids for the contracts were received. It followed that bidders not parties to this scheme would be compelled, it is charged, to make bids at prices based upon the most expensive construction mentioned in the specifications. On the other hand, it is further charged that the defendants would be advised by Carter before their bids were put in, and opened, that, if they or any one of them should be the successful bidder, the engineer officer would require mattresses of the cheapest design, and that the design itself would be construed most liberally in their favor. This, it is

stated, was done with the intent that the alleged conspirators, or some other person or corporation acting for them, should always be the successful bidders for such work at the lowest cost to the contractors, and at the highest cost to the United States. The effect of this, as otherwise stated in the indictment, was to require the successful bidder to furnish, at the option of the engineer officer, at one price per unit of work or material, several types of such work and of such material, largely varying in cost to the contractors—the option of the engineer officer, so far as the general bidder knew, was not to be exercised until after the letting of the contract, but that Carter would, prior to the time of opening the bids for such work, secretly inform the parties to the fraudulent scheme that he would require only the cheapest type of such material and work. This, it is alleged, was done to enable the contractors to obtain the contract at least expense to themselves and at greatest cost to the United States. It was also contemplated that, if some person not a party to the fraudulent scheme charged should be the successful bidder, the engineer officer would require him to furnish that type of work or material specified in the contract most costly to him; and, further, that the engineer would in such case give the specifications such rigid and unfair construction, against the interest of the contractor, that the performance of such contract would be ruinous to him. This was done, it is alleged, with the further purpose to cut off all competition between other contractors, and the parties to the fraudulent scheme. In addition to this, it is alleged that the scheme contemplated that Carter, as such engineer officer, should, in the actual construction of the work done under contracts obtained by or for the benefit of his co-conspirators, so change the quantities and type of material and work as would insure to them the maximum profit in such contracts, and he should do this even though the changes thus made would result in imposing upon the government work and material of very inferior value.

It is further charged that, when some person not a party to the scheme was the lowest bidder at the letting of such contracts, and one of the co-conspirators had put in a bid at a higher rate, Carter, as engineer officer, would recommend the rejection of the lowest bid for any slight defect in the proposal. In other instances, where it was discovered that a lower bid had been made, in order to carry out the fraudulent scheme, as such officer he would permit the parties to the scheme to present hurriedly written proposals at a lower figure for such contracts and written guaranties thereon, and Carter would knowingly and corruptly approve for acceptance such proposals, although he might also know that the written guaranties were forgeries. It is charged that in addition he would knowingly approve for acceptance by the United States written modifications of such contracts and written consents of the contractors' bondsmen, although he knew the signatures of the contractors were forgeries, and it is alleged that he would knowingly and fraudulently approve for payment claims and accounts rendered to him as disbursing officer by the alleged co-conspirators, or by one of them, or by a person or corporation who had nominally secured contracts for their secret benefit. And, finally, as

disbursing officer, it was charged that when in funds he would fraudulently pay over to the parties to said scheme, or one of them, or to some person or corporation for their benefit, the accounts of money for which their claims were rendered, and that the parties to said fraudulent scheme, including Carter himself, would divide and appropriate to their own use, the money thus fraudulently obtained.

It is further charged that on or about the 1st day of January, 1897, Benjamin D. Greene, John F. Gaynor, William T. Gaynor, Edward H. Gaynor, Michael A. Connolly, and Oberlin M. Carter, were proceeding with the construction of certain works in this district. This was under two contracts. These had been obtained by the alleged co-conspirators, on October 8, 1896. They were obtained, it is alleged, for their secret benefit, but in the name of the Atlantic Contracting Company, through Oberlin M. Carter, engineer officer in charge, fraudulently, at high and exorbitant prices and cost to the United States, by means of the fraudulent scheme hereinbefore described. One of these contracts was for the construction of jetties at Cumberland Sound. The other was for the construction of training walls and improving Savannah Harbor.

It is further charged that the alleged conspirators on the 1st day of January, 1897, in this district, did conspire together to defraud the United States of large sums of money by means of the fraudulent schemes and device heretofore described, and that this scheme was applied, not only to the execution and completion of the work under the contracts made on the 8th day of October, 1896, but also to the presentation to and approval by Oberlin M. Carter, engineer officer, of claims and accounts, and the payment of money on the same, and to the division of such money so fraudulently paid between the parties to said fraudulent scheme and conspiracy.

It is further alleged that the conspiracy extended also to the concealment of the money so fraudulently paid, and so fraudulently divided between the conspirators; that the fraudulent scheme was also applied so as to obtain for the conspirators, or for some person or corporation for their benefit, all contracts for river and harbor improvements which might thereafter be let in the Savannah district; that this was done through Oberlin M. Carter, as such engineer officer; and that he also, in pursuance of said fraudulent scheme, as aforesaid, obtained for the accused modifications of contracts, and the presentation and approval of claims and accounts upon the contracts so modified, at high and exorbitant prices, and the payment of money on the same, and the division of such money so fraudulently paid between the defendants. The jury will observe the charge is that the conspirators agreed on or about the 1st day of January, 1897, to apply these fraudulent schemes alleged to have been concocted in 1891, not only to the contracts of October 8, 1896, but to modifications of such contracts obtained, or to be obtained.

It is further charged that, on or about the 1st day of January, 1897, the alleged conspirators, including the defendants on trial, were proceeding with the construction of certain works in this district. This was under the two contracts of the 8th day of October, 1896. These

had been obtained by the defendants, for their secret benefit, in the name of the Atlantic Contracting Company. They had been fraudulently obtained by means set forth in the fraudulent scheme hereinbefore described. One of these contracts was for the construction of jetties at Cumberland Sound, and the other was for the construction of training walls and for improving the harbor at Savannah. Then follows the specific charge that the defendants did on that day conspire to defraud the United States of large sums of money by applying the fraudulent devices relating to the execution of the work under such contracts to the execution and completion of the work of the contracts of October 8th, upon which they were then engaged, and to the presentation and approval of claims and accounts, and the payment of moneys on the same, and the division thereof.

I will at this point caution you that all I have said, or may say, in this description or analysis of the indictments, refers to matters alleged, and not to matters in evidence. You will recall my instructions to the effect that, before a conspiracy of this character is punishable by the statute of the United States heretofore explained, some act must be done by one or more of the conspirators to carry its object into effect. This, in the terminology of the law, is called an overt act. This imports an act which manifests the intention of the conspirator to carry out his criminal design. Such an act is now charged to have been done by two of the alleged conspirators. It is that Michael A. Connolly, one of the persons indicted, did on the 17th day of March, 1897, assist the said Oberlin M. Carter in the preparation of a certain document, purporting to be articles of agreement entered into between Oberlin M. Carter, captain corps of engineers, United States army, and the Atlantic Contracting Company. This document purported to modify the contract which had been made on the 8th day of October, 1896, between the Atlantic Contracting Company and Oberlin M. Carter, captain corps of engineers, for the work at the entrance of Cumberland Sound, Ga. It purported to be signed by O. M. Carter, captain corps of engineers, United States army, and by the Atlantic Contracting Company, John F. Gaynor, president, and by William T. Gaynor, secretary. Upon these appeared the name of Michael A. Connolly as attesting witness to the signatures. It is charged that Michael A. Connolly did then and there himself write thereon the name and signature of the said William T. Gaynor, secretary; further, that the said Michael A. Connolly did likewise then and there assist the said Oberlin M. Carter in the preparation of a document purporting to be dated on the 18th day of March, 1897, and purporting to be the written consent of Anson M. Bangs, and Eugene Hughes, the contractors' bondsmen, on the contract of October 8, 1896. This consent purported to relate to the modified agreement for work at Cumberland Sound, dated March 17, 1897, above described, and it is charged that Michael A. Connolly did then and there write the signatures, "Anson M. Bangs" and "Eugene Hughes," signed to said document, which purported to be their assent as sureties. It is further charged that he did then and there write the signatures "James C. Bogart" and "Henry Smith," which signatures purported to be signed on said document as

witnesses to the signatures of Anson M. Bangs and Eugene Hughes thereto.

It is further charged that Oberlin M. Carter did then and there knowingly cause said documents with false signatures of William T. Gaynor, Anson M. Bangs, Eugene Hughes, James C. Bogart, and Henry Smith signed thereto, as aforesaid, to be then and there forwarded to the War Department of the United States, with Carter's recommendation for their approval by the Secretary of War.

Another overt act charged to have been done to carry the object of the conspiracy into effect is that the alleged conspirators, Benjamin D. Greene, John F. Gaynor, William T. Gaynor, Edward H. Gaynor, Michael A. Connolly, and Oberlin M. Carter, did on the 1st day of July, 1897, knowingly, willfully, and fraudulently cause to be presented for approval and payment to Oberlin M. Carter, engineer in charge of the Savannah district, a certain claim against the United States; the said conspirators knowing that the claim was fraudulent. The claim is as follows:

"Savannah, Ga., July 1, 1897.

"The United States Engineer Department to the Atlantic Contracting Company, Dr.

"To labor and material furnished during the month of January, 1897, under formal written contract dated October 8, 1896, on work of improving Harbor at Savannah, Georgia, as follows:

| | | |
|---|---|---|
| 31,724.23 square yards of brush mattress, at .95 | | $30,138 02 |
| 2,297.86 cubic yards of fourth-class stone at $2.75 | | 6,319 11 |
| | | $36,457 13 |
| Less 10 per cent. retained | | 3,645 71 |
| Amount due | | $32,811 42 |

"Submitted by                    The Atlantic Contracting Company,
                                        "By Edward H. Gaynor, Treasurer."

It is charged that this claim was fraudulent, because the price charged for the brush mattress was the high and exorbitant price provided for in the contract of October 8, 1896, for Cumberland Sound; also that the quality of the material in said brush mattresses, and in the fascines composing the same, as furnished in said work and charged for in the claim, was inferior to that called for in the specifications for said contract; that the form of construction of both mattresses and fascines are different from and inferior to the forms prescribed in the specifications; that the mattresses contained less material per square yard of mattress surface than the specifications required; and that all this was done in accordance with the fraudulent devices in the scheme hereinbefore described, and through the fraudulent exercise of his powers and discretion by said Oberlin M. Carter, as engineer officer, in favor of the contractors, and against the United States.

The second count charges the fraudulent scheme which it is alleged was renewed and adopted by the conspiracy in substantially the same language as in the count just explained. Other overt acts, however, are described and charged. The first is that Oberlin M. Carter, engineer officer, as aforesaid, did then and there issue to the

Atlantic Contracting Company a certain check, signed by him in his official capacity, and drawn on the Assistant Treasurer of the United States, New York, and payable to the order of the Atlantic Contracting Company, for the sum of $345,000, for contract work improving Cumberland Sound, Ga., and did then and there deliver the said check to John F. Gaynor, in payment of a claim of the said Atlantic Contracting Company, for said sum, for work claimed to have been done by that company in the improvement of Cumberland Sound under the contract of October 8, 1896, which claim he, the said Oberlin M. Carter, then and there knew to be fraudulent. The check is set forth in words and figures following:

"War.  U. S. Engineer, Office Engineers.
"No. 275,037.  Savannah, Ga., July 6, 1897.
  "Assistant Treasurer of the U. S., New York.
"Pay to the order of the Atlantic Contracting Co. three hundred and forty-five thousand dollars ($345,000.00).  O. M. Carter,
  "Capt. Corps of Engrs. U. S. A., Engineer, U. S. A.
"State object for which drawn:
"Contract work. Improving Cumberland Sound, Ga."

Here also are reiterated, in substance, the charges as set forth in the second count, wherein the alleged fraudulent character of the claim is described.

A third overt act is charged with relation to the issuance of another check of the same general character, for the sum of $230,749.90, for contract work improving Savannah Harbor, Ga. This check, it is also charged, was delivered to John F. Gaynor in payment of a claim of the Atlantic Contracting Company for said sum. It is set forth in the indictment, as follows:

"War.  U. S. Engineer, Office Engineers.
"No. 270,537.  Savannah, Ga., July 6, 1897.
  "Assistant Treasurer of the U. S., New York.
"Pay to the order of the Atlantic Contracting Company two hundred and thirty thousand, seven hundred and forty-nine 90–100 dollars ($230,749.90).
  "O. M. Carter,
  "Capt. Corps of Eng. U. S. A., Engineer U. S. A.
"State object for which drawn:
"Contract work. Improving Savannah Harbor, Ga."

It is alleged to be fraudulent for the reasons substantially stated in similar claims hereinbefore described.

The charge of the third count is presented with some variation from the language used in stating the charges previously explained. While it would appear to be the charge of a conspiracy complete in itself, with relation to certain formal written contracts, each dated the 8th day of October, 1896, one of which was for the construction of jetties at Cumberland Sound, and the other for the construction of training walls and improving the harbor of Savannah, in a general sense, the means of which the persons charged availed themselves are similar to those set forth in the previous counts. To this is superadded the charge that Carter, as engineer officer, knowingly and corruptly, with intent to defraud the United States, would approve for acceptance written modifications of such contracts, and with false and forged

signatures of the contractors' bondsmen to written consents to such modifications, and would forward such false documents to the War Department of the United States, as if they were genuine documents, for the approval of the Secretary of War. This was done, it is charged, with the intent to secure to the alleged conspirators, without competition, supplementary contracts at high and exorbitant prices. It is charged that the contractors themselves would be the only real bidders for such contract work; that this was done secretly for the benefit of the conspirators, naming them; and that Carter not only inaugurated such projects, but would so superintend the execution of the same that large amounts of unnecessary and useless work would be fraudulently undertaken and done.

There is the further charge that Carter, as engineer officer in charge, would so falsely and fraudulently exercise his powers in the approval and acceptance of the work that the contractors would receive payment for the construction of such work under such contracts at high and exorbitant rates for the poorest and cheapest class of material and work put under such contracts at least cost to such contractors.

As an overt act done in pursuance of this conspiracy, and to effect its object, it is charged that Michael A. Connolly assisted Carter by committing the same forgeries as charged in the first count; that this was done with the same fictitious consents, and with the same forged signatures of Anson M. Bangs and Eugene Hughes, of James C. Bogart and Henry Smith therein described, and that Carter did knowingly cause said document with said false signatures to be forwarded to the War Department of the United States with his recommendation that they be approved by the Secretary of War.

As another overt act done in support of this conspiracy, it is charged that the conspirators did knowingly, willfully, and fraudulently cause to be presented to Carter for approval and payment a claim for the sum of $345,000 for labor and material and supplies claimed to have been furnished the United States from December, 1896, to June, 1897. It is charged that the conspirators well knew that this claim was fraudulent; that the labor, material, and supplies furnished and charged for at the prices fixed were of inferior quality and not in accordance with the specifications of the contract; that the brush mattresses and fascines were not in accordance with the forms prescribed; that the mattresses charged for by the square yard contained less material per square yard of mattress surface than the form of mattress required by the specifications of the contract; and that the claim was false in this respect that the quantity of material charged for at the contract price was largely in excess of the quantity actually furnished.

The fourth count of the indictment is framed under a different penal statute of the national laws. This is section 5438, Revised Statutes [U. S. Comp. St. 1901, p. 3674]:

"Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious or fraudulent, or who,

for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim—every person so offending in any of the matters set forth in this section"—shall be liable to the penalties prescribed.

When you look to the indictments you will find that the fourth count charges conspiracy to commit the crime defined in the distinct clause of the statute. This provides:

"Every person who enters into any agreement, combination or conspiracy to defraud the government of the United States or any department or officer thereof or aiding to obtain the payment or allowance of any false or fraudulent claim shall be liable"—to the penalties of the statute.

The conspiracy charged in the fourth count is an explicit charge that Benjamin D. Greene, John F. Gaynor, William T. Gaynor, Edward H. Gaynor, Michael A. Connolly, and Oberlin M. Carter did combine, conspire, confederate, and agree together to defraud the government of the United States by obtaining through Oberlin M. Carter, in his official capacity heretofore described, a certain false and fraudulent claim. This was for labor and material claimed to have been furnished by the Atlantic Contracting Company under the contract entered into on the 8th day of October, 1896, for improving Cumberland Sound; that the claim was for the sum of $345,000; that Carter was a disbursing officer of the United States intrusted with the disbursing of money applicable to such improvements; that he was vested with power, duty, and discretion to approve such claims; that the conspirators, all of them, knew that the claim was false and fraudulent, in this, that the labor, material, and supplies furnished and charged for at the prices fixed in the contract were inferior in quality and not in accordance with the specifications, nor were the brush mattresses and fascines composing them in accordance with such specifications; and that the quantity of material charged for was largely in excess of that actually furnished.

As an overt act to effect the object of the said conspiracy it is charged that the alleged conspirators presented a false and fraudulent claim in words and figures as follows:

"Savannah, Ga., July 1, 1897.

"The United States Engineering Department to the Atlantic Contracting Company, Dr.

"To labor and material furnished during the month of December, 1896, on work of improving Cumberland Sound, Georgia, under formal written contract dated October 8, 1896, as follows:

| | |
|---|---|
| 18,727.34 square yards of mattresses at $1.10 | $20,600 07 |
| 1,968.06 cubic yards of third-class stone at $3.90 | 7,675 43 |
| | $28,275 50 |
| Less 10 per cent. retained | 2,827 55 |
| Amount due | $25,447 95 |

"Submitted by                    The Atlantic Contracting Company,
                                        "By Edward H. Gaynor, Treasurer."

·—and that this claim was false and fraudulent for the reasons just stated.

The fifth and sixth counts contain no charge of conspiracy, but are framed under the clause of the statute which provides:

"Every person who makes or causes to be made or presents or causes to be presented for payment or approval to or by any person or officer in the civil, military or naval service of the United States, any claim upon or against the government of the United States or any department or officer thereof, knowing such claim to be false, fictitious or fraudulent, or who for the purpose of obtaining or aiding to obtain payment or approval of such claim makes, uses or causes to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, shall be liable to the penalties of the statute."

The fifth count contains no charge of conspiracy. It presents the specific allegation that the parties indicted did unlawfully, willfully, and fraudulently cause to be presented to Carter false and fraudulent claims for labor and material furnished by the Atlantic Contracting Company under a contract entered into on the 8th day of October, 1896, for the construction of retaining walls and improving the Harbor of Savannah; that this claim was for the sum of $230,749. It is charged to be of the same fraudulent character and for the same reasons set forth in the preceding count which has just been explained.

The sixth count is similar in character. It charges that in the same manner and with the same criminal purpose these same parties did present to Carter, in his official capacity, a fraudulent claim of the sum of $22,612.46. This claim was then and there presented in the form of a voucher and account in the words and figures following:

"Savannah, Ga., July 1, 1897.

"The United States Engineering Department to the Atlantic Contracting Company, Dr.

"To labor and material furnished during the month of December, 1896, under formal written contract dated October 8, 1896, on the work of improving Harbor at Savannah Harbor, Georgia, as follows:

| | |
|---|---|
| 21,356.67 square yards of mattresses at .95 | $20,288 84 |
| 1,758.59 cubic yards of fourth-class stone at $2.75 | 4,836 12 |
| | $25,124 96 |
| Less 10 per cent. retained | 2,512 50 |
| Amount due | $22,612 46 |

"Submitted by ·                    The Atlantic Contracting Company,
                                   "By Edward H. Gaynor, Treasurer."

This is charged to be false and fraudulent for the same reasons set forth with relation to the fraudulent claims alleged to have been presented in the fifth count.

The sixth count of this indictment concludes with the following charge:

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present that after the said Benjamin D. Greene, John F. Gaynor, William T. Gaynor, Edward H. Gaynor, Michael A. Connolly, and Oberlin M. Carter had, in said Southern district of Georgia, on or about the 1st day of July, Anno Domini 1897, conspired and agreed together to defraud the United States as

aforesaid, and after the said conspirators had done the acts hereinbefore set forth to effect the object of said conspiracy, and at a time, the exact date of which is to the grand jurors aforesaid unknown, but which was prior to the 1st day of December, Anno Domini 1899, the said Benjamin D. Greene, John F. Gaynor, William T. Gaynor, and Edward H. Gaynor left the Southern district and state of Georgia, and continuously remained away from said Southern district and state of Georgia until or about the 1st day of February, Anno Domini 1902, and during said period, to wit, from said time prior to the 1st day of December, A. D. 1899, to the 1st day of February, Anno Domini 1902, continuously, the said Benjamin D. Greene, John F. Gaynor, William T. Gaynor, and Edward H. Gaynor were persons fleeing from justice."

A brief explanation will suffice to explain to you the charges in indictment No. 322. The same persons are indicted. It is charged that they formed and operated for some years in the district a certain scheme to defraud the United States under contracts for river and harbor improvements. This scheme is fully described in the indictment and is substantially the scheme heretofore explained to you. The devices to be used as charged were of three general classes: The first, those relating to the fraudulent letting of the contracts to the defendants without competition and at exhorbitant prices; second, those relating to the execution of the work in disregard of the specifications and of fair dealing, and the fraudulent acceptance of such work by the engineer; third, those relating to the approval and payment by the engineer of the accounts to be rendered for such work. That the work was done at exorbitant and fraudulent prices, that the accounts were fraudulent, that the division of the fruits of the fraud between the engineer and the contractor followed, is also charged.

It is further charged that on October 8, 1896, the defendants had fraudulently obtained from the engineer officer, by means of the said fraudulent scheme, two certain contracts, described in the indictment, let by the engineer. The distinct charge of conspiracy follows. It is made in the following language:

"The said Benjamin D. Greene, and naming the other alleged co-conspirators, on said 1st day of January, 1897, in the said Eastern division of the Southern district of Georgia, then and there unlawfully, knowingly, and feloniously amongst themselves, and with said divers other persons to the grand jurors aforesaid unknown, did band, conspire, confederate, and agree together as aforesaid, to defraud the United States of said divers large sums of money hereinbefore mentioned, by means of applying said fraudulent scheme in and to the execution and completion of the work under said contracts so made on the 8th day of October, 1896, as aforesaid, and in the obtaining of the money for the fraudulent accounts which should be rendered under said contracts to said Oberlin M. Carter, as such engineer officer as aforesaid, and generally to carry said fraudulent scheme into execution in the obtaining of all contracts of like character which might thereafter be let in said Savannah district by the United States through the said Oberlin M. Carter, as such engineer officer."

In the second count, as an overt act done to carry out the object of the conspiracy, it is charged that the defendants Connolly and Carter knowingly prepared on March 17, 1897, a document with false signatures and false witnesses, giving to the defendant contractors, without competition, a contract for harbor improvements by dredging, and

146 F.—52

that Carter approved this contract and recommended· its acceptance by the Secretary of War.

The third count charges as an additional overt act that the defendants on the 1st day of July, 1897, caused to be presented to Carter as such disbursing officer a certain claim against the United States, which claim is set out in a former count in words and figures. And it is further charged that they knew the claim to be false and fraudulent.

The fourth and fifth counts charge as to other overt acts the issuance by Carter of two certain checks as disbursing officer. These are described in the respective counts, and these it is charged were issued for claims presented by the defendants which he and they knew to be fraudulent.

In the sixth count is charged the conspiracy alleged to have been formed on or about January 1, 1897, and is in legal effect the same as the third count in indictment 371, which has been heretofore explained; but it sets forth the conspiracy there charged without reciting the antecedent scheme or combination, as had been done in the first count of that indictment, and in this also.

. The seventh count charges an overt act to carry out the object of the conspiracy, the presentation of the claim for $345,000 for labor, material, and supplies, heretofore described. And the eighth count charges another overt act, namely, the issuance by Carter, as engineer officer in charge of the Savannah district, of a certain check in payment of said claim which he then and there knew to be fraudulent. The check is set forth in this count of the indictment, and is the same check for $345,000 which has been heretofore read.

The last two counts, namely, ninth and tenth, of this indictment, have been stricken on demurrer. This was the first indictment found. It was clearly not obnoxious to the statute of limitations for the crimes alleged, and therefore contains no charge that the accused now on trial were fugitives from justice.

The. grand jury has also indicted the persons accused for the crime of embezzlement. Generally it may be said that this is a charge of crime based upon substantially the same facts and circumstances upon which the government relies to sustain the indictments already explained. Embezzlement may be defined as a fraudulent appropriation of another's property by a person to whom it has been intrusted, or into whose hands it has lawfully come. The offense is of statutory origin, and the particular statute of the jurisdiction in which it is charged must be considered in order to determine the constituent elements of the offense there defined. This is in section 5497 of the Revised Statutes [U. S. Comp. St. 1901, p. 3707]. Omitting irrelevant language, it will read:

"Every * * * person not an authorized depository of public moneys, who knowingly receives from any disbursing officer * * * or other agent of the United States any public money * * * otherwise than in payment of a debt against the United States, or who uses, transfers, converts, appropriates or applies any portion of the public money for any purpose not prescribed by law * * * is guilty of an act of embezzlement of the public money so * * * used, converted, appropriated or applied, and shall ·be punished," etc.

The indictment framed pursuant to this statute is No. 476. It describes the official character of Carter, his trust for the improvement of rivers and harbors in the Savannah district, his powers, duties, and discretion, particularly that of approving or rejecting claims and accounts, his discretion as a disbursing officer and agent of the United States for the payment of such claims from funds intrusted to him. It is then charged, by virtue of his office, and whilst he was so employed, that he had possession of the sum of $575,740, in lawful money, the property of his employer—the United States. It is further charged that the other defendants, Greene, the three Gaynors named, and Connolly, not being authorized depositaries of the United States, received from Carter this sum, well knowing that it had been fraudulently paid out by him, and did then and there, with like guilty knowledge, apply this public money to the payment of two fraudulent claims against the United States aggregating that amount. These claims, it is alleged, Greene, the Gaynors, and Connolly caused to be presented in writing to Carter, and that they well knew the claims thus presented upon which the money was paid were fraudulent, and that such payment was an application of the public money of the United States for a purpose not prescribed by law. The indictment sets out a description of the claims and the particulars in which they are alleged to have been fraudulent. A description of the claims and the particulars; that is, a repetition. This description does not vary in any material way from that utilized in the other indictments. The method of the alleged fraudulent payment by Carter is also described. And it is charged that Greene, the Gaynors, and Connolly, so knowingly applying the public money of the United States for a purpose not prescribed by law, did then and there embezzle the same.

The second count of this indictment contains a similar charge of embezzlement. This describes an alleged fraudulent claim relating to the Cumberland Sound work, and the amount alleged to have been embezzled is $345,000.

The third count charges a similar offense. It describes a claim alleged to be fraudulent relating to the Savannah Harbor work. The sum alleged to have been embezzled is $230,749.90.

It will be observed that the fourth count of the indictment makes a general charge of embezzlement against the persons named in the first three counts and against Carter also, and charges him as participating with the others in the felonious embezzlement of the sum of $575,749.90, which is the aggregate of the sums alleged to have been fraudulently claimed on the Cumberland Sound work and on the Savannah Harbor work. It is also alleged to be the parcel of money of which the said Oberlin M. Carter then had the custody, management, and control by virtue of his employment. And they are all charged that they did fraudulently and feloniously apply and dispose of the same to their own use and benefit; said application of said money being not for a purpose prescribed by law.

To each count of said indictment for embezzlement there is appended the following charge:

"And the grand jurors aforesaid, upon their oaths as aforesaid, do further present that after the commission of the said embezzlement, and after the acts done hereinbefore set forth, to accomplish said embezzlement, at a time the exact date of which is to the grand jurors aforesaid unknown, but which was prior to the 1st day of December, A. D. 1899, the said Benjamin D. Greene and John F. Gaynor left the Southern district and state of Georgia, and continuously remained away from said Southern district of Georgia until on or about the 1st day of February, A. D. 1902, when they returned to said Southern district of Georgia, and again on or about the 7th day of March, A. D. 1902, the said Benjamin D. Greene and John F. Gaynor again left the Southern district of Georgia and remained away from said Southern district and state of Georgia until on or about the 9th day of October, A. D. 1905, and that during said period, to wit, from the said time prior to the said 1st day of December, A. D. 1899, and the said 9th day of October, A. D. 1905, the said Benjamin D. Greene and John F. Gaynor were persons fleeing from justice. Contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the said United States."

Such is the analysis of the indictment.

The grand jury having returned into court the indictments thus explained, and the accused having pleaded not guilty, the issues are formed to which for the last three months the jury and the court have given their undivided attention. There are, gentlemen, certain fundamental principles to which at this stage of my effort to assist you I will call your attention. One of these is that ours is a government of laws, and not of men. It follows that the triors of every accusation equivalent in importance to that under consideration, namely the jurors, should clearly understand not only the law, but the reason for the existence of the law, in whose administration their assistance is invoked. Among the chief causes of the formation of our government was the necessity for making rules for the regulation of interstate and foreign commerce. At one period of our history, even after our independence of Great Britain had been established, we had no such rules. Rhode Island might, and did, tax imports from Massachusetts and New York at a greater rate than similar commodities from Great Britain or any other foreign land. South Carolina might establish a custom house to exact imposts on products shipped from Georgia, and Georgia might do the same thing against South Carolina or any or all of the 13 original states. This produced a condition which was seen to be intolerable, and some of the great men who had achieved our liberties set to work to arrange a treaty or agreement of commerce between Maryland and Virginia, and incidentally to control the navigation of the Potomac River and the Chesapeake Bay. Washington, Madison, and other illustrious Americans of that day were promoters of this plan. But when the first conference was held at Alexandria, in Virginia, it was at once perceived that such an understanding was necessary, not only between Maryland and Virginia, but between all of the states which had taken part in the Revolution and had but four years previously established their independence. Further consideration between the statesmen and patriots of that day evolved the great convention of 1787, which framed the Constitution, the foundation law of our government. The convention which framed this Constitution was a body of men of whom the history of time affords no superior. It was composed of 55 members. The grade

of intellectuality was exceedingly high. Many of the states had taken care to send the older patriots. Four had signed the Declaration of Independence 11 years before. Many were brilliant patriots of '76. Eighteen belonged to the Continental Congress. The convention truly represented the wealth, conservatism, and culture of the states. While many of the delegates in this day would be termed aristocrats, they were all devoted to the maintenance of the largest liberty consistent with the public safety, but no more. The convention comprised men familiar with the history of nations, and competent to deduce the lessons of experience from the annals of time: Jurists of profound and solid learning, who well knew how much the noble science of jurisprudence had accomplished in the advancement of liberty and just government; soldiers, whose fortitude in the physical suffering of the battle and camp enabled them to estimate correctly the blessings of peace, which good government alone can insure. At last it was finished, and the illustrious Bancroft declares:

"The members were awe-struck with the result of their counsels. The Constitution was a nobler work than any one of them had believed possible to devise."

Jefferson has proclaimed that "it was the wisest ever presented to man"; and Gladstone, whose marvelous career had begun when your fathers were yet unborn, and who has yet lately departed, one of the noblest instances of enduring intellectuality the world has ever known, has declared:

"As the British Constitution is the most subtle organism which has proceeding from progressive history, so the American Constitution is the most wonderful work ever struck off at a given time by the brain and purpose of men."

The objects of this Constitution, which is but a brief instrument, are adequately stated in its preamble:

"We, the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general welfare, and secure the Blessings of Liberty to Ourselves and our Posterity, do ordain and establish this Constitution for the United States of America."

Such were the purposes of the law which organized the great Republic. This Constitution created a national Legislature. It comprehends, as you know, a Congress composed of the Senate and House of Representatives. This is the lawmaking body. The Constitution granted certain powers to Congress. Four of these and the laws, made in pursuance thereof, may be easily discoverable among the foundation stones on which the indictments before you must rest:

First: "The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."

Second: Congress shall have Power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

Third: Congress shall have Power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and

all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

Fourth: "No money shall be drawn from the Treasury but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all Public Money shall be published from time to time."

Under the laws made pursuant to the grant of the taxing power, the funds which the proof before you shows were intrusted to the disbursing officer of the government, and were subsequently expended, were collected from the people. Under the power of Congress relating to the expenditure of this money, acts of appropriation were made by Congress before a dollar of it was available for river and harbor improvements on the coast and on the interior waterways of Georgia. These appropriations were made under and in obedience to the principle of the preamble to promote the general welfare, and under the express grant of Congress to regulate interstate and foreign commerce. The object of this grant has for many years been held to include the promotion of interstate and foreign commerce, and, since much of this was conducted by maritime and waterway navigation, it has been as steadily held by our government that Congress had and has the power to make appropriations for the improvement of our harbors, of the approaches thereto, and of our navigable streams.

Commerce, said the Supreme Court, includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than that in which they lie. Again, in a famous case between South Carolina and Georgia involving the improvement of the Savannah river, the Supreme Court declared that the right to regulate commerce includes the right to regulate navigation and hence to regulate and improve navigable rivers and ports on such rivers, and the same doctrine was emphasized in the case of Carter when it was carried to the Supreme Court of the United States.

A further brief consideration of the philosophy of our organic law will show you the reason for the laws with the violation of which the accused stand indicted. There is no syllable in the Constitution which expressly declares that conspiracy to defraud the government or embezzlement of government funds is criminal. There is, however, the grant of power to Congress "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all others powers vested by this Constitution in the government of the United States, or in any department or officer thereof." Now, when Congress was given power to collect the money of the people, it followed ex necessitate that it must have the power to pass laws for its protection. When it was required that Congress should not spend money of the people except for the purpose for which it was appropriated, it became necessary to pass laws to guard the money which had thus been appropriated. When Congress was given the power to regulate interstate and foreign commerce, it was given the power to enact the laws to make that regulation of such character as would

promote interstate and foreign commerce, and would be contributory to the welfare of the people. And so these laws under which these indictments are framed were enacted by the representatives of the people of the states in Congress assembled.

Pardon me, if in passing I call your attention to another principle of that great instrument of organic law. It provides:

"This Constitution and the Laws of the United States which shall be made in pursuance thereof: and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the Contrary notwithstanding."

Not only is this to be found in the Constitution of the United States, but this provision is expressly reiterated in our own Constitution, and is expressly enacted in the first section of the Code of Georgia, that famous codification which is the pride of our jurists and the people of this state.

It follows, then, that this case in contemplation of the indictments involves, to an extent, the basic principles of our government; the safety of the money collected from the people for governmental purposes; the fidelity and integrity with which the Constitution and the laws design that it shall be appropriated for the purpose for which it was voted. In this case, this was an improvement, for the people of our state, the people of other states, and foreign lands dealing with us, of the facilities and instrumentalities of commerce found in those harbors, estuaries, and rivers with which the God of nature has so richly endowed our shore line, and on whose bosoms the commerce of this people may be borne from the farms where it is they are produced to producers and customers in other states and in foreign lands. It is, then, gentlemen, no ordinary case. It should command the liveliest attention of the conscientious, patriotic, and intelligent citizens who are selected from among their fellows and at whatever hardship to themselves, consecrated by law for its fearless, impartial, and righteous determination. Nor should you forget that it involves other basic principles of government. These are clearly outlined by the Bill of Rights in the Constitution. This provides that:

"No person shall be held to answer for a capital, or other infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger."

It also provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and District wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

In the practical application of that sovereign rule which secures to the accused an impartial trial, there are other settled principles of the law to which your attention must be called. One of these is that the burden of proof is upon the prosecution. This imports

that the government is always under the obligation of proving every fact necessary to substantiate the accusation which, through its time-honored instrumentality, the grand jury, it has preferred against the person accused. This rule is but another illustration of the humanity of American law. It is familiar to all who have taken part in the trial of criminal cases. A proposition equally familiar is the logical sequence to that just stated. It is that the accused is presumed to be innocent until by the submission of proof the jury is satisfied that he is guilty as charged. How simple and yet how sovereign are these safeguards of liberty. But the law is not framed exclusively for the protection of the accused. It has regard, also, to the interest of society as well. It follows that while the burden of proof is on the prosecution, and while the accused is presumed to be innocent, yet when the weight of evidence, considered as a whole, satisfies the jury beyond a reasonable doubt that the charge is true, the presumption of innocence is destroyed, and, in those fortunate communities where the laws are observed, a conviction is at once the logical and legal result.

It is important that you should clearly understand the term "reasonable doubt." It does not import a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. A reasonable doubt is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in such a condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. By "reasonable doubt" is not meant a strained or whimsical conjecture, but an actual, sincere, mental hesitation caused either by insufficient evidence or by unsatisfactory evidence.

The term "evidence" includes not only that offered on the part of the government, but that also offered for the defense. If, then, including the testimony of the accused, who in these courts is permitted to give evidence under oath, upon consideration of all the proof, there is a reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. There can be, however, no reasonable doubt of a fact or conclusion, if it has been clearly established by satisfactory proof. In this case the evidence has been both direct and circumstantial. "Direct" evidence is that which immediately points to the question at issue. It is positive in its character. It often depends upon the credibility and intelligence of the witnesses who testify to a knowledge of the facts. It may also be documentary in character. "Indirect" or "circumstantial" evidence is that which tends to establish the issue only by proof of facts sustaining by their consistency the hypothesis claimed, and from which the jury may infer the fact. "Direct" and "circumstantial" evidence differ merely in their logical relations to the fact in issue. Evidence as to the existence of the fact is "direct." "Circumstantial" evidence is composed of facts which raise a logical inference as to the existence of the fact in issue. A conviction may well be had upon circumstantial evidence; but, to warrant a conviction on evidence of this character,

the proven facts must not only be consistent with the hypothesis of guilt, but must do this so clearly and satisfactorily as to exclude every other reasonable hypothesis save that of guilt.

While the basic principles defining the rights of the accused, and the obligations of the government in criminal cases, are the same in the state as in the United States courts, there is an important difference in the relations of the court and the jury, in the degree of assistance which may be rendered the jury by the court, to which I must call your attention.

The Supreme Court of the United States has declared:

"In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to a jury [that is, the judge of the United States courts] may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts."

In another case the rule is more elaborately stated. Referring to the relations of the court and jury in these courts, while declaring that what is said by the court as to the facts is only advisory, and in no wise intended to fetter the exercise finally of the juror's own independent judgment, the Supreme Court observed:

"Within these limitations, it is the right and duty of the court to aid them by recalling the testimony to their recollection; by collating its details; by suggesting grounds of preference, where there is contradiction; by directing their attention to the most important facts; by elucidating the true points of inquiry; by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts and their combined effect, stripped of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important resting upon those who preside at jury trials."

Some practitioners seem to think with the eccentric Horne Tooke, who told Lord Mansfield, before whom he was being tried, that his Lordship's only business was to help the tipstaves keep order while the jury tried the case. Some of the states, but not all, deny to the judges the right to assist the jury in finding the facts; but this practice the Supreme Court of the United States has expressly held has no place in the practice of the United States courts. And said that eminent lawwriter, the late Seymour D. Thompson, in his work on "Charging the Jury":

"Such a system is scarcely more wise than it would be to select a lawyer, a doctor, a clergyman, a farmer, a merchant, a shoemaker, a blacksmith, a saloonkeeper, a street-car driver, a capitalist, and a barber, constitute them a ship crew, and start them out on a voyage in company with an experienced navigator, who is permitted to give them general instructions on the theory of navigation, but who is prohibited from giving them any positive order how to navigate the ship, and from correcting any blunders they may make in navigating it."

It must be, however, borne in mind that all the court may feel at liberty to say is said merely to assist, and not to control, you. Yours, under our system, is the absolute right to find the facts for yourselves. The truth has been anchored in our jurisprudence for centuries that

12 good men in the jury box are, of all others, the best attainable triors of facts. You must therefore recall the facts for yourselves, and my summation is merely advisory, to aid you as far as I can. This case has lasted three months. There are multitudes of exhibits, and more that 12,000 pages of evidence, I believe. The effort of the court, in the limits above stated, to present the salient and what seems the more material facts, may be, in such a case as this, as it is intended to be serviceable to you in reaching the just and righteous conclusion which the law and your duty require; but the duty of finding the facts is exclusively your own.

It is appropriate here to state a settled rule of evidence that previous intimacy between persons charged with conspiracy is competent and important proof on the trial. "It is usual," said an eminent writer on the criminal law, "to begin by showing that the defendants all knew each other, and that a certain degree of intimacy existed between them, so as to show that their conspiring together is not improbable; and if to this can be added evidence of any consultations or private meetings between them, there is, then, a strong foundation for the evidence to be subsequently given, namely, of the overt acts of each of the defendants, in furtherance of the common design." Proof of close intimacy would seem especially important if the duties of the parties respectively were intended to be in opposition, and, should the occasion arise, might forbid such intimacy. As I remember the evidence, it appears that Lieutenant O. M. Carter, corps of engineers, of the United States army, was assigned to duty under Gen. Gillmore, of the same corps, about August 1, 1884. His duties were connected with the river and harbor improvements made and to be made by the government of the United States in what is known as the "Savannah District." The defendants Benjamin D. Greene and John F. Gaynor were engaged in doing river and harbor work in the Savannah district about that time. Subsequently Carter, Greene, and Gaynor became acquainted. Carter, it will be observed, was a trusted officer of the government, a graduate of West Point, and because of proficiency in his studies had been appointed to the corps of engineers. Placed here by the government, for the purpose of guarding its interests, it was his duty to deal at arm's length with the contractors whose work he was ordered to supervise. His commanding officer, Gen. Gillmore, had his headquarters in New York. Carter was in local charge. His salary was fixed by act of Congress, and paid from the public treasury. It was at this time $2,208. If he had other means or sources of income at this time, the fact does not appear from the evidence. As early as 1886 evidence is offered to show that a loan of $1,600 was made by Greene, one of the contractors, to Carter, the trusted representative of the government. It amounted to 72 per cent. of the annual salary of this officer. It is true that this loan was afterwards repaid with interest, but whether, as the government contends, intimacy as a matter of fact existed between the engineer officer and the contractors, the jury must determine from this and other proof. The question is not whether any of these suggested projects between Carter and the

contractors, if they existed, were in themselves corrupt or criminal. They are offered merely to show intimacy. It need not be criminal intimacy, but this feature of the proof in cases of conspiracy is met, if the mere fact of intimacy is shown.

Among the number of letters from Carter to John F. Gaynor is one dated November 2, 1885. It contains this expression:

"If you know of any lumbermen who want to buy pine lands in Georgia, I think I can put you into something paying."

While stating that he can get a tract of 60,000 acres of virgin yellow pine on the Altamaha river, and has contingent opportunities to get 104,000 acres more, he adds:

"If you know of any one to whom you can sell, or if you are too busy, and will send me the names of big firms who might want to buy, I will attend to the matter myself. It is not yet cold enough to go to work on our project."

What that project was, the evidence does not disclose. "So I am looking up pine lands and whooping up the convention." It was stated in the opening argument of the district attorney that the convention was to promote large appropriations by Congress for rivers and harbors, and this seems to have been further recognized in the argument on both sides. This was something more than a year after his assignment to duty in this district. At a later period, namely, May 24, 1888, in a letter addressed to "Dear Captain," signed "O. M. C.," and indexed in his letterbook under the name B. D. Greene, it appears that the contemplated ventures were not confined to timber lands. After some information about the cost and consumption of gas manufactured by certain companies, we read as follows:

"Be careful about the air jack and not let any inventor steal our ideas and leave us out. * * * I think we can essay to give him (Minis) one-fourth, and you, John and I to take one-fourth each, if it comes to anything. Keep a record of the expense, and we will share that, anyway, but above all things don't let some one steal our thunder, as I believe there is something in it. * * * I have just been offered a chance in a marble quarry which looks well. * * * Do you know where is the best place to have it tested and its marketable value obtained? * * * If it amounts to anything, of course I want you to go in with me, but say nothing to John, as this is another matter. I hear nothing further about the railroad."

If by "John" the defendant John F. Gaynor was meant, it was apparently contemplated, it would seem, to let him into a share of the profits on the air jack, but to exclude him from the quarry.

Another letter, dated June 11, 1888, from Carter, indexed as before, "Dear Captain," is asked:

"What could you afford to pay for rock delivered to you on the cars at Savannah or at Brunswick (to be used at Fernandina)? I expect to go to some quarries on the line of the S., F. & W. in about ten days, and they say they will put rock in at Savannah and Brunswick at whatever rates I say. Of course, I haven't seen the quarries yet, but if the rock is good, it will be worth looking into."

In a letter of August 23d, in the same year, 1888, addressed "My Dear Captain," signed "O. M. C.," not indexed, after saying, "I had a long talk with Gordon yesterday about the timber question," that prices had more than doubled within the last two years, he writes:

"I saw Huestead about the marble, and he says that he learns that a very badly shattered specimen was shipped to New York. Don't fail to see Clay," he writes, "the next time you go to town, as Minis is very anxious, and I think more than ever there is something in it." He adds: "I have had Oconee and Ocmulgee transferred to me. Craighill is in California." The Oconee and Ocmulgee are Georgia rivers upon which improvements were contemplated, and Craighill was Carter's commanding officer, who, it afterwards appears, was under duty to visit and inspect the work in his local charge.

Again, on September 1, 1888, the letter books disclose a communication to "Dear Captain," from "O. M. C.," relative to a lease of quarry lands at Rome. "I have many things to talk to you about," is written. "I have also my eye on some coal lands near Birmingham."

Again, on September 23, 1888, from the same to the same, it is stated:

> "There may be some delay in getting out specifications for works, as everything goes to Craighill, and he is away a great part of the time. Will send as soon as they are out. A paving company has just been organized here that I can get 50 shares in. I have nothing to invest just now, as my money is tied up at home, but I thought you and John might like to take $1,250 or $2,500 worth of stock. Let me know if you wish to venture in it. By the way, I think I can get the Central Railroad to agree to deliver from 500 to 1,000 tons of granite at their wharves daily at from $1.50 to $1.70 per ton. I sincerely hope the Chili scheme is not a paper one only. It looks too bright to last."

The jury may consider this as throwing light on the question whether or not Carter was interested in the Chili scheme.

From the same to the same, November 22, 1888, this again treats of the pnuematic jack, also scheme for tying cotton, a visit from a Mr. Clay, and states:

> "I told him that I wished you, Gaynor, Minis with me in the jack, but only you, Gaynor, himself and myself in the cotton tying business. Whatever you do, I shall be satisfied with, but my suggestion is that you, Gaynor, Minis, Clay and I shall each have a one-fifth interest in the jack [in the other you, Gaynor, Clay and I have one-fourth]. I think we have a thing which is worth millions, the best thing since the air brake. Whatever the Chili business comes to, this appears to be certain."

Again, you may consider if the Chilian project was in part Carter's or was it true, as Greene testified, that Carter had nothing to do with it?

> "Minis just this moment came in. He thinks he ought to have one-fourth, and that you and Gaynor ought not to want as much as he. But I explained Gaynor's value in labor troubles, and so forth, and he acquiesced in my opinion."

From the same to the same, May 26, 1889, the ventures multip : 

> "Yours of 24th received. I saw Shepard and gave him the specimens collected. From his partial tests he was very enthusiastic, saying I had the most valuable thing in the country, that it would make all connected with it rich, that he wanted to go in, and so forth. * * * I saw Gordon yesterday and told him I wished the same parties as before, namely, you, John, Comer, himself and myself in it. He objected, said he wished to share equally with me, but did not wish to admit others, and so forth; said this

was a new deal, and so forth. It was much as I had anticipated, but, of course, John and I go in on my share, which may amount to something. * * * Shall you be here within a week? If not, can you manage to let me have $2,000, if I should need it? I don't want to be frozen out of a good thing. Gaynor is not here, and I have not seen him in some days."

In a letter from Carter to Gen. Dunne, April 10, 1888, reference is made to Gen. Gillmore's death, and the writer states that he has had local charge of Savannah Harbor, Cumberland Sound, Brunswick Harbor, Altamaha and Savannah rivers, and Fts. Clinch, Oglethorpe, and Pulaski, and:

"I should be very glad if I could be retained here and put in charge of them. * * * I should be very glad to have the command as indicated."

There is other evidence upon which the government relies to show intimacy between Carter, Greene, and, apparently, Gaynor also. It appears from the evidence that a Mr. Curtis, now dead, who was an inspector on the works under Carter, reported that Greene and Gaynor had attempted to bribe him. As representing the government, it was obviously the duty of Carter to investigate, and report upon, this charge. On the contrary, it appears that on June 6, 1889, he wired Greene in New York as follows:

"General Alexander desires me to ask you to telegraph the Morning News at once, the following statement over your signature: 'The affidavit of Mr. Curtis, so far as it alleges an attempt upon my part to bribe him, and so far as it relates to statements said to have been made by me, reflecting in any manner whatever upon Lieutenant Carter, is false in every particular. An affidavit to this effect will follow in due time.'"

It will be observed that this embodies the telegram which Carter states that Gen. Alexander desired Greene to send to the Morning News. What Greene did in response to this telegraphic appeal does not fully appear, except from his testimony. This is followed by another telegram from Carter to Greene, dated the same day, giving the affidavit of Curtis to which the first telegram related. The affidavit of Curtis is set out as follows:

"In February, B. D. Greene renewed the above proposition of Gaynor, stating that he would add to my salary $500 per month, and would get Lieutenant Carter to increase said salary. He said it was in his power to secure my appointment, and that he had also the power to have Lieutenant Carter remove any obnoxious inspector, instancing Inspector G. W. Brown, who was removed to Fernandina in 1886, and stating that Brown's successor was worth to him $60 per day."

This is followed by a letter from Carter to Greene of the same date, which reads as follows:

"Dear Greene: It is absolutely necessary that you send affidavit as I requested. * * * Do not fail to insert in the affidavit each and every statement that I have made. * * * John's affidavit, so far as it relates to him, will be ready."

In this is inclosed a copy of the proposed affidavit.

From this correspondence, as far as stated, the jury may be able to determine the character of the relations which existed between the engineer officer in charge of the government's interests, and the contractors engaged in government work, to be paid for by the check

of this officer from moneys appropriated by Congress. If Curtis charged a contractor with an attempt to bribe an inspector, it was the engineer's business to investigate, to press the inquiry, and ascertain the truth. If, to the contrary, he is found conducting the defense, it is material for the jury, as illustrating the relations of the parties. Carter states that Gaynor's affidavit "will be ready." Now, this evidence is not offered to show that Curtis' charges were true, nor that Greene had made a corrupt agreement with him. The truth of Curtis' charge is aside from the question of the relevancy of this evidence. The material fact is that Curtis made a charge against the contractor, and the engineer officer at once proceeded to prepare the contractor's defense. And all of this is offered merely to show strong and close intimacy between Carter and the contractor.

It appears that many ventures were contemplated or suggested, in yellow pine, in the air jack, in marble quarries, in rock quarries, in coal lands near Birmingham, in a paving company in Savannah, in a scheme for tying cotton, in some discovery, the nature of which the letters do not disclose, but "the most valuable thing in the country which would make all connected rich." A contingent application for another loan of $2,000 is made. Carter informs Greene that the general in command, or division engineer, is in California; that he will let him have specifications as soon as possible, and on Gen. Gillmore's death makes application to be retained in local charge in this district. More than one reference was made to the Chili scheme. This you may deem to be sufficiently developed in a letter from Greene to Carter, October 25, 1888. Carter's letters to Greene, have been addressed, as you perceive, "Dear Captain"; Greene's letter to him is addressed "Dear Carter," and the letter is as follows:

"John goes to Chili on Thursday. * * * About six months from now $6,000,000 harbor work is coming up in Chili, and all have assurance of our ability to get it. * * * John goes down on the ship with the general manager of the syndicate, so you see our show seems good. * * * Now, I want to do up Charleston, Savannah and Fernandina, by July 1st, next, so that we can go down by that time, if not before. * * * This, I think, is the chance of our lives. Now, let that dredging, so John and I can sell out our stock, and hurry up the two works all you can, so that we can get going by New Year's. This is important. This Chili business is business, and I think within ninety days we shall be into that tunnel. What do you think of this? Of course, the scheme I outlined when I first wrote you about Chili a month or more ago will be carried out, and a year hence will find us both struggling with the Spanish lingo."

This is signed "B. D. G." Greene testifies that Carter had nothing to do with this matter. In view of this statement, and on the evidence of these letters, the jury will find the fact as it exists.

In this epistolary correspondence, Mr. John F. Gaynor for the first time appears. It is April 28, 1889. His letter is written, not to Carter, but to Greene. "Friend Greene," he writes "I saw General Fields today. He goes to Chili Wednesday. He says the President of Chili cabled him to be there by the first of June, and so forth. He says that the arrangements he made with us in regard to the harbor work he stands by and it is a go."

The correspondents seem next to be engaged in projects nearer home. On January 22, 1891, B. D. Greene writes to Carter in New York as follows:

"He [Mr. Richardson] says he knows they are going to build soon. * * * Would it not be well for Mr. W. to write a line to C. V. and ask him about it, saying that he had a group of friends who wished to make a proposal when the time came?"

He adds in a postscript:

"I shall be back here on February 20, and we can see if anything can then be done about the Utica business."

"Mr. W.," we are informed, is Mr. Westcott; "C. V.," Cornelius Vanderbilt. Who composed the "group of friends" may be a matter of legitimate inference by the jury.

Two months later, March 27, 1891, Carter himself writes to E. V. Rossiter, Grand Central Depot, New York, refers to contract for Herkimer-Poland Extension, and remarks: "I regret exceedingly that I had no opportunity to submit a proposition for that work." Subsequently he wrote a letter to Dr. F. S. Webb, president Wagner Palace Car Company, refers to extension of Adirondack Railroad to Tupper Lake, and states:

"My associates and myself are in a position to begin work at once; to take a contract for any amount of work and carry the same forward to your entire satisfaction."

Who were his "associates" the jury will determine.

To Walter Katter, chief engineer of the New York Central & Hudson River Railroad, he writes asking to be informed when certain proposed Buffalo work would come up. To C. P. Bassett, Newark, March 30, 1891, he writes asking when proposals in connection with work in connection with water supply, sewerage, and drainage of Orange would be opened. To A. M. Newton, New York, he writes:

"I gave a letter to Captain Greene for you which explains itself. I have written Doctor Seward that you would come to Orange," and so forth.

In connection with all this correspondence to which Carter and Greene were parties, the stock certificate book of the Empire Construction Company was put in evidence. It was found in Carter's file case, among his papers, and was preserved by government authorities in box marked "B 31." It shows certificates of stock issued to John F. Gaynor and Edward H. Gaynor. The name "B. D. Greene, President," is signed to some of the certificates. In the back is a certificate certifying that ———— is the owner of 1980 shares of the capital stock of the company. The certificate is signed by B. D. Greene. The first certificate was issued to B. D. Greene for 1980 shares. Across this is written: "Canceled. B. D. Greene, President." Since it is true, as a matter of law, that a transfer in blank by the president of a company made this stock available for the benefit of its possessor, the jury will determine whether or not this transfer, taken in connection with the fact that the stock was found in Carter's file case, is sufficient evidence that he had an interest in it. It otherwise appears from the evidence that this Empire Construction Company subsequently obtained the contract for sewerage, etc., at Orange.

All of this may be considered by the jury, whose duty it is to determine whether it discloses a state of intimacy in projects, particularly of a financial character, between Carter and Greene and Gaynor. These incidents are not offered singly and alone to show that the charges are true, but, as is usually necessary in cases of this character, to show the one ground of the charge, namely, close intimacy and association.

The jury will bear in mind that the ventures suggested involve the air jack, marble quarries, stone quarries, the cotton tying scheme, the "most valuable discovery in the country," coal lands—did not apparently involve the business of contracting. And the New York contract follows—or correspondence about the New York contract follows: It should also be noted that after this time the correspondence apparently relates to attempts to secure contracts, and, finally, to contracting itself.

This is the evidence the government offers to establish relations of intimacy between Greene and Gaynor, the contractors, and Carter, the engineer officer, beginning as early as 1885, soon after the latter was assigned to duty in the Savannah district, and continuing to 1891. Upon the subject of intimacy the evidence of the defendants is silent, save the testimony of Greene himself. He testified there was no particular intimacy between himself and Carter, and that he did not see him frequently. To this testimony of the defendant you will give such weight as you think under all the circumstances it deserves. Legitimate inferences to be drawn from the correspondence which I have summarized, and other evidence involved in or relating thereto, are competent for the jury to make. To some extent the relations of the parties are traced to 1891, and in this year the government charges that the scheme to defraud the United States, in which it is alleged the defendants and Carter participated, was formed. This is my recollection of the evidence, but the jury must find the fact for themselves.

As heretofore stated, a close intimacy between Carter and the contractors was not in itself criminal. This is also true with regard to joint ventures or enterprises which they had entered or contemplated. That such ventures, if they existed, were not to be commended under the circumstances, in view of Carter's position, is another and an entirely different matter. The evidence, however, is highly important, if the government has brought to your attention additional evidence tending to show a corrupt agreement between the engineer officer and the contractors, and other evidence tending to show that their relations culminated in the scheme and conspiracy for which they stand indicted. It is therefore not proper for the jury to segregate each element of proof from the others. By this course, it might be true that a number of transactions, apparently insignificant in themselves, but which, taken all together, indicate a consistent criminal purpose, would be regarded as harmless or noncriminal, yet when considered as an entirety they might afford satisfactory proof of participation in fraud to the extent of the conspiracy charged. It is proper, therefore, that you should consider in connection with the

proof of the intimate relations between the parties indicted, if you are satisfied that they were thus intimate, the character of the work in which they were connected, and all the other evidence in the case. In this connection, it will be your duty to consider the various contracts for jetty construction made from 1884 to 1897, to be performed in the Savannah district. At first, as lieutenant and afterwards as captain, Carter was the engineer in charge of the river and harbor improvements in Georgia, and a portion of Flordia, from August 19, 1884, until July 20, 1897. From 1884 to 1888, his commanding officer in charge of the district, Gen. Q. A. Gillmore, had his headquarters in New York. Gen. Gillmore died early in 1888, and after that time Carter was in complete local charge.

On September 1, 1884, John F. Gaynor appears and enters into a contract with Gen. Q. A. Gillmore. Another contract had been made by Gen. Gillmore with Lara & Ross, but with this Gaynor had no connection. In general, it may be said that the contracts mentioned, and all the others offered in evidence, relate to the construction of jetties, spur-dams, and training walls. This was mainly done by the use of what are called "mattresses," "fascines," etc. Also, in general, it may be said that jetties, dams, and similar structures were used for the purpose of controlling the flow of tidal and other streams, so as to restrict the tidal or other current into narrower compass, to thus increase the velocity of the flow to scour and thus deepen and widen the channel, with a view to facilitate commerce on the ocean and interior waterways.

With regard to many of these contracts, there are no charges of fraud, embezzlement, criminal conspiracy, or other unlawful conduct. They are, however, offered for the purpose of showing the prices at which work was let in the Savannah district at different periods, the method of construction, the method of payment, and to portray the general relation of the defendants, particularly those on trial, to the contracts for river and harbor improvements in this district, both before and after the year 1891. They are offered, also, as proof of the scheme alleged to have been concocted in 1891 between the parties indicted. It is insisted by the government that all the contracts in the district let from 1891 to 1896 were pursuant to this scheme, and obtained by the alleged co-conspirators, including the two defendants on trial, or for their benefit. An exception to this was the contract of A. J. Twiggs. A further most important contention is that for the work done under the contracts from 1891 to 1896, except on the contract of Twiggs, disbursing checks amounting in the aggregate to $3,176,908.86, issued and signed by Carter in payment therefor, were divided, primarily, into two parts; one of these was deposited in local banks, and disbursed for payment of the work actually done, and the expenses actually incurred; that the other and much the greater part, which it is contended were the profits, was, as a result of the conspiracy charged, carried to New York, and in one way and another described in the evidence, divided between Carter, the engineer of the government, and the contractors,

146 F.—53

who are the two defendants on trial, B. D. Greene and John F. Gaynor.

The contracts prior to the year 1891, and therefore prior to the date of the scheme alleged, are offered to show, in addition to the purposes above described, the knowledge that Carter, Greene, and Gaynor, as the defendants on trial will for convenience be termed, had of the district, their intimate knowledge of the character of work being done, of the specifications drawn, of the mattresses and other work provided for by the contracts, how the contracts and specifications were fixed so that bidders before the date of the alleged conspiracy would secure the opportunity of fair and competitive bidding. This in connection with proof of subsequent dates is also offered to show that, after the alleged scheme was formed in 1891, there was a marked change in the specifications, and in the manner in which the bids were let, and in which the work was done.

It is not necessary for the court to recount a list of the jetty contracts made in the Savannah district from September 1, 1884, to October 8, 1896. The jury will remember the proof upon which the government relies to satisfy them that the defendants on trial obtained an interest in each and all of these contracts, except those of Lara & Ross and Albert J. Twiggs. The sole contract in which, according to the contention of the government, the defendants on trial had no interest, was that at and near Augusta, which was accorded to A. J. Twiggs. I do not recall any evidence contradictory of this contention. It will be borne in mind that it is not charged in the indictment that there was any corrupt agreement with relation to the contracts controlled by the defendants on trial anterior to 1891. It is proper that I should advise you that the mere fact that the defendants obtained all of these contracts is not in itself criminal. You should, however, in the opinion of the court, construe the almost unbroken success of these contractors, in obtaining control of contracts of such importance, through a period of time so long, in connection with the existence of the intimate relations between the engineer officer and themselves, if such relations have been satisfactorily established.

In the same connection you will consider the proof offered to show the numerous, mutual, and joint ventures into which it is insisted that the contractors and the engineer entered or attempted to enter; the proof that there was a disposition on the part of this engineer officer to eagerly and rapidly acquire money, and possibly fortune. This too, while in itself not reprehensible, yet if manifested in a manner which satisfies you that he depended on the co-operation and assistance of the defendants on trial, and if it also appears that they met his advances and afforded that co-operation, either in the way he suggested or in a more effective way, such evidence as indicating the purposes and motives of the party may become increasingly significant when construed in relation with subsequent proof, if it has been presented; which may be more incriminatory in its character and more distinctly probative of the charges, or either of them, made in the indictment.

Tabular evidence has been afforded you, also, of the size of the contracts let from 1890 to 1896 in the Savannah district, and the period of time in which they were advertised. It was shown that this evidence was compiled from data also submitted to the court and jury and to which reference is made. The table itself is known as Exhibit 161. From this it appears that there are 17 contracts, varying in the amount involved from $10,000 to $3,150,000. It also appears that 10 of the contracts involve less than $50,000 each. Relative to the charge in the indictment of meager and insufficient advertisement, it is proper for the court to direct your attention to a few of the larger contracts.

The contract of November 5, 1890, for improvements in the Savannah Harbor, of which John F. Gaynor was the contractor, involved $235,000. It was advertised in Savannah, in the Morning News, for 21 days; in Charleston, in the News and Courier, 21 days; in the Times-Democrat, New Orleans, 20 days; and in the Engineering News, in the Marine Journal, and in the Scientific American each 16 days.

The contract of October 22, 1892, for jetties, was secured by the Atlantic Contracting Company, for dredging by P. Sanford Ross. The work involved in the aggregate, $3,150,000. In Savannah it was advertised in the Morning News 25 days; in the News and Courier, in the Engineering News, in the Times-Union, 24 days; and in the Seaboard, New York, 23 days.

The contract of October 8, 1896, was for jetties and dredging in Savannah Harbor. The first class of work was secured by the Atlantic Contracting Company; the latter by P. Sanford Ross. The amount involved was $1,005,000.

On the same day a contract was let for Cumberland Sound, which was secured by the Atlantic Contracting Company. It involved $2,350,000. These last two contracts were advertised in Savannah, in the Morning News, for 22 days; in the Florida Citizen, Jacksonville, for the same time; in the Engineering News, New York, 19 days; in the Marine Journal and in the Engineering Record, for 17 days each. It may be said generally of all the contracts, from 1890 to 1896, that the longest period of advertisement was made in the Savannah News for 27 days, and the shortest for 15 days; and the longest in the Engineering News, New York, 23 days, and the shortest, 11 days.

Your attention is called to the act of Congress of August 11, 1888, § 3 (Rev. St. Supp. p. 160), which provides:

"That it shall be the duty of the Secretary of War to apply the money herein or hereafter appropriated for improvements of rivers and harbors, * * * in carrying on the various works by contract or otherwise, as may be most economical and advantageous to the government. Where said works are done by contract, such contract shall be made after sufficient public advertisement for proposals in such manner and form as the Secretary of War shall prescribe."

The regulations made by the Secretary of War, and having, with certain restrictions, the effect of law, have been identified in evidence by Maj. Charles McClure. The United States Army Regulations of 1889 (section 602) provides:

"Officers advertising sales of property or for proposals for labor or supplies, will, as a rule, allow thirty days to intervene between the date of the

first publication of the advertisement and the time of sale or date designated for the opening of proposals: A shorter period may be named if the necessities of the service render it advisable, but no period of less than ten days shall be designated except in cases of emergency."

Section 505, of the regulations of 1895, has a similar provision: "Advertisements in newspapers announcing sales of property or inviting proposals for furnishing labor or supplies will, as a rule, allow thirty days to intervene between the date of the first publication and date of sale or opening of bids," with the same provision for a shorter advertisement in certain cases. And section 520 of the same volume provides: "In case of large purchases, a period of thirty or more days should intervene between the date of the first publication and of opening proposals." And of this law and these regulations Carter is charged with a knowledge; this is as matter of law.

As showing the knowledge of Carter, in fact, as to the length of advertisement proper, a letter from him to Gen. Craighill, chief of engineers, dated November 4, 1896, is offered. This relates to a contract for the construction of a battery by the Venable Contruction Company. It was necessary to have a wharf constructed before the work could proceed under that contract, and Carter writes, "The delays have been so great that an advertisement of thirty days will retard the work and the battery," and asks for authority to call for proposals on ten days' notice. Evidence is also offered to show that while the first appearance of the advertisement, calling for proposals for what is known as the October 8, 1896, contract at Savannah, was on August 17th, the date of the advertisement was June 6th. It otherwise appears that on June 4th Carter forwarded to the chief of engineers the form of advertisement dated as above, with specifications, asking for authority to advertise, etc.; that there was a delay in the matter until about August 15th, but that Carter, because of such delay, did not change the date of the advertisement. On the 15th, Carter, who was in Washington, wired Connolly, his clerk, in Savannah, to advertise all work to be opened September 8th, and that he had specifications. This was followed by another telegram from Carter from New York: "Date all advertisements June 6, but all will be opened September 8th." Col. Tweedale, chief clerk of the War Department, testified that when an advertisement was submitted to the department it was his duty to examine it, strike out superfluous words, etc., but that the question of date of advertisement does not enter into the consideration of the War Department; that being a matter for the engineer officer to fix, in view of the regulations. That it was the duty, also, of that officer to allow sufficient time for advertisement. Col. Marshal, corps of engineers, U. S. A., testified for the defense that he had advertised, he thought, every length of time from 15 to 60 days; that he considered the special case and advertised the length of time he thought would be sufficient for the purpose. Col. J. H. Willard, corps of engineers, U. S. A., testifies that the length of advertisement is determined by the chief of engineers on the recommendation of local engineers; that he had in one case, involving $750,000, advertised 60 days; that he had advertised a dredging contract for 20 days, when $15,000 was

involved, and he was very anxious to get immediate results. Evidence is offered to show that on August 18, 1892, the chief of engineers telegraphed Carter to "request authority to advertise for bids," and that such a letter requesting authority was actually written on August 18th, and form of advertisement inclosed; but that by the direction of Carter both were dated back to August 17th. As the bids were to be opened on September 17th, a date recommended by Carter, it is insisted that this was an effort on the part of Carter to create the impression that there had been 30 days' advertisement. The jury will attach such importance to this evidence, if they deem it sufficiently proven, as they think proper. It appears, from all of this evidence, that it was incumbent on the engineer officer to advertise a sufficient length of time to give all persons interested an opportunity to ascertain the date of the opening of bids, to investigate the character of the work to be let, and to make estimate of the bidder's ability to undertake the contract. If the discretion vested in the engineer officer was exercised in favor of fair and open bidding and wide publicity, as with other engineer officers who have testified, no complaint can be made; but, if he exercised the discretion vested in him with the intent to shut off competition and to aid the defendants in obtaining contracts, then it would be a matter material for the jury to consider with relation to the general intent of the indictments.

A number of engineer officers testified that for the purpose of giving general knowledge, and for informing those likely to bid, they regularly kept in their offices a list of contractors who were in the habit of bidding for government work. To such persons they were in the habit of voluntarily mailing specifications, so soon as the project was determined on. They did not wait for the demand for such specifications. You will inquire if this conduct on the part of many engineer officers was different from that adopted by Carter, and, if you find that such difference existed, you may consider this also in connection with the general charge in the indictment that a part of the alleged scheme between Carter and the defendants on trial was to hold back specifications and make a meager and partial distribution of them, so that other parties would not have an opportunity to compete. It is all a question for the jury.

P. Sanford Ross, Schermerhorn, and others whom you will recall, testified for the defense that they kept informed in various ways of the appropriations made or contemplated by Congress, and kept in touch with proposed contract work. This evidence was to the effect that newspaper advertising was of no great value to such concerns as theirs. This is probably true if such a concern wishes to obtain uninterrupted control of profitable contracts. Advertising in newspapers and scientific publications is, however, the means adopted by the government of reaching possible bidders, and, if the engineer officer corruptly endeavored to limit such method, he is culpable, and if, from all the evidence, the jury is properly satisfied that it was part of the corrupt scheme in the indictment, and involved the defendants on trial, they may give such weight to it as they think proper in determining the truth of the general charges made in the indictment.

It appears that it is the settled practice of the War Department for bids or proposals to be made in triplicate, and a part of each bid or proposal is a copy of the specifications. Prospective bidders, therefore, must have three specifications of the work to bid on. These specifications are printed by the government and furnished to the engineer for distribution; the number of copies desired being requested by the engineer officer. Of the copies furnished, 125 are sent to the chief of engineers for distribution to engineer officers throughout the country.

It is contended by the government that a part of the fraudulent scheme concocted by the defendants was that Carter would keep an accurate list of all applicants for specifications, and that he would in various ways seek to ascertain the names of proposed bidders, and give the knowledge acquired by him to the defendants, and thus enable them the better to put in bids that would be successful, and to discourage and keep off other proposed bidders. In support of this contention, abstracts from the records of the engineer's office have been offered, together with documents from which the data was obtained. These abstracts give in concise form the names of applicants for specification, number sent, dates, reference to data, and so forth. These lists were made up from the names of persons who actually applied for such specifications, and it does not appear from the evidence that, like the other engineer officers who testified in behalf of the defense, Carter kept lists of contractors to whom he would voluntarily send such information.

It appears that for the bidding which ripened into the contract of October 22, 1892, known as the "Big Contract," 250 specifications were requested. Of these 125 were forwarded to the chief of engineers. It appears that there were 21 applicants for specifications, and that to 12 of the applicants Carter sent one copy each. The letters inclosing specifications were copied in Carter's letter-press book, which was in evidence, and it appears that it was the custom of Carter to inform applicants that, if they intended to bid, two other specifications would be sent, and he usually added: "If you do not intend, to bid, please return the inclosed specification." It does not appear from the evidence either of the engineer officers who testified for the government, or those who testified for the accused, that any of them required the specifications forwarded to an applicant to be returned to the engineer officer in case the applicant did not intend to bid. To 10 of the applicants for the same specifications, Carter sent one full set each. So, as to the Cumberland Sound 1892 contract, there were 10 applicants for specifications. To 9 he sent only one copy each. In the case of the Cumberland Sound 1894 contract, Carter received 13 applications, and to 9 he sent only one copy each. There were 34 applicants for specifications for the work under the October 8, 1896, contract, for Savannah Harbor, and, of these, to 21 were forwarded full sets. This is largely a matter of record. The Court states it; the jury must find the facts for themselves. And, of the 34 applicants for specifications for work under the Cumberland Sound 1896 contract, 19 were sent only one copy each.

Numerous letters were offered relative to applications for specifications. In some of them the applicants state that, owing to shortness of time, bids could not be submitted. Col. Marshall and Col. Quinn, for the defense, both testified that it had been their practice to send one copy of the specifications to applicants, unless they had reason to think the applicants contemplated bidding. It was also testified by some of the witnesses that sometimes applications were made for specifications by contractors or others who wished to furnish some part of the material needed by the successful bidder, and that in such cases one copy was sufficient. It cannot be claimed that this practice of keeping a record of the applications, or the meager and grudging distribution of them, if this existed, is in itself criminal. The queston is: Did Carter make use of this method as an instrumentality of a corrupt scheme to secure all the contracts for the defendants on trial? The jury will remember the testimony of Twiggs, a prospective bidder, but who, for a consideration of $500 and a promise to be allowed to furnish certain stone, had turned over the bid prepared by him to John F. Gaynor. If I recall the testimony correctly, Twiggs was in Savannah at the time of which he spoke. He says he asked Gaynor if he was not afraid of some other bid, and told him of one he heard was coming from Augusta; that Gaynor then wrote a note, rang for a boy, and sent the note to some one, and in a very short time he got a reply, which he tore up, and then remarked to Twiggs: "No, there will be no other bids to interfere with it." Whether this information was obtained from Carter is a matter for the jury to determine under all the circumstances.

The testimony of Agnew is that he visited Carter's office, and was told by Connolly, Carter's stenographer and clerk, who was also indicted, but is not on trial, that specifications could only be obtained from Carter in person.

Frank A. D. Hancock testified that he applied for specifications, and Carter inquired if he was a representative, saying he did not give specifications to representatives. McAlpin & Schley, having obtained a full set of specifications, Carter on September 7th, a day before the opening of bids, wrote to them asking them to return the specifications if they did not desire to bid. W. H. Venable testified that he expected to bid, but did not wish to be known in the matter. That he had a Mr. W. W. Osborne, an attorney, make application to Carter for specifications, and that he failed to get them. The following letter is in evidence:

"Law Offices, Barrow & Osborne,          Savannah, September 4, 1896.

"Capt. O. M. Carter Savannah, Ga.—Dear Sir: We have a client who asks us to get from you immediately copies of specifications for the jetty work for Savannah Harbor and Cumberland Harbor. We would like these specifications at once.

"Very truly yours,          Barrow & Osborne."

The reply of Carter is:

"Replying to your inquiry of the 4th instant, please send to me the name and address of the parties desiring specifications."

Another letter from Barrow & Osborne gives the name of the applicant as R. A. Johnson, Augusta, Ga. A letter is also introduced

from Carter to this supposititious Johnson, who we may presume was the alter ego of Venable, inclosing one copy, stating that, if he desired to bid, two more copies would be sent.

There is also evidence which is offered to show that Carter and the defendants on trial used other methods of shutting off competition.

Hancock, to whom reference has been previously made, testified that he, with McAlpin & Schley, contemplated bidding for work known as contracts of October 8, 1896; that he called on Carter for specifications and had a conversation with him in his private office. Carter asked if he realized the character of the work. Said that it would require a very expensive outlay. The engineer informed Hancock, according to his statement, that a railroad and trestling would have to be built to the site of the work at Cumberland; that the plant to conduct the work would cost $400,000; and that there would be no money available for about 12 months, and, to use the language of the witness: "I had better be very careful or my friends might be in trouble."

In reply to his application for specifications, Carter said it was necessary in their system to make some record of the distribution of specifications, as they were limited in the number of them, but that he would mail them.

Agnew also testified that after several efforts he obtained specifications; that these were used by Ross & Co.; that the latter's bid was sent to him to put in; that on the morning of opening the bids Ed. Gaynor urged him not to put in bids, and finally offered him $500 not to do so. He further testified that John F. Gaynor urged him to accept the offer, and, I quote his language: "Ed. Gaynor said to me that, if I put in a bid, it would cause them to lose a great deal of money." He further testified that, about 10 minutes before 12 on the day of opening bids, "Ed. Gaynor came in and picked up an envelope off Capt. Carter's desk and substituted another for it." The bidders were read out by Carter. They were Ross & Co., Rittenhouse & Moore, and Anson M. Bangs. The latter was the successful bidder.

According to the testimony of Mr. Gleason, the signature of Anson M. Bangs to the proposal for this contract was in the handwriting of Connolly, the stenographer and clerk of Carter; that most of the writing in the body of the proposal was in the handwriting of Connolly; that the signature "W. T. Gaynor," was in the handwriting of Connolly. This testimony as to these signatures, and that they were in Connolly's handwriting, was not disputed or denied in any manner. It is important to bear in mind, also, that the evidence is that, under the contract thus secured, nominally at least by Bangs, the cost of brush mattresses was reduced to 57 cents per square yard. The contract price in the previous contract was $1.05, and in the succeeding contract, 1896, $1.10 per square yard. It otherwise appears in the testimony that, while in the name of Bangs, the defendants on trial were concerned in it. The jury may then justifiably inquire if they were not permitted to underbid not only other bidders, but their own previous bid, in order to control the contracts. And, if they could afford to reduce their bid nearly one-half to prevent competition, the

jury may inquire if the government would not have made great saving if competition generally had been permitted.

W. H. Venable, whose depositions were read, testified that he contemplated bidding for work under the 1896 contract; that he called on Capt. Carter and obtained specifications; that Capt. Carter explained the intricacies and difficulties of the work at Savannah and Cumberland; that there was no appropriation available; that the work had to be executed, whether money was forthcoming or not; that the work had to go along in the way set forth in the specifications; that the equipment would cost $400,000; that a tramway had to be built. As Venable was leaving Carter's office, he met Edward H. Gaynor, and told Gaynor that he expected to bid, but if he could sell stone he preferred not to bid. He then had a meeting with Greene and John F. Gaynor at the hotel. He testified that he made a contract with the Atlantic Contracting Company, by John F. Gaynor, president, under which he was to furnish stone to it as contractor. According to this testimony of Venable, John Gaynor then asked him for his bid, which had been prepared; "he wanted to take up those as he had with the others." The further testimony is that Greene told Venable just after the contract was awarded that he had "prepared a bid of $200,000 less than the one he put in, and had it in his pocket"; that he intended to put that bid in in case "anyone else there, any bidders unknown, had put in a bid." If this is true, the effect upon the Treasury can be well appreciated.

It is true that the defense called a number of witnesses like P. Sanford Ross, and Schermerhorn, and others, men who had large experience, who protested that there had been no collusion and no difficulty in obtaining adequate information about contracts and specifications. Capt. Greene also denied any collusion on his part, or on the part of Gaynor, or any attempt to suppress competition. Upon all the evidence submitted for the defense upon this, as upon every other point, you should bestow your careful consideration, and bear in mind always that the burden of proof is on the government, and, under the rules previously explained, the jury must find the facts and make their conclusions accordingly.

We take another step forward. This case comprehends incidents running through nearly a quarter of a century, and the jury must bear with the court in its attempt to help them, but not to control them. We must listen to and consider with patience and fortitude what are the duties of the engineer officer as shown by the proof.

Maj. Cassius E. Gillette succeeded Carter as engineer officer in the Savannah district. He was sworn as a witness for the government. His testimony is in part devoted to a description of the powers, duties, and discretion of an engineer officer in charge of a district to which he is assigned for the work of improving the rivers and harbors. From this testimony, and the testimony of Sterly, and Cooper, of Conant, of Bacon, and of other engineer officers who have been sworn, and also from the law and regulations of the War Department, which have the effect of law, it appears that it is the duty of an engineer officer to propose projects for improvement. This he does in his discretion, but

the project requires the approval of his superior officers. It remains, however, for Congress to make appropriations for the performance or execution of the work proposed. Usually a part only of the amount appropriated is immediately available. It then becomes the duty of the engineer officer to submit a project of expenditure of the funds available, to point out the order of construction, and to recommend whether the work by the government is to be done by contract or with hired labor. Here also, subject to the supervision of his superior officers, he has full power and discretion. As the representative of the United States, he controls the money placed to his credit for the payment of contractors. It is his duty to sign disbursing checks for work done or material furnished. Subject also to the approval of his superior officers, he prepares specifications for proposed work, and has power, duty, and discretion in drafting them. This extends to the language used, to the various details, and his also is the duty and discretion to recommend their acceptance. He thus originates the specifications. It is also his duty to draft and suggest forms of advertisements by which notice is given to bidders; to recommend the newspapers in which they should be inserted, and the length of time the advertisements should run. He designates the time in which the successful bidder will be required to finish the work. It is his duty to see to it that information is given to the public in regard to the proposed works and contracts. He receives proposals for contracts and recommends their acceptance or rejection. He also appoves or rejects bonds tendered by contractors. His most important duty, perhaps, is the superintendence of the work done by contractors, and he is fully responsible therefor. It is his duty to accept it or reject it, accordingly as it is in compliance with the contract and specifications, or otherwise. If the interest of the United States demands it, he has the duty to suggest supplemental contracts and make recommendations concerning them, but these are not effective until they are finally acted upon by the Secretary of War. He has also full power to approve or reject the accounts rendered to him by the contractors for work claimed to be done, accordingly as such accounts are fair and honest, or false and fraudulent; and he is entirely responsible for the payment of money placed to his credit. In the absence of orders from ranking officers to the contrary, he is primarily responsible for all that is done. He is on the ground. He is the active representative of the government. From him the War Department receives the information upon which it acts or asks Congress to act. He must guard and protect the interests of the United States and see to it that the money appropriated by Congress for the improvement of rivers and harbors of his district are honestly and properly expended for this purpose. To this end, it is his clear duty to endeavor to secure competition for bids for work to be done, and after the contract is secured to require the work to be done in accordance with the specifications, and, when it is completed, it is also his duty to accept it or reject it, accordingly as it is in compliance with the specifications or otherwise.

There is little, if any, dispute about these obligations and duties

of the engineer officer to the government which has educated and commissioned him, which affords him ample maintenance and thus secures him in the enjoyment of social and official distinction commensurate with the dignity and importance of his trust. It is contended by the government, as we have seen, that so far from fulfilling these duties, the engineer officer subordinated the discretions and powers of his trust to the interests of the contractors, and the mutual greed of the contractors on trial and himself, with the result that large sums which were appropriated for the welfare of the people were diverted to the personal and joint gain of the contractors and himself. In support of this contention, the contracts have been offered and admitted in evidence. They include contracts made by Gen. Gillmore, the predecessor of Carter, the many contracts made by the latter with Greene and Gaynor, and the one contract made with Twiggs. These, as stated, relate in large measure to the construction of jetties, training walls, and similar structures, by the use of mattresses, fascines, and stone. In the contracts entered into from 1884 to 1892, where two designs of mattresses were specified to be put in at the same price, the contractor was given the option of using either. This was largely done when the works were under the control of Gen. Q. A. Gillmore, and for a time after his death while under the control of Carter. It is, however, further contended that beginning with the contract of September 16, 1892, Carter changed the specifications and contracts so that three designs of mattresses were specified. These, it is claimed, varied greatly in cost to the contractor, and by the specifications of the engineer officer the option was reserved to use any one of the mattresses he thought proper. How he would exercise this option, it is contended, he withheld from all bidders save the persons indicted with him. By this device it is insisted that all others not a party to the scheme were obliged to make bids at a price sufficient to meet the cost of the most expensive mattress design. It is further contended that, since the alleged conspirators were informed that the engineer would use only the cheapest design, this gave to them the opportunity to underbid all competitors, and while such bid on their part would be a low price for the most expensive design, and therefore, when contrasted with the bids of those not in the secret, would secure the contract, it would be an exorbitant price for the cheapest mattress, which they had been informed would actually be used.

The contract of September 1, 1884, is illustrative of the form used by Gen. Gillmore, who was then in control. The contractor was John F. Gaynor. The contract calls for what is known as the "log and brush" mattress, and for stone with which to sink it. It is the first and one of the simplest forms. Since it is subsequently referred to more than once, it seems proper to describe it. After stating that the work "will consist essentially in building up said dam, wing dams, and training walls, with successive courses composed of log and brush mattresses, overlaid with riprap stone, and putting riprap stone alone upon the works wherever required," the following description of the mattress is given:

"The mattress is simply a raft of round logs, not less than 12 inches in average diameter, and not less than 9 inches in diameter at the small end, placed in close contact, side by side, at right angles to the line of the wall or dam, and firmly held by transverse binders spiked or bolted to them. The binders will be smaller logs or poles, not less than five inches in diameter at the small end, and placed not more than eight feet apart, and those on the outside will be close to the ends of the logs. The spaces between the binders will be closely filled up with compact bundles of brush, placed parallel to the logs of the mattress, to such depth as to give a thickness of not less than six inches when compacted in the finished work; secured in place by pole binders, in such manner as the engineer in charge shall approve. The logs and binders used may be of loblolly or other cheap variety of pine, and must be of gentle taper and sufficiently straight, and the brush will be live, hard-wood brush. Logs will not be used that do not fit close enough together to hold the stone safely, even without the aid of brush."

Bidders were "required to name a price per square yard for mattresses in the work." The contractor in this case was paid 47 cents per square yard.

The first contract in evidence providing for mattresses of two designs was made by Gen. Gillmore with Lara & Ross, September 27, 1884. One of these is the log and brush mattress described in the previous contract, except the layer of live wood brush, and is five inches instead of six inches. The second design of the Lara & Ross contract is thus described:

"This mattress will consist of a bottom grillage of poles, of an average diameter of at least six inches, and not less than five inches in diameter at the small end, placed from four to six feet apart between centers, both longitudinally and transversely, and the lower poles will be parallel to the line of the jetty. The spaces between the upper poles of this bottom grillage will be filled in with small poles. Upon this raft will be placed two layers of stout hard-wood brush, crossing each other at right angles, each course to be five inches thick in the finished jetty, to be followed by a top grillage constructed like the one placed at the bottom. The upper layer of brush will be placed at right angles to the line of the jetty. The poles of each grillage will be securely lashed together by suitable wire or rope lashings, and the upper and lower grillages will also be securely lashed together, in such manner as the engineer in charge shall approve, so as to form a strong and compact mattress, not less than 16 inches thick in the finished work, the thickness being estimated between the bottom poles of the upper and the top poles of the lower grillage."

The model of the pole mattress it known as "No. 4." In regard to both mattresses, it is stipulated that they "will not be accepted until properly placed in the work and secured there by a layer of stone." The contract price for putting in mattresses under this contract was 59 cents per square yard. It is true that with the mattresses under the Lara & Ross contract the defendants on trial had nothing to do. The designs are proven, however, for the reason that they indicate the character and price of mattresses as used before the changes permitted by Carter, which are alleged to result in mattresses fraudulent in construction and exorbitant in price.

Tracing the history as directed by the evidence of mattresses with two designs, we now find that this was provided for in the contract for work at Cumberland Sound made with Anson M. Bangs, October 29, 1886. The designs are the same as the two set forth in the Lara

& Ross specification. The bidder was required to name one price, and, if he received the contract, he had the option as to which design he would use. The price was 47 cents per square yard. This was also true with regard to the contract of W. T. Gaynor entered into January 16, 1889. This was made by Carter. The same two designs are provided for, the same one price, and the design to be used was at the contractor's option. There the price has reached the figure of 63 cents per square yard.

On November 5, 1890, it is shown by the evidence that John F. Gaynor secured the next contract in which two designs appear. They were identical with the specifications made by Gen. Gillmore in the Lara & Ross contract, except as to the quantity of brush in the first design. They were to be paid for at one price, and which would be put in the works depended on the bidder's option; that is, the contractor's option. The contract price was now 85 cents per square yard.

Carter, as it appears from the evidence, was now in full charge. In addition, however, to the two designs mentioned, it is stated in the specifications of this contract that proposals will be received for certain pile work for fascines, and for brush mattresses 15 feet wide, to be placed on the channel side of the training wall. The description is:

"This mattress shall consist of a top and bottom grillage of poles, bound with wire or rope, and filled between with a layer of brush fascines packed closely together. These mattresses must be sunk in proper place and weighted with stone."

Both the fascines and this type of mattress itself are to be paid for by the cubic yard. A separate bid was asked for fascines. The price was $1.40 per cubic yard for fascines. These fascines had to be made into mattresses when used alongside the training wall.

Another contract in which two designs of mattresses were specified, was that of March 2, 1891, with John F. Gaynor. These designs were again put in at the contractor's option, and were again bid for at one price. The price was 96 cents per square yard. In the contract of May 4, 1891, again with John F. Gaynor, the same two designs were provided for. These were again to be used at the contractor's option. The price for each design was the same, and was now 99 cents. In addition to these two designs in the contract of May 4, 1891, a "brush mattress" was described, for which separate bids were asked. This could be used at the engineer's option. The price was 97 cents. This "brush mattress" for which separate bids were asked in this contract, as we shall presently see, was in the next and later contracts, substituted by Carter, for the second design, or "pole mattress," which had been used from the Lara & Ross contract made by Gen. Gillmore up to that time in all contracts where two designs of mattresses were called for.

The next contract of this general character is that of September 16, 1892, that is to say, about a year and four months after the last contract mentioned. It was made between Engineer Officer Carter and Edward H. Gaynor. This contract was made in the year after that in which it is alleged that the scheme to defraud described in the in-

dictment had been formed. In this contract, in the language of Maj. Gillette, there was a "radical change." Here for the first time three designs of mattresses were described, and for the first time this statement appears: "Any of the following designs for mattresses may be used at the option of the engineer officer in charge." Prices were required from bidders "separately for each of the following items: First, mattresses, per square yard; second, riprap stone per cubic yard."

It follows that separate bids were not required for the separate designs of mattresses, but the price offered must have been per square yard on each. It follows that there was but one price, and the general bidder could make no estimate of his probable outlay on the contract. The undisclosed option of the engineer to select that design which he should direct to be placed in the works effectually forbade that opportunity to the bidder.

An examination of the three mattress designs described in the specifications of the contract of September 16, 1892, will disclose the fact that the first design is in substance the same as the first design in all the contracts we have considered with John F. Gaynor, made by Gen. Gillmore on September 1, 1884, to the contract of September 16, 1892. This difference is, however, notable. In the Gillmore contracts, the layer of brush on the raft of logs was sometimes five inches and sometimes six inches in the finished work. In the four contracts preceding that under discussion, the evidence is that Carter required this layer to be only four inches. In this and all future mattresses of this design, Carter required the layer of brush in the first design mattresses to be six inches in the finished work.

At this stage of the work we find that the second Gillmore mattress design, to be bid for at the same price, and put in the work at the contractor's option, is abandoned by Carter. Now, in the contract of September 16, 1892, he adopts a second design of his own. This is the "brush mattress," as described in the contract of May 4, 1891, for which a separate bid was asked. Hereafter it will be known as the "second design mattress." Its description as it appears in the contract of September 16, 1892, the jury will remember. According to the testimony of Maj. Gillette, this mattress will cost about 37½ cents less per square yard than the first design of log and brush mattress set out in the contract. Greene, however, testified that the cost of the mattress, as I understand his testimony, was about the same.

It is also material that the jury now clearly understand the description of the new third design mattress described in the contract under discussion, namely, that of September 16, 1892. It will be remembered that Maj. Gillette testifies that this design was the cheapest construction of the three. Indeed, he testified that it would cost from 37½ to 50 per cent. less than the first design of the same contract. The description is as follows:

"This mattress will consist of a bottom grillage of poles of live saplings of pine or other timber of a kind approved by the engineer officer in charge. The poles must be straight, of a slight taper, of an average diameter of from four to five inches, and not less than three inches at the small end, and must

be placed from four to eight feet apart between centers, both longitudinally and transversely and spliced together with long scarf joints in a manner satisfactory to the engineer officer in charge. Upon this grillage will be placed a layer of closely compacted fascines surmounted by a top grillage similar in design to the one at the bottom. The poles of each grillage will be securely fastened together by suitable wire or rope lashings, and the upper and lower grillage will be securely fastened together by suitable wire or rope lashings, and the upper and lower grillages will also be securely fastened together in such manner as the engineer officer in charge may approve."

Elsewhere in this contract is given a description of the fascines to be used, and this I will read, for your consideration:

"All fascines will be made of live brush of cedar, water oak, myrtle, sweet gum, or any other variety of wood approved by the engineer officer in charge. The fascines will be from 60 to 100 feet in length, and must be compressed tightly by an approved form of choker, to a diameter of nine inches at intervals of two feet, where they must be bound firmly with wire or tarred rope of approved strength. The brush shall be as straight and well trimmed as can be obtained. The fascines shall be carefully and thoroughly made and handled with care."

It may be said that this specification affords a description of the fascine required in all of the contracts. It is true that there is some difference in length and other slight variations, but that is the type. This contract was awarded to Edward H. Gaynor. It involved $170,000, and the price was $1.05 per square yard of mattress. After this Carter let the contract of October 22, 1892, for improving the Savannah Harbor. That is called the "big contract" of 1892. The amount involved in jetty work was about $2,110,869.46. The Atlantic Contracting Company was the successful bidder. He also let to Anson M. Bangs the contract of November 15, 1894, involving $170,000, and for the contract of October 8, 1896, involving $1,050,000 for the improvement of Savannah Harbor, the Atlantic Contracting Company was also the successful bidder. On the same day he let to the same company a contract involving $2,350,000 for the improvement of Cumberland Sound. In all of these contracts it will appear that the same three designs are specified in substantially the same language, save, perhaps, as to the width of the mattresses and the length of the fascines. It also appears that in all of these great contracts the three designs of mattresses were bid for at one price, and the option was reserved to the engineer officer to use any design he might select. While carefully preserving this option, it is noteworthy that in all the great contracts just enumerated the engineer selected the third design. Nor should it be forgotten that in view of much of the evidence it is contended by the government that this is the cheapest design.

There are certain important considerations to which at this stage it seems my duty to invite the attention of the jury. There is absolute unanimity among the engineer witnesses both for the government and for the defense, that the log and brush mattress, that is to say, the first design of these contracts, is not the most effective on an ocean bar or in a silt-bearing stream. The reason given for this is that it is not so flexible as a fascine mattress, and therefore does not adhere so closely to the bottom, that it is heavier, and there is greater sub-

sidence, nor does it so successfully catch the sand on an ocean bar or the silt of a tidal stream or interior river. Practically all of the engineer officers whose opinion was asked testified that, of the constructions for which specifications were made, it was the most costly. Gillette, as we have seen, says that it cost from 75 to 100 per cent. more that the third design. It is true that Mr. Nicholas, who made mattresses and fascines under several of the contractors, testified that he never saw any difference to speak of in the cost of log mattresses and brush matresses; that the actual labor in making each averaged from 16 to 21 cents per square yard; that this was in addition to the cost of the logs and brush. Col. Quinn was asked if there was any material difference in the cost of designs Nos. 1, 2, and 3. He replied:

"Well, I couldn't say that. Of course there may be some slight difference. I should think a mat that contains more material would necessarily cost more than the lighter material, but the material is so little in price that the labor involved is of more importance, probably, than the quantity of material."

If the jury should find that the weight of the testimony is to this effect, and if their practical experience and the examination of the several models of mattress designs should corroborate the testimony of the engineer officers who spoke on this subject, and lead them to the conclusion that the first design was most expensive to the contractor, they may inquire, "Why was it," since Carter did not use it after about 1890, and since very few were used by him before that time, that this costly design was always inserted in the specifications, as one to which his express, but undisclosed option might extend? Was it with unlawful intent to prevent competition by calling on all possible contractors to bid in the dark at one price for the construction of either of three designs largely varying in cost to them? Were the defendants, as a part of this scheme, informed of his purpose to require bids for a costly design and to use a cheaper design? Did he intend in this way to deter uninformed bidders, and to control the contracts for the defendants and enable them to secure for the cheapest design, a price equal to the cost of that design which was the most expensive? These are questions for the jury, and must be determined from the evidence.

Was this conduct of the engineer officer done purposely to defraud the government, and for the illegal profits of the defendant on trial, and himself?

In this connection it is proper to charge you that if you find this conduct, charged by the government, to have been done by its engineer officer, was in fact done, it must be done with the guilty intent charged, and the proof must show this to the degree of satisfaction heretofore defined as requisite, before the jury will be justified in concluding that he is guilty, as charged. It is, besides, true that before the defendants on trial, or either of them, can be convicted, the proof must show likewise to the satisfaction of the jury, and to the degree heretofore defined, that they participated in the guilty purpose of the engineer officer. To determine the question of guilty intent and guilty participation involved, the jury must bear in mind the general rules I have given and all the evidence submitted for their consideration.

A convenient method of inquiry for the jury may be to inquire, in the first instance, whether the alleged fraudulent scheme or device described in the indictment, and illustrated by the evidence, as far as we have considered it, is one by which the government could be defrauded, and the alleged co-conspirators, including the defendants on trial, could be profited.

Much has been said about all of this work having been done within the appropriation, but, if the fraud and conspiracy was in fact present, as charged, the contention that no money was expended save that appropriated by Congress is no defense whatever to the charges made. The money, as we have seen, could not be taken from the treasury save by an appropriation. It is none the less the money of the people after it has been thus appropriated. The title to every dollar is in the government of the United States, which is but another name for the people of the United States. The act of appropriation imparts no share of that title to the contractors, until their work is honestly done in accordance with the specifications of their contracts. These funds are appropriated, not only for effective work, but for work reasonably permanent. Nor is it contemplated by Congress that all the money appropriated for particular work should be expended on that work, provided by honest methods it was competent to have the work done for a cost less than the sum total of the appropriation. The balance, after the work is properly done, is the people's money. Every individual who buys a suit of clothes, a pair of shoes, a blanket, an axe, a saw, a trace chain, a roll of barbed wire, a ball of binding twine, or any of the innumerable manufactured articles of civilized man, in the import tax or duty thereon, pays his share of the sums appropriated by Congress from the treasury of the United States. Should he purchase an alcoholic stimulant, he pays perhaps a greater share. If not collected in this way, the only other alternative would be by direct taxation. The loss of the government, then, is the loss of the people. These propositions are too obvious for elaboration.

In what manner, then, could the government lose by reason of the device charged, if the proof shows it to be true? It is the amount which is actually paid to the contractors through the alleged connivance of the engineer officer above that which would have been paid if the bidders had been given an opportunity to bid on the third design mattress. To determine the saving which might have been made on this ground alone, you should look to the testimony of witnesses as to the relative cost. Take the figures of Maj. Gillette, and the practically equivalent figures of other engineer officers and others as developed for the government. If a given number of square yards of the third, or cheapest, design mattress, after competition, cost the government $1,000, the same number of square yards of the first design, according to Gillette, would cost the government $1,750 to $2,000, if the first design is 75 or 100 per cent. more costly than the third. If by the device described bidders were forced to make bids calculated on the necessity of furnishing the most expensive design, while the government actually received mattresses of the cheapest design, the loss to the government, by want of competition between the bidders

for the third design, would be the difference between the cost of the third design and the cost of the first design.

Let us suppose, then, that the government has appropriated a million dollars for the erection of a training wall in the Savannah river. Its engineer officer is its representative, not only to make a project of the improvement, but a project of the expenditure. His is a fiduciary position. His trust is as sacred as that of any other trustee—more sacred, perhaps, in that he has been selected from the people, educated, trained, and sworn for that precise duty. The honesty of the man, the stainless honor of the soldier, and the rare skill of the engineer in the performance of his duty, are the government's and the people's right. If, then, in the construction of this work by such a device as that described, by making specifications which would call for the expenditure of a million dollars, if the most costly design of mattress was used, and at the same time the engineer officer inserts in the specifications a design which he may use at his undisclosed option, if the mattress costs in the aggregate only $500,000, the loss to the government is not only the inferiority and instability in construction of the work, but the difference between $500,000 and $1,000,000, which is $500,000. In addition to this, suppose the third design is better adapted for its purpose than the first design. The loss to the government by compelling all bidders to offer prices equivalent to the value of the first design would have precisely the same effect to the government, for in this case the government would pay $500,000 for the very same work and construction that it paid $1,000,000 for in the other case.

To illustrate it in another way: Suppose the government wishes to erect a public building like that in which we are now convened, and calls for bids separately, for a structure of marble and one of brick. Let us suppose that the brick building is more substantial and valuable for the purposes of the government. The lowest bid for the marble is $100,000, and the lowest bid for the brick building is $50,000. The government can then select which building it will erect. If it erects the brick building, it gets the best building for $50,000. Suppose, however, bidders are asked to bid at the same price on the two buildings; the representative of the government reserving the option to select, after the bids are received, which it will erect. Bidders may know that the brick building is the better, but they also know that the marble may be selected, and therefore make a bid based on the cost of constructing the marble building, that is, $100,000. If, after the bids are received, the engineer decides to use the brick building, the contractors received $100,000 for the same building they would have been glad to build for $50,000, if allowed to bid separately.

In addition to the claim of injury to the government, resulting from the alleged device to defeat competition just disclosed, it is contended that by the substitution of the structure known as the "multiple mattress," or "multiple mat," for mattresses of the third design, a sum unlawfully and illegitimately great was secured from the government, and that this was divided between Greene, Gaynor, and Carter. It

is insisted that this multiple "mat" was of much cheaper construction than the third design before described, that it was wholly different from the specifications of the third design, upon which proposals were asked and bids let, that bidders had no opportunity to furnish such a structure.

Mr. Marshal, will you separate those models of fascines and mattresses there so that the jury can look at them as I go along?

The contention is that this was done, not only to secure contracts to Greene and Gaynor, but to secure for them and for Carter a large and unlawful profit.

Is this contention true? Let us first look to the contract of October 8, 1896, for Cumberland Sound. Here the contractor was the Atlantic Contracting Company. Here, also, is the stereotyped description of the three designs described in all the contracts since and including that of September 16, 1892. Here, also, was the stipulation that they were to be bid for at the same price, and to be used at the engineer's option. It is expressly stipulated that, at the option of the engineer officer in charge, the first design, the second design, and the third design may be used. The third design is prescribed in the precise language used for that design in the contract of September 16, 1892, which has just been read to the jury. Nothing whatever has been said in the specifications or the accompanying text of the contract with reference to the multiple mat, and the term "multiple mat" appears in none of the contracts which are in evidence. In the contract of October 8, 1896, and in all the contracts since January 16, 1892, there are certain general provisions which the jury will bear in mind descriptive of the mattresses and descriptive of the fascines. It appears from the testimony of Maj. Rees, who was sworn as a witness for the defense, that he was Carter's assistant from 1889 till the Spring of 1893. At first, he states, single mattresses were placed in the work and sunk with a load of stone, but in April, 1893, the use of multiple mattresses of about three courses began. The jury may be justified in inquiring if this was not the continuous mat described by Cooper, the assistant engineer who was sworn for the government. The latter testified that, when he returned to the district in August, 1893, work was going on under the 1892 contract for improving Savannah Harbor, and that the contractors were putting in the third design, to quote his language: "Three at a time in the form of continuous mats, tipping them off of the end of a lighter."

It was Greene, or some other witness, I am not sure which, who testified that the multiple mat was the result of an evolution, and Cooper states that, after the storm of 1893 had destroyed the plant of the contractors in the Savannah Harbor, they then built mattresses in "an entirely different manner." From and after the latter part of September mats were built on barges, and it appears that this construction was used in all the jetty contracts after that time. This also appears from the reports in the engineer's office, and from the payments made thereon. There is evidence to the effect that the multiple mats were not always uniform. Cooper testified that they varied greatly through the contract of 1892. Some of them, he said, had more poles

than others, some less, but the general average was to have a complete grillage on the bottom and then on top of the mattress. "On the top of the bottom grillage you would have a layer of bundles of brush. These bundles were in nearly all cases about 15 or 16 feet long, and, when the mats were longer than that, they would be placed end to end to make a tier across the mats." That is true of the contracts at Savannah in 1892 and 1896. As stated by this witness, his duties were performed on the Savannah contracts. A fuller description, as appears from the evidence, is, first, that there was a full grillage of poles such as that described for the third design, then a layer of bundles of brush or fascines, then a half grillage or one layer of poles, then another layer of bundles of brush or fascines, then another half grillage or one layer of poles, and so forth, until the top is reached, when there is a full grillage of poles, as in the third design. The several grillages and half grillages, of course, are wired or lashed together. In this way a multiple mat of several courses was built on a barge. This was towed to the works and slid off into the water. Stone from an adjacent barge was then thrown on top of the top course until the whole mattress was sunk. Sometimes there was what is known as a "step"; that is, several of the bottom courses were wider than the courses on top. Wherever this step occurred, it seems there was always placed a full grillage of poles.

It is further in evidence that each course of the multiple mattress was treated by Carter as a complete third design mattress and paid for by the square yard as such. This is not disputed or denied by the evidence. For instance, a multiple mat of eight mattresses of the third design, like that next to Mr. Reporter. The fact last stated, in connection with other evidence, is of first importance in the determination of the issues framed upon those indictments, if the jury find it to be true. Reference to the description of the third design mattress, specifications of which were to inform all bidders before their contracts were made, and to guide them thereafter, disclose a very different structure from this multiple mat, the use of which it is not disputed the engineer officer permitted.

Wherever clear and unambiguous, these contracts in writing or printing are matters for the construction of the court. If uncertain or ambiguous, proof may be offered to explain the ambiguity, and then the question falls within the province of the jury. No ambiguity has been pointed out, and none exists in these specifications. There is no contention on the part of the defendants that any ambiguity exists. It is true that evidence has been offered to the effect that these specifications permit the use of the multiple mats as described in the evidence; but, in view of the plain, explicit, and determinate character of the contract, the court is obliged to instruct you that, however sincere such witnesses may be, such evidence cannot be accepted by the jury to vary, change, or alter the terms of the written contract.

It is, moreover, true that even if it were true that the multiple mat was permissible under these specifications, if Carter continuously advertised for bids, specifying three other designs, one of which was of higher cost than the multiple mat, and did not mention the multiple

mat in his specifications, yet always, under the alleged fraudulent scheme described in the indictments, while publicly claiming his option to use the third design, actually used the cheaper structure for the benefit of particular contractors with whom he had an unlawful and corrupt agreement to make an illegitimate profit out of the government, it would make no difference so far as such joint action was concerned whether or not these witnesses were right in their view that it was permissible to use the multiple mat in lieu of the third design.

While it is true, and while you are bound to accept the instruction of the court as a matter of law that the multiple mat was not a compliance with the third design of the specifications, you are, however, at entire liberty to consider evidence on this subject to determine whether or not Carter and the defendants on trial in adopting the multiple mat acted with guilty intent as charged, and with the intention of diverting the funds with which he was intrusted to their joint personal gain. The presence or absence of guilty intent is the supreme test, the pivot upon which this case will turn.

Did Carter, then, without gain to himself, and not in collusion with the contractor, in good faith believe that he had the right to put in the multiple mat, that it was beneficial to the government, he could have done so without criminality on his part, although his construction of the contract and his estimate of the result might both have been erroneous, provided this was done without gain to himself or collusion or connivance to increase the gains of the contractors. So, too, a contractor without collusion might have consented to use the multiple mat under Carter's direction without criminality on his part. The crucial question, then, is in the use of the multiple mattress, not in name nor in fact described in the specifications—did Carter and the defendants on trial act without guilty intent, or were they prompted by the criminal purpose, and were they guilty of the criminal conduct with which they are charged?

At this point, gentlemen, apologizing to you for my somewhat lengthy observations, we will take a recess till half past 8 o'clock tonight.

Continuing after recess, the court further charged:

When we took a recess this afternoon, gentlemen, we had just discussed the necessity of proof of guilty intent on the part of the accused to support the charges of the indictment.

Of course, it is obvious to you that your determination of this vital matter cannot depend, alone, on any mere question of engineering, on any such matter as a departure from specifications. To determine it, you must look to the entire case. Contemplating the whole record, if you then find, on review of all the evidence, and particularly that evidence which relates to the enormous gains of the contractors, as conceded by the testimony of Greene himself, a profit so greatly above his expectations, according to his own testimony, that he was enabled to give to the father-in-law of the engineer, to secure his influence, or to borrow other money from him, nearly a half million dollars, and the other evidence which relates to the alleged division of these profits

between the defendants on trial and the engineer officer, that, in a word, the engineer officer was bought for a price, then every departure from correct engineering which the evidence may have proven, resulting in increased cost to the government, in inferiority of construction, in the use of cheaper material at a greater price, in the reduction of the quantity of stone to be used, in the construction of lengthy and unnecessary jetties of brush mattresses in localities where it was inevitable that it would be destroyed by the teredo, in the reduction of advertisements, in the suppression of opportunities for general bidding, in close intimacy between the alleged conspirators, all becomes of increasing importance. It is, however, true that you should by no means lose sight of the testimony relating to the engineering features of the work which you have heard. It is a part of the proof upon which the presence or absence of guilty intent is to be found. The clear language of the specifications provides that each mattress shall be constructed according to the design stated, carried to the work, and sunk singly with its complement of stone. It also provides that the mattress shall not be accepted and paid for until it is so sunken. From an examination of the third design mattress, is it not apparent, as a matter of fact, that the multiple mat described is a wide departure from its specifications? The third design has for its bottom a full grillage of poles, then a layer of closely compacted fascines, then on top another full grillage of poles, all, of course, wired or lashed together. If it was necessary to put in any number of these mattresses at any locality, with equal explicitness the specifications provide that they must be carried out and sunk separately, and on top of each mattress a layer of stone must be placed. It follows that the complete structure would contain, first, a full grillage of poles, then a layer of closely compacted fascines, then another full grillage of poles, a layer of stone, then another full grillage of poles, another layer of fascines and a top grillage of poles, with another layer of stone, another full grillage of poles, and so forth, until the number of mattresses required had been sunk. This is one picture. Now, let us look at the other. A multiple mattress of eight courses is built on a barge, and the whole structure is carried to the works, sunk at one time with stone thrown on top of the last course. Could Carter, Greene, or Gaynor doubt, as a matter of fact, that these structures, models of which are before you, were wholly different in character and construction? Besides, according to the evidence, there is only one layer of poles between the courses of this mat. About three-fourths of the poles required in eight mattresses of the third design sunk separately are left out of the multiple mat.

Now, to contend that this structure is better engineering, and more beneficial to the government, is utterly untenable, in view of the specifications and the contract, except in so far as it may, if the proof justifies it, illustrate the presence of good faith on the part of the defendants, and therefore the absence of guilty intent.

According to the testimony of Greene himself, by the use of this multiple mat, a sum in the neighborhood of more than $500,000 was earned as profit. While it is true that Greene contends that he might have made the same amount of money by the use of the single mats

that he did by the use of the multiple mats, certain it is that he testified that he made far more than he had contemplated, and from his testimony it can readily be estimated that the gains of the Atlantic Contracting Company, all of whose stock was held by Greene and Gaynor except a few shares, were in the neighborhood of $1,500,000 profit. This testimony, of course, relates to what is termed "the big contract" of 1892, for the improvement of the river and harbor at Savannah. As the profits, according to Greene's testimony, speaking in round numbers, were $1,500,000, and the gross sum actually paid the contractors under the October 22, 1892, contract, as appears from an exhibit in evidence, was $2,110,869.35, the percentage of profit on this contract was over 240 per cent. The amount paid the contractors is made up of the following principal items:

| | |
|---|---|
| Square yards, mats 95 cents | $1,295,393 74 |
| Cubic yards fascines | 332,899 26 |
| | $1,628,393 00 |
| Stone | 376,904 60 |
| Piles, timber, etc., | 105,571 93 |
| | $2,110,869 53 |

The jury will be justified in inquiring if the greater proportion of profit was not made out of the brush mats and fascines rather than out of the stone, timber, piling, etc. These figures of the governmental expenditure are not questioned. They are taken from the files of the engineer office, and no attack has been made upon them.

The statement of profit in close approximation is the testimony of Greene himself. It is to be observed that he testified that he expected to make only $300,000 or $400,000. This, of course, was when he entered into the contract. At that time the multiple mats were not in use. This was in October, 1892, and not until September, 1893, were they adopted. If the testimony of the assistant engineer, Cooper, is accepted by the jury—and the court does not recall any material contradiction of it—he did not return to his work here until August, 1893. The multiple mat had not been used before his departure, and he testified that after his return nine-tenths of such mats were put in under his supervision. It is true, however, that at the time the contract was let the specifications stated that approximately only 350,000 square yards of mattress would be used. Greene testified that the increased profit was due to the increased amount of brush mattresses put in.

It is true Cooper, on cross-examination, testified that the multiple mats were of great advantage, that they enabled the work to be carried on with rapidity, and there was consequently less danger from storms and scour in front of the dam. Other witnesses testified that, in their opinion, from an engineering standpoint, the multiple mattress was well adapted for the purpose of constructing dams and jetties in sheltered water. This, however, is entirely aside from the real issue in this case, provided the corrupt design to defraud the government is shown as charged. In this connection the jury should determine, if they find the fraudulent scheme which is charged in the indictment, it makes no difference whether the profits of the co-conspirators re-

sulted from a change in the character of the mattress, or of the material used, or from the fact that the engineer officer permitted a far greater proportion of mattress to be used than had been intended when the bidding was made, and when the contracts were secured. Nor does it matter, in the presence of such a scheme, whether the profits came from one cause or the other, or from both causes combined.

At this point the jury should inquire to whom belonged the increment of value in the immense profits which Greene testified that he and his associates made. If, indeed, they were legitimate profits, why, obviously, as stated, to the government, and that is to say, to the people of the United States.

By a provision most specific in the contract itself, the government had attempted to guard its rights. Several times in the course of the argument counsel have let fall the expression that the government ought to be able to take care of itself. That is true. A government of the people, by the people, and for the people, ought to be able to take care of the rights and values secured by the Constitution and laws to the people. In the effort to take care of itself in all such cases, the government, through the representatives of the people, has enacted the statutes under which these indictments were brought. May it not be true that this case and this trial is an attempt on the part of the government to take care of itself? It attempted to take care of itself when the contracts were framed. There are two provisions of the contract by which the government sought to take care of itself. The first is this:

"The United States reserves the right to make such alterations in the details of construction, or in material, as may be deemed best during the progress of the work, providing that, should such alterations materially vary the cost of the mattress, the price to be paid shall be increased or diminished proportionally; such change of price being agreed upon before the alterations in the mattress are made."

This is in the specifications, which are a part of the contract. In the contract itself the government seeks to take care of itself by the following provision:

"If at any time during the prosecution of the work it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War; provided, that no payments shall be made unless such supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred."

The argument, in effect, is that, if the government has been "taken in," why it may as well pay the bill and charge the result to the profit and loss account of the people; to take no means to redress their wrong, and by the processes of law to prevent its recurrence. This is to ignore the principles of criminal jurisprudence as administered by civilized people.

But if the jury is satisfied from the evidence that, after carefully guarding its rights in the phraseology of its contract, the government placed its agent here in the person of an army officer of the United States to see to it that the work was executed according to these contractual provisions by which it had attempted to take care of itself, that the agent was induced to betray his trust, and then a radical change is made either in the details of construction or in material, or in the character of the project itself, by which the contractors with the knowledge of the government's agent, and through fraudulent connivance with him, are permitted to make a profit of 240 per cent. at the expense of the people, then it is the duty of the jury also to determine if the government is not taking proper measures "to take care of itself" through the indictment and prosecution which it has brought. Whether its cause is righteous and its accusations are justified by the proof, the jury will determine in accordance with those general rules for the government of such trials which the court has already given in charge.

The court, however, is careful to again remind the jury that guilty intent on the part of the accused is an essential ingredient of the crime here charged. No amount of profit, however great, no departure from contractual or engineering specifications, however marked, will justify a verdict of guilty, unless the jury are satisfied to the degree required by law that the accused intended in the progress of their relations the corrupt and fraudulent scheme and conspiracy charged.

What, then, was the purpose of the engineer officer in calling for bids for the third design mattress? What was his motive in allowing the contractors to put in a structure which was not permissible under the specifications of the third design, or which, if he believed it to be permissible, was radically different, and, according to much of the evidence, much cheaper than the third design, as described in the specifications. The jury will also inquire if it was not much cheaper, or if the engineer did not permit an excessive amount of this construction to be used, when compared with the amount estimated in the contract the defendants made with him—whence was the source of their stupendous profits?

But the jury should bear in mind that, according to all the proof, they are dealing with men of a high order of intelligence. John F. Gaynor, it may be gathered from the evidence, was a contractor of long experience; also, according to Greene's letters, inferentially at least, a man of strong personal influence; according to the statement of his leading counsel, in his opening argument, a man of wit. According to Greene, Gaynor had traveled extensively. Throughout the examination he was termed "Colonel" Gaynor. Carter was, and Greene had been, engineer officers of distinction. Of Carter, Gillette testified he believed him to be a brilliant and attractive man, and an ornament to the engineer corps. The jury will consider the important fiduciary trust given him by the government. The engineer officer in charge of the improvements of our great and important state. Greene, himself, is a graduate of West Point, fourth in his class; was intrusted while in the service with work similar to that of Carter's,

and since then had large experience in engineering problems relating to such contracts as those described in the evidence. These men, as testified in effect by Col. Marshall, as I recall it, had enjoyed the opportunities of an education of the mind equal to that accorded to George F. Meade or Robert E. Lee.

The jury may therefore, if they think proper, conclude that these men knew what they were about. If the multiple mattress was cheaper to the contractor than the third design, if large sums could be saved by its use, the jury may, if they think proper, conclude from the evidence that the three defendants knew the fact. If the jury then conclude that it was used with knowledge on the part of these men that large profits were to result from its use, was this done solely for the benefit of the contractors, or did Carter, in obedience to his duty, report the change in construction and material, so that the government might share in the benefit? This is an important inquiry. It is also to be recalled that the third design was to be paid for by the square yard. Its description was so plainly set out in the contract that when a mattress was examined by the inspector, if it came up to the specifications, all he had to do was to measure the top surface.

How was it with the multiple mat? According to the testimony of Cooper, Carter prepared a table of heights, and the height of the mat determined how many theoretical third design mattresses composed it. This witness stated that the measurement was taken with a pole, with the feet and tenths marked on it, and the bottom of the pole placed to the bottom of the lower grillage pole, and the height measured up to the top of the top grillage pole, and then the reading would be on the pole in feet and tenths. According to this table, a one-course mat was to have a height of 2 feet; a two-course mat of 3½ feet; a three-course mat, 5 feet; a four-course mat, 6 feet; a five-course mat, 7½ feet; a six-course mat, 9 feet; a seven-course mat, 10 feet; and an eight-course mat, 12 feet. That is to say, a multiple mat, 12 feet high, would be paid for as eight complete third design mattresses, and the yardage calculated on the surface of each of the eight courses.

The witness Cooper, as stated, testified that he saw nine-tenths of the work put in under the 1892 "big contract," and that, shortly after the contract closed, he made an accurate estimate of the cost to the contractor of a square yard of mattress used in that contract, and that his estimate was 9 cents. For this the government was paying 95 cents. To illustrate: The mattress sunk July 13, 1894, No. 104, ten courses, total square yards counting each course as a mattress of the third design, had a total yardage of 4,122.22. The contract price paid by the government, calculated on the square yardage, was $3,916.11, and according to Cooper's estimate the cost to the contractor was $371. If this testimony is satisfactory to the jury, it will not be difficult for them to estimate how profits to the contractors would rapidly accumulate. Now, if this was permitted through the unlawful connivance charged of the engineer officer with the contractors, and if the jury are satisfied that the mat described was fairly typical of others which were constructed and paid for in substantially the same way, it might go far in the opinion of the jury to support the general tenor of the charge made in the indictment.

The jury will also inquire, if competitors had been given an opportunity for putting in multiple mats, would these particular contractors have enjoyed the uninterrupted opportunity of making such large profits? and would not competition for the opportunity to put in such mats have reduced the cost to the government?

The jury, in this connection, may also consider that in no specification made, or advertisement sent out, were bidders and contractors informed in any manner that multiple mats would be used. Is it not true that the engineer officer should have advised bidders that multiple mats might be used? or ought he not to have given them an opportunity to make a separate bid on such mats?

It is true that several engineer officers and civil engineers testified for the defense that the multiple mat was the best for the purposes of the work, except on ocean bars or in salt water; but I do not recall that any of these officers testified that they used the multiple mat and paid for each course by the square yard as though it was a separate mattress.

The jury will remember if some of them did not testify that it was paid for by the cubic yard, as for fascines; that is to say, for the actual brush material in it.

To sum up on this general subject, you are instructed that the reservations in the contract in behalf of the United States cannot be taken advantage of by the engineer officer to enable him to allow the contractors to substitute, for a designated mattress, a structure widely different in form and construction, in compactness, in material, and in cost. In this sense the engineer officer is not to be regarded as the United States. He is an officer of the United States with his duties clearly marked out. The contract indicates how such important changes shall be made, and how changes of projects shall be approved. These provisions are confirmed by the general law on the subject, and the regulations of the War Department. If, then, the engineer officer shall violate the terms and reservations of the contract and the reservations of the department, he would be amenable as a military officer for such conduct. If he did this in joint and corrupt combination and conspiracy with others, with intention to defraud the United States, he, like, any other citizen, would be indictable with his co-conspirators, and protection could be claimed for none of them, because of stipulations in the contract in behalf of the United States which the engineer officer had thus abused and disregarded.

The government also contends that not only did Carter allow the use of the multiple mat, but that the construction of these mats was cheap and inferior. This is denied on the part of the defense. There is much evidence submitted on both sides of this issue. Maj. Gillette gave testimony in detail as to the insufficiency of mattresses he saw on the barge anchored opposite the engineer office at Fernandina. He stated that the only complete grillage on this mattress was the grillage at the bottom and the grillage on top. "It was loose brush," he said, "I stepped on it and went down into it." He said he did not notice that the brush was put in in bundles or layers until the assistant engineer spoke of it as an eight-course mattress. He further states, when it was put into the water it did not have much flotation, a large percentage of

it was leaves, they threw rocks onto the mattress, and they went out of sight. The official reports of the yardage of that mattress reached the engineer's office. They appear on the tri-monthly report dated August 1, 1897, date July 29, 1896, Range No. 3, North Jetty, courses 9 to 16. This would indicate an eight-course mattress placed upon another eight-course mattress. Four courses of this mattress had a width of 70 feet, and four courses of 81 feet. A second mattress was brought in after Maj. Gillette's first visit, which Maj. Gillette gave the assistant engineer orders to hold, stating, "I wished to see what proportion of material was in these mattresses, as compared with what there would be if constructed under the same system, properly choked and a full supply of poles," that is, under the multiple system. The mattress next brought in was held by the inspector, and Mr. Gillette stated that it was a great deal better than the first: "I should think there was twice the material in it that there was in the first one." He said: "It was constructed more systematically. You could see it was made of bundles of brush. They were much better choked." He then caused an experimental mattress to be constructed for comparison. This had four courses, and had twice as much material as the second mattress brought in by the contractor, and that had twice as much material as the first he saw.

There is other evidence to the same effect. On the other hand, the defense has offered the testimony of a mattress maker, several foremen of brush camps and other witnesses, who testify that they were familiar with the construction of fascines and mattresses, and that they were properly constructed. They, of course, referred to the construction of the multiple mat. There is also evidence introduced in the shape of the reports of engineers, giving measurements of multiple mats upon which payment was based. The jury will recall that, by the table of heights prepared by Carter, an eight-course mat was to be 12 feet high in order to be paid for as eight third design mattresses. From the evidence submitted by the government, it appears that many mattresses, although recorded and paid for as a mat of a certain number of courses, did not come up to the height indicated by Carter as necessary to entitle the contractors to payment. For instance, Exhibit 369, mattress No. 20, sunk June 26th, eight courses; height measured on the barge nine feet. An eight-course mat according to the table of heights was to be 12 feet. In this eight-course mat, with one step, according to the evidence there would be counted the diameter of 12 grillage poles, 4½ inches each, 54 inches; this leaves 54 inches for fascines, making each of the eight courses 6¾ inches.

Now, under the contract, all fascines were to be tightly choked to a diameter of nine inches. The jury should inquire if the fascines were properly made and choked. They may also inquire if Carter required the contractors to put in mattresses of the height he designated.

Referring to the same mattress, it appears from another exhibit in evidence showing the soundings before and after mattresses are sunk, loaded with stone, that this mattress after sinking was only six feet high, or a decrease of one-third. Deducting from the height of the mat, namely 72 inches, the height of the 12 poles, or 54 inches, it will

be seen that the thickness of the fascines or bundles of brush between the layers of poles will average $2\frac{1}{2}$ inches. The jury will bear in mind that this measurement is taken at the poles of the grillage, and would show the thickness of the fascines or brush bundles at that point. In the spaces between the poles, as the elasticity of the brush will cause some expansion, of course the thickness of the brush material would naturally be greater.

Referring to the same exhibit showing dimensions of mattresses used in Cumberland Sound contract of 1896, it appears that on June 28th the eight-course mattress is 9.4 feet high, instead of 12 feet. Another, June 30th, eight courses, height 8.9, instead of 12 feet. July 1st, eight-course mat, 8.8 feet, instead of twelve.

There is proof to the effect that during the months of May and June, 1897, thirty-eight eight-course mats were sunk in the Cumberland Sound, and, although according to the table of heights prepared by Carter, an eight-course mat should be 12 feet high in order to be paid for as eight third design mattresses, only one was as high as 11 feet, and the great majority were from 8 to 10 feet in height. These, as stated, were permitted to go in the work and be paid for as eight third design mattresses. Subsequently to this period, it was determined to superimpose stone jetties on the lines of Carter's jetties in Cumberland Sound. From the testimony of Gillette and others, the jury, if they think proper, can infer that but a portion of the Greene and Gaynor construction remained. How much, it may be difficult to determine. There is a conflict in the testimony upon this subject. Wisner and Ripley made their observations of these works and took their measurements in December, 1897, and January, 1898. This was done to obtain evidence to be used in behalf of Carter before the court-martial. You will recall the testimony of these witnesses as brought out in the direct and also the cross-examination. They measured cross-sections as they stated, and in some places stated that they found substantial portions of the jetties remaining. Sometimes they got off the jetties altogether. It is to be observed that their measurements were taken shortly after the work was stopped, possibly before the operation of the teredo had become destructive. It may be that a large part of this structure had disappeared through the constant action of the teredo. The jury will determine this possibility.

Other evidence discloses that much of the jetties had been washed away. One witness for the defense testifies that he found a complete mat quite a distance from the work, but it was his opinion that this was lost from a barge. This he said had come through the breakers on the Florida coast, and according to his statement was yet intact. The teredo doubtless was the most dangerous enemy to this structure. This form of marine life which is so destructive to wood in salt water is so fully set forth by the evidence and so clearly understood by the jury that it probably requires no further elucidation. Carter himself, in a letter to Gen. Craighill, dated May 22, 1888, which is in evidence, stated:

"In certain instances I think a small amount of log and brush mattress work properly constructed can be used as far up as the sand will flow, and

I have a small amount of this in my Savannah project, more as a basis of expense than as recommending its use, as I do not think it should be used at all when it can be helped, and in some localities, not under any circumstances. At Fernandina it cannot be safely used above the foundation course."

This is the language of Carter. In the foundation course it would be covered by the sand and protected from its enemy. Major Gillette testified, "In wood which is in sea water in this locality, the wood is very promptly honeycombed by a jellylike worm known as the teredo; destroys it very rapidly." The evidence is full upon this subject, and there seems nothing contradictory about the teredo and his mischievous operations.

As to the amount of the Cumberland Sound brush jetties which survived the onslaught of the ocean storms and the attack of the teredo, the jury may consider the testimony of the engineer officers for the government and for the defense. Bacon testified that in 1898, when he surveyed it, very little mattress work could be seen, and what was in evidence was very rotten. Where the water was deep its condition could not be so readily ascertained, but from the soundings taken it indicated that there was very little jetty there, especially at the end. What he found was rock, presumably used for sinking the multiple mats.

Of the south jetty, according to the same witness, for a distance of 7,000 or 8,000 feet from shore, it was in very good condition. Beyond that for 2,000 or 3,000 feet there was evidence of a jetty being there. But beginning at a point about 10,000 feet from the shore and out to a distance of 13,000 feet from shore there was no evidence of jetty at all. He testified that the teredo would destroy every part of loose brush material that had any heart in it in the course of a few months in the Summertime.

Gillette on this general subject testified that the project for improvements at Cumberland Sound, which ripened into the contract of 1896, provided for a foundation and apron course of brush mattresses 100 feet in width and laid with riprap stone. "Riprap," according to the Encyclopedia Americana, recently published by the Scientific American, "is a common name applied to broken stone used for beds, walls and foundations in building and construction.". Riprap was to be used to sink the foundation mattresses. The jetty section which was provided should be based on this brush mattress with the stone hearting of small stone, covered with heavier stone. In going seaward the heavier stone should increase in weight from 1,000 pounds to five tons. Gillette testifies that Carter's project provides distinctly for a rock jetty with mattress foundation, and he also testifies that the jetty as far as it was constructed was a brush jetty.

In this connection you will recall the testimony of Greene to the effect that it was to be a stone jetty, and after a while he intended to put stone on it. In the same connection you should consider the evidence to the effect that while the contract was made in 1896, and while the work stopped in July, 1897, the amount of brush mattress which had been used, on a part of the work only, was more than twice as much as had been estimated by Carter for the entire contract.

It is also in evidence that, instead of putting in the foundation course and aprons provided for by the project, the contractors along the line of jetty had been permitted to put in multiple mats, each of many courses. Indeed, at the time Gillette visited the works he testified that they were placing on top of the first layer of mats other mats, thus bringing up the height in places to as much as 16 courses, or the height of two eight-course mats, which, if constructed according to Carter's table for measurement, would have been 24 feet.

It was contemplated by the original project and afterwards stipulated that the cost of the mattress to be used as the foundation on which the stone was to be superimposed should be estimated by the square yard of its surface. It appears from this testimony to which I have just adverted, if accepted by the jury, that the contractors were paid by Carter by the square yard of each course of the bottom and of the superimposed courses. In other words, where there were 16 courses, they were paid for by all the square yards of surface calculated on each of 16 third design mattresses, provided 16 such mattresses had been used in the work. If this is true, and it is record evidence, and, so far as I recall the testimony, is not contradicted in any manner, it is not difficult to ascertain why it was that prodigious profits were made by the contractors.

The jury should not ignore the fact that Carter was a skillful engineer; that he had disclosed his knowledge of the effect of the teredo; that the work in Cumberland Sound was in salt water, and in waters which, according to the testimony of at least one of the witnesses, were rife with the operations of this destructive enemy of submerged work. When the specifications called only for a foundation of brush mattress, what was the necessity of piling up course after course of brush mattresses on jetties, some of them paid for as if they were 24 feet in height, when it was known that in a few months that for all effective purposes they would be largely destroyed?

Mr. Wisner himself, one of the most intelligent witnesses, and the first for the defense, stated that he wished to go on record as opposed to the use of brush mattresses on an ocean bar, except when used as a foundation for a rock jetty. There is, however, much testimony to the effect that brush mattresses had been used largely on the South Atlantic and Gulf Coast. While this had been generally abandoned by engineers for work in salt water, this should be considered by the jury in passing on the question whether or not Carter and the defendants on trial acted without criminal intent.

These considerations, wherever they are deemed appropriate, the jury should also apply to the evidence relative to brush mattresses used at the Tybee breakwater, and wherever in salt water the teredo could destroy the work.

The stone jetties at Cumberland Sound were subsequently constructed. According to the testimony of Gillette, which on this subject is not in fair dispute, they were constructed over the lines and the remains of the Carter jetties. According to the testimony of Bacon and Gillette, after a survey, the controlling depth between Greene and Gaynor jetties, so far as they had been constructed when the survey

had been made, was less than six feet. It is but just to remember, however, that the jetties had not been finally completed. The stone jetties were built under the supervision of Gillette and Bacon, and by Christie, Lowe & Heyworth. The north jetty extended out something less than four miles from the shore. A substructure was placed on the old work, composed of small stone, and this built to a uniform height of five feet below mean low water. On top of that heavy blocks of stone were placed up to the average height of mean high water. It was in evidence at this time that the old work as far as it could be seen by the eye was either rock or sand—rock mostly—and there was some remains of the mattress work to be seen, not very much. There was a considerable amount of the old jetty under water. The south stone jetty extended a distance of 4,000 or 5,000 feet from shore, and was built up to five feet above mean low water. As the result of the building of these jetties, the channel was deepened across the bar from 6 feet to about 24 feet at low water, or from 10 feet to 34 feet at high water.

It is quite important for the jury to consider the difference in the cost of this permanent and effective structure when contrasted with the brush mattress which we have been discussing. The witness Bacon compares the cost as follows: He testifies that the record shows that a single multiple mat, No. 20, put in June 26, 1897, under contract of 1896, contained 4,240 square yards, at contract price, $1.10, cost $4,664; adding to that the cost of stone used for sinking, $473.24, it made a total cost of $5,137.24. Stone jetties having the same size as the eight-course referred to, using first and second-class stone, cost the government under the Christie, Lowe & Heyworth contract $4,713,-90; and with third-class stone it would have cost $4,077.40. If the mattress compressed one-third, and there is much evidence on the subject of compression, Bacon says one-third should be taken off for that, making the stone jetty for an equivalent space cost the government $3,142.60, as against the eight-course mattress, $5,137.24, loaded with stone, or $4,664 without the stone. The jury will inquire, then, if it does not appear that the finished stone jetty, effective in its operation and to a large extent enduring in character, did not actually cost less than the foundation brush mattresses put in by Carter and the defendants on trial.

For the brush work done in Cumberland Sound, the evidence discloses that Carter carried in person to New York and delivered one disbursing check which he had signed for $345,000.

Notwithstanding the vast sums disbursed in connection with the improvements in the river and harbor of Savannah, it is not deemed essential to give elaborate instructions regarding that work. An important feature of the evidence is that offered to substantiate the charge that Carter, through connivance, permitted Greene and Gaynor, when they were interested in contracts let by him, to put in a much greater quantity of mattress material than he estimated would be required when specifications were made and bids invited. In this connection it is also proper to consider the evidence tending to show the disproportionate amount of mattresses used compared with dredging and when com-

pared with stone. I refer in this to the Greene and Gaynor contracts. This is a matter of record about which there does not appear to be fair dispute.

In the specifications for the contract of October 22, 1892, known as the "big contract" for the Savannah river and harbor improvements, it was stated that approximately 350,000 square yards of mattress would be used, and 7,000,000 cubic yards of dredging would be done. The Atlantic Contracting Company secured the contract for jetty work. Instead of the 350,000 square yards as specified, 1,363,572.26 square yards, or more than three times as much as the specifications called for, were used. For the entire work, including mattresses, stone, piles, fascines, and so forth, the government paid on that contract the sum of 2,110,869.53, and yet the amount estimated when the bid was accepted was only $1,686,500. Thus it will be seen that the excess of cost over the estimate in that contract alone was $422,139.53. It is also true that the increased amount paid for jetty work decreased the amount paid for dredging, which was done by P. Sanford Ross. The decrease was nearly $450,000. The amount of dredging was therefore a great deal less than the estimated amount. The estimated amount of stone was a great deal more than the stone actually used. It must be understood that the greater part of this large sum was diverted from the dredging contract, and from stone, and was paid for the excess over the estimates of multiple mats, and it was paid like that at Cumberland Sound, on bills presented for the square yards calculated on the several courses of the multiple mats used.

The jury should also remember, in this connection, that Gillette and other engineering witnesses testified strongly as to the great importance of dredging in maintaining the depth of the channel. Col. Quinn testified interestingly on this subject, and stated in effect that the time would come when that, while deepening the channel, much made land would be available for warehouses and the like, and would be created between here and the mouth of the river by dredging with the powerful pumps now in use in the bottom of the channel, and forcing it over the jetties on the marsh, when it would soon assume the form of land, possibly of dry land. The importance of work of this character is, however, sufficiently evidenced by the fact that in this one contract Carter specified for dredging to the extent of 7,000,000 cubic yards.

In the contract of September 16, 1892, at Cumberland Sound, the specifications placed the estimated quantity of mattress to be used at 50,000 square yards. In point of fact, the record evidence is that there were used 107,734.92 square yards. In the contract of November 5, 1894, the estimated quantity is 50,000 square yards of mattresses, and the record evidence shows that 213,334.11 square yards were used, or nearly four times as much. In the specifications for the contract of October 8, 1896, for the Savannah Harbor, it was estimated that 200,000 square yards of mattress would be used. The contract was not completed, but up to July 31, 1897, the evidence of the engineer's record is that 255,820.43 square yards had been used. In the contract of October 8, 1896, Cumberland Sound, the estimated quantity of mattresses was 200,000 square yards. The work was not completed;

146 F.—55

but up to July 31, 1897, according to the same class of evidence, 446,-102.41 square yards had been used, or over twice as much as the estimate provided for. Of the five contracts above mentioned, in which this large excess above the estimate of multiple mats were used, the Atlantic Contracting Company obtained three, Edward H. Gaynor one, and John F. Gaynor one. It is not in dispute that Edward H. Gaynor was acting for the defendants on trial, and that Greene and Gaynor, the defendants on trial, were stockholders to a large amount in the Atlantic Contracting Company.

Of all the contracts let in the Georgia district during Carter's command in Georgia, one, a small contract on the upper river, was let to Albert J. Twiggs. With this the defendants had nothing to do. The quantity of fascines estimated in the specifications was 7,500 cubic yards. Here there was no excess of such construction. There were used only 9,232.04 cubic yards. In the same contract the necessary stone was estimated at 4,000 cubic yards, and the amount used was 6,742 cubic yards, or over 50 per cent. more than was estimated. It is proper for the jury to contrast the manner in which this contract was required to be executed, and all the other contracts in which Greene and Gaynor were the successful bidders, and determine after careful consideration of all the evidence whether there was collusion and fraudulent connivance, as charged in the indictment, to injure and shut off other contractors, to benefit the contractors on trial, and further fraudulent purpose to so carry out the contracts as to secure for the defendants on trial the greatest profits at the smallest cost to the contractors and the smallest benefit to the government. If all this was done in good faith, without the corrupt agreement and the corrupt conspiracy charged, there can be no conviction; but, if the evidence as an entirety satisfies the jury to the degree heretofore defined of the truth of the charges made, a conviction will be justified.

There is much conflict in the testimony as to the manner in which fascines for mattresses were constructed. This the jury should reconcile as far as possible, and, if it cannot be reconciled, ordinarily they should accept the testimony of that witness or those witnesses who have the best opportunity to know the facts to which they testify and the least inducement from interest or otherwise to testify falsely. The credibility of witnesses is to be always a question for the jury, and they may accord credit where under all the circumstances they think proper.

There are certain general features with regard to the fascines to which I will briefly advert.

It is further contended by the government that, in pursuance of the scheme alleged in the indictment, a change was made by Carter in the method of payment for fascine mattresses, the result of which was to greatly increase the cost to the government and to correspondingly increase the profits to be divided between the alleged conspirators. A reference to contracts prior to May 4, 1891, will disclose that in addition to the two designs of mattress, known as the "Gillmore design," which Carter continued to use, which were to be paid for by the square yard, that in many contracts fascines were to be furnished and

paid for by the government by the cubic yard. These fascines' were sometimes placed in the work singly, and sometimes in the form of mattresses. A mattress of this description would, briefly stated, consist of a bottom grillage of poles, a layer of fascines, and a top grillage of poles; the top and bottom grillages being bound together with wire or rope. The object of the government was to place in the works fascines or brush material, and this, as stated, was paid for by the cubic yard. Gillette testified that the advantage derived by the contractor from putting in a large number of fascines at one time compensated him for the additional expense of making them into mattress form.

It is, moreover, contended that Carter's third design mattress is in all essential particulars the same construction as the fascine mattresses just described, which was paid for by the cubic yard of fascines in it. If this contention be true, and that is for the jury to determine, when Carter specified in the contract of September 16, 1892, his third design mattress, which was to contain one layer of fascines, and be paid for by the square yard of its top surface, the cost to the government of the fascine material in it was greatly increased. To illustrate, in the contract of November 5, 1890, the fascines, or fascine mattresses, were paid for by the cubic yard at $1.40. The thickness of the mattresses were 12 inches. If put in the works in the form of mattresses, it would take three to make a yard in height, and the pay would remain $1.40 per cubic yard. Now in the contract of October 22, 1892, the fascines were only nine inches, one layer was placed in the third design mattress, and the price per square yard was 95 cents. To make a cubic yard, four such mattresses must be used, and the price per cubic yard would be four times 95 cents, or $3.80. That is to say, under the contract of November 5, 1890, the government paid for fascines in the form of mattresses therein described, $1.40 a cubic yard. In the contract of October 22, 1892, the government paid for a cubic yard of fascine in the form of third design mattresses $3.80.

The jury will also inquire if the significance of this contention is not greater when the fascine mattress used prior to 1891 and paid for by the cubic yard is compared with a "course" of the multiple mat paid for by the square yard of its surface. In making this comparison, the jury should bear in mind, however, that the third design mattresses and multiple mats were frequently of greater width, and it may be true that it would cost the contractor more to sink fascines when placed in such large mattresses than to sink them singly, and, in comparing the relative cost, this may be taken into consideration.

Again, in the contract of C. C. Ely, May 31, 1889, for the construction of a retaining wall in Brunswick Harbor, "with brush fascines or mattresses loaded with riprap stone," where the fascines were to be from 12 to 20 feet long, the contract price for fascines and fascine mattresses was $1.34 per cubic yard. The fascine material in the Cumberland Sound contract, according to evidence which does not seem to be in dispute, cost the government—I mean the contract of October 8, 1896, cost the government—$4.40 per cubic yard; a cubic yard in depth requiring four nine-inch mattresses. To put it the other way: If the mattresses put in under the Ely contract of 1889 had been paid

for by the square yard of the surface of each mattress, as the mattresses at Cumberland in 1896 were, the price estimated on the basis of $1.34 per cubic yard would have amounted to only 44 to 56 cents, while the Cumberland mattresses were paid for at $1.10 per cubic yard. There has been tendered in evidence a compilation, "Cost of fascines or brush mattresses under various contracts in Savannah district, from 1884 to 1897." This will be before the jury.

The practical inquiry is whether Carter, as a part of the fraudulent scheme alleged, by the use of the third design mattress and of the multiple mat, to be paid for by the square yard, in lieu of fascines and fascine mattresses to be bid for and paid for by the cubic yard, as it is insisted had formerly been done, largely increased the cost of such fascine mattresses to the government, and correspondingly increased the profits to the defendants on trial, and that this was done corruptly and for the purpose of effecting the fraudulent scheme described in the indictment. As stated heretofore in defining the conspiracy charged in this indictment, it is incumbent on the government not only to show that a conspiracy was formed, but that some act was done by some of the conspirators to effect the object of the conspiracy. Several overt acts are charged to have been committed as already described.

In indictment 322, the overt act charged in the second count is that on the 17th day of March, 1897, Michael A. Connolly, one of the defendants and alleged conspirators, but who is not on trial, in pursuance of the conspiracy charged, did assist Oberlin M. Carter in the preparation of a certain document purporting to be articles of agreement between Oberlin M. Carter, corps of engineers, United States army, and the Atlantic Contracting Company, and which purports to modify the contract made on the 8th of October, 1896, for work at Cumberland Sound; and which document purports to be signed by said Carter and by the Atlantic Contracting Company, John F. Gaynor, president, and by William T. Gaynor, secretary. It is charged that said Connolly forged the name "William T. Gaynor, Secretary." This document is before the jury and may be inspected by them. Mr. Sterly testifies that the name W. T. Gaynor is not in the handwriting of W. T. Gaynor. Mr. Gleason, who testifies that he has been connected with the Southern Bank of the State of Georgia for 23 years, and is now with the Citizens & Southern Bank also states that as receiving and paying teller he had large experience in the comparison of handwriting; that he knew Michael A. Connolly, had seen him write, and, after examining several genuine signatures, testified that the signature "Michael A. Connolly," as attesting witness, is the genuine handwriting of Connolly; and that the name "W. T. Gaynor" on this document, is in the handwriting of Connolly.

It is further charged that Connolly assisted Carter in the preparation of a document purporting to be dated on the 18th of March, 1897, and purporting to be the written consent of Anson M. Bangs and Eugene Hughes to the agreement; that Connolly forged the names of Bangs and Hughes; and that he also forged the signatures of James C. Bogart and Henry Smith as witnesses. Mr. Gleason testifies that

the signatures of Bangs, and another necessary signature, are in the handwriting of Connolly. There is no denial of this evidence. It is also charged that Carter did knowingly cause such documents thus fraudulently prepared to be forwarded to the War Department of the United States for approval. The jury will recall the letters written by Carter under date of March 17th; one to the chief of engineers, stating that he inclosed for approval the supplemental contract proposed; and another letter to John F. Gaynor, New York, asking him to sign the supplemental contract, and take it to the War Department. It is contended that Gaynor was in Washington at that time. They will further consider the letter from the chief of engineers, acknowledging that the proposed supplemental contract had been received, and stating that it could not be approved.

If the jury are satisfied that the conspiracy is proved, as charged, and that the facts just enumerated are true, they may, if they think proper, regard this evidence as proof of an overt act; that is to say, of an act on the part of one of the co-conspirators to carry the conspiracy into effect.

The same alleged overt act is set out as done to effect the object of the conspiracy charged in the first count of indictment No. 371, and also in the third count of this same indictment.

In the third count of indictment 322, it is charged, as an overt act done to effect the object of the conspiracy, that on the 1st day of July, 1897, the alleged co-conspirators, all of them, did cause to be presented to Oberlin M. Carter, an officer in the military service of the United States, a claim against the United States which they then and there well knew to be fraudulent. This is fully set out in the analysis of the indictment hereinbefore given. The claim is for $32,811.42, and is for labor and material furnished during the months of January, 1897, under contract of October 8, 1896, on work of improving harbor at Savannah. It is evidence that while the work under this contract was in progress, no money was available from January 1st to July 1, 1897, and that on the last-named date claims were rendered to the Engineer Department for work done each month. The testimony is that the name, "Edward H. Gaynor," signed to the claim, is in the handwriting of Connolly. It appears that the claim was approved by Capt. Carter, and that it was paid in the check for $230,749.90 early in July. There is no evidence to contradict the proof that the name Edward H. Gaynor was signed in the handwriting of Connolly. To determine whether this claim was fraudulent, and whether it was presented to Carter, in pursuance of the alleged conspiracy, the jury will look to all the evidence under the rules heretofore explained. The record of the engineer's office offers official evidence that it was in fact presented. The same overt act is charged as having been committed to effect the object of the conspiracy charged in the first count of indictment 371.

As an overt act in pursuance of the conspiracy charged in the first count of indictment No. 322, it is charged in the fourth count that Carter, on the 6th day of July, 1897, signed a check to the Atlantic Contracting Company, for $345,000, and delivered it to John F. Gay-

nor, in payment of a claim for work said to have been done under the contract of October 8, 1896, for improving Cumberland Sound, which claim Carter knew to be fraudulent. Sterly testified that Carter left Savannah for Washington on June 30, 1897, and did not return to Savannah until July 7th. The alleged fraudulent claim of $345,000 was paid by check No. 270,537, dated July 6, 1897, on the Assistant Treasurer of the United States, New York. The amount and number of the check was entered on the voucher by Sterly before Carter came back, and after Carter returned the date of the check was added. When Carter left Savannah he took two blank checks with him, one for $345,000 filled out complete, except the date. The check was filled out by Carter, and Sterly made the entry on the voucher and on the stub. Mr. Marlor, Deputy Assistant Treasurer of the United States, testified to the payment of this check by the Subtreasury, and, as to the indorsement thereon, "Atlantic Contracting Company, John F. Gaynor, President," and "For Deposit, B. D. Greene." To determine whether this check was given in payment of a fraudulent claim, as charged, the jury will consider all the evidence.

In the eighth count of this indictment this is also charged as an overt act done in pursuance of the conspiracy charged in the sixth count of this indictment. The same overt act is charged as done to effect the object of the conspiracy charged in the second count of indictment No. 371. It is for the jury, if they are satisfied the conspiracy has been proven, to determine from the evidence whether the preparation and presentation of this check for the work at Cumberland Sound, in the manner described in the indictment, was an act done by one of the conspirators to carry the conspiracy into effect. The question is exclusively for the jury and should be determined in view of the general rules the court defined in the outset of these instructions.

The next overt act charged as done in pursuance of the conspiracy, set out in the first count of indictment No. 322, appears in the fifth count. It is there charged that Carter, as engineer officer, issued to the Atlantic Contracting Company a check for $230,749.90, in payment of an alleged fraudulent claim, for work claimed to have been done by the Atlantic Contracting Company, under contract of October 8, 1896, for improving Savannah Harbor, and that Carter knew said claim to be false. This check is similar to the one for $345,000 just referred to. It is dated July 6, 1897, and has been read to the jury heretofore. Sterly testifies that when Carter went to Washington on June 30, 1897, he carried two blank checks; one was for the purpose of paying this claim, but the amount of the monthly reports could not be ascertained when Carter left, and, according to the testimony of Sterly, the latter, under the instructions of Carter wired him at Washington on July 1st, the amount of the aggregate of the vouchers, or $230,749.90. The vouchers were not marked approved by Carter until after he returned on July 7, 1897. Mr. Marlor testified that this check was paid through the Subtreasury, and that it was indorsed precisely as the check for $345,000, just described. This, if true, connects all three of these alleged conspirators with

this check, and it is for the jury to determine whether the preparation, carrying, and deposit of the check, and the collection of the money thereon, were acts done by one or more, or all of the alleged conspirators to effect the object of the conspiracy, if they believe such conspiracy has, in fact, been proven.

The same overt act is charged as one to effect the object of the conspiracy alleged in the second count of indictment 371, and the instructions just given the jury may regard as appropriate to that also.

The seventh count charges as an overt act, done in pursuance of the conspiracy alleged in the sixth count of indictment No. 322, that the defendants, on the 1st day of July, 1897, caused to be presented to Carter, as engineer officer, for approval and payment, a claim against the United States for labor, material, and supplies claimed to have been furnished for work in improving Cumberland Sound, under contract of October 8, 1896; and that the defendants well knew the claim to be fraudulent. It is for the jury to determine whether this claim was fraudulent, and whether it was presented to Carter for approval and payment. The jury will recall the evidence on this subject relative to the approval of the claim, and the issuance of a check by Carter for $375,000 to pay it.

The same overt act is charged in the third count of indictment No. 371.

As another overt act done to effect the object of the conspiracy charged in the fourth count of indictment 371, it is alleged that the defendants, on the 1st day of July, 1897, caused to be presented to Carter, as engineer officer, for approval and payment, a false and fraudulent claim. The particulars wherein said claim is alleged to be fraudulent are set out in the count. This claim is in evidence. It is for the jury to determine from all the evidence whether this claim was fraudulent, and whether it was presented to effect the object of the conspiracy charged, if they believe such conspiracy has been proven.

The fifth and sixth counts of this indictment have already been described. They do not charge conspiracy, but charge that the defendants caused to be presented to Carter, as engineer officer, for approval and payment certain fraudulent claims set out in the counts named. The particulars in which the claims are alleged to be false and fraudulent are enumerated. The jury will determine from all the evidence heretofore given under the rules whether the claim set out in either or both counts was false and fraudulent for approval and payment with the guilty intent charged in the counts.

The indictment for embezzlement has been analyzed and described by the court. The jury have heard the evidence relating thereto. Much of the evidence which the court has recounted applies to the charges made in this indictment.

The jury will remember the evidence about the issue and payment of the checks for $345,000, and $230,749.90, the proceeds of which it is charged have been embezzled. The court has called your attention heretofore to the testimony of Sterly, as to the manner in which the checks were made out, and as to Carter's leaving Savannah on June

30, 1897, with two blank checks. Attention has also been called to the testimony of Mr. Marlor as to the payment of the checks, and their indorsement. In addition to what I have already said as to the law upon this subject, in view of certain evidence, I will further state: It is not only the payment of the money by check, but the issue of the check and the application of the payment to the claim, which, according to the evidence was done in this district, which constitutes embezzlement provided the essentials of embezzlement are also shown. If the act was partly done in this district, and partly in another, it is prosecutable in this district as if committed wholly in this district. Embezzlement, when committed by a series of connected transactions from day to day, may be alleged as of a single day where the facts are shown in evidence. The application of the money to the claim, coupled with the payment and withdrawal of the funds by checks, constitutes embezzlement, if the facts otherwise show that it is embezzlement.

It is further insisted by the government that when the charges set forth in these indictments, substantially as stated, except the indictment for embezzlement which was returned afterwards, were made against the defendants on trial, that they took refuge in flight. This is urged as evidence of their guilt. Now, there is a popular conception that when a man runs away from a criminal charge that it is conclusive evidence of his guilt. This, however, is not the law. Before it can be considered as evidence, the jury must be satisfied that the defendants fled. To determine this you may look to all the evidence in the case, and to the evidence of Greene himself. These remarks relate to the departure of these parties to His Britannic Majesty's Dominion of Canada. It is always competent to prove the flight of the accused as having a tendency to establish guilt. It is, however, not conclusive. It is always a fact of importance to take into consideration, and combined with other facts may sometimes afford strong evidence of guilt. It does not, however, raise a legal presumption that the accused is guilty. It is merely a circumstance, tending, if not sufficiently explained, to increase the probability of the defendant's being the guilty person, which on sound principles is to be weighed by the jury like any other evidentiary circumstances. I think it justifiable to state, also, that, in each case where flight is relied on as evidence of guilt, it is competent for the jury to take all the circumstances into consideration. If, for instance, the person accused of crime is youthful, uninformed, helpless, without means or counsel to defend himself, these and similar facts are matters which the jury may consider and which might tend to reduce the evidentiary effect of flight under the circumstances to show guilt. In cases where the defendant is a man of experience, clear intelligence, and has ample means to make his defense, these facts also may be considered by the jury, and may, if in their judgment it is proper, increase in their minds the evidentiary effect of flight to show guilt. Each case depends upon its own circumstances, and, if there is any case of flight, any explanation of it consistent with the innocence of the accused, he is entitled to the benefit of that explanation. I may add that one indicted in a particular state, or in a particular national ju-

dicial district in that state, has no right to justify his flight, upon the ground that there are other localities in which he would prefer to be tried. The Constitution declares that he shall be tried in the district where the crime was committed, which shall have been previously ascertained by laws, and no man can justify his flight because he objects to a familiar principle of the Constitution of the United States.

We now approach the consideration of a topic which you are instructed, in my opinion, is to be largely considered as the crucial or determining evidence in the case which has engaged us for so long. It is the proof offered by the government to show that the engineer officer placed here to represent the interest of the government, as against the interest or wrongs of the contractors, had been bought by them and seduced from his duty to the government, or voluntarily betrayed it for the benefit of the contractors; that he devoted his acknowledged skill in engineering and the opportunities which had been trusted to him, with the purpose of accumulating through conspiracy with the defendants a fortune from funds to be unlawfully diverted from the appropriation placed to his credit for the purpose of the government work in this district. All of the evidence which I have heretofore recounted, while all material in itself, if accepted by you, as in accordance with the government's contention, is in the main subsidiary to the main question, and that was: Did the engineer officer secure, as charged, a share in the profits of the great improvements in Georgia, undertaken for the welfare of the American people?

The record contains a vast amount of evidence, some parts of it consisting of minute incidents, others apparently of larger scope and compass. Facts of great significance, in the opinion of the court, relate to the changes in the engineering plan, in the forms of construction, in the comparative volume of material used, in relative expensiveness to the government. Much of this and many other circumstances, I have referred to, and all of it, doubtless, is fresh in your memory, and all you should consider as offered for the prosecution or for the defense. Were the court and jury obliged to take many items of this evidence and consider them singly and alone, without due regard to the correlation in which all evidence must be considered, upon a charge of conspiracy, it would be a judicial duty to instruct you that the defendants were entitled to acquittal, and it would be your duty to acquit. While evidence of this general character is often thus considered and treated in the argument of counsel, this is not permitted to the jury and the court. On the contrary, to quote from an authority cited by General Barr:

"To hold that nothing but positive evidence is sufficient to establish a conspiracy would be to give immunity to one of the most dangerous crimes which infest society. Hence, in order to discover conspirators, we are forced to follow them through all the devious windings in which the natural necessity of avoiding detection teaches men so circumstanced to envelop themselves. It is from the circumstances attending a criminal, or a series of criminal acts, that we are able to become satisfied that they are the results, not merely of individuals, but the products of concerted and associated action."

We must consider it altogether, and if there is found in the great mass one cementing and cohesive force, which binds the evidence to-

gether, and calm and impartial consideration makes the finger of justice point unerringly to the guilt of the accused, it is the duty of the upright and conscientious to accord to such evidence the probative effect which the rational, conscientious, and patriotic mind will deem it deserves.

Such, it is insisted by the government, is the proof it offers to show that the engineer officer himself was bought, or sold himself, for a share in the profits in these contracts, made with the values of the people, and for the benefit of the people; that from the slender salary of a subaltern his income and expenditures soon rivaled the prodigal and golden youth who spend their substance in riotous living. With no other resources, his outlay from 1890 to 1897, covering the period of these contracts, and the alleged fraudulent scheme and conspiracy, increased from $4,000 in the year 1890, to $28,000 per annum in 1896; and from a condition when his means were so slender that he was compelled to borrow, his accumulations for the same period, invested in gilt-edged securities, to gather and receipt for as his own, in an account, quite if not nearly, a half million dollars. That is the contention of the government. If that is proven, in your opinion, it is evidence of the gravest consideration for the jury, and if they further find, as contended by the government, that this wealth was accumulated because they divided with him the profits of the contract it was his duty to supervise, and they are satisfied of these facts beyond a reasonable doubt, the government has proved its case. Finding these facts to exist in connection with all the other evidence I have recounted, the government has proved its case, and it is entitled to a verdict of conviction against the defendants on trial.

There is no denial that I recall of what may be deemed the astonishing increase in the personal expenditures of the engineer officer, Carter. You may conclude, therefore, that these are shown by incontestable proof. You will look to the evidence to ascertain the sources of the income which was so rapidly increased and so lavishly expended. It does not appear from the evidence that when he assumed command of the Savannah district he had any income in excess of his salary. This, with his commutation in 1890, amounted to $2,208. This was his total income. His personal expenditures that year were $4,306.60. In 1891, his salary and commutation was $2,845.57, his total known income, $2,970.57; his personal expenditures, $5,897.83—or about twice his income. In 1892, his salary and commutation was $3,032. There was now an additional income which the government insists accrued from dividends and interests on investments alleged to have been made with funds arising from the operation of the fraudulent scheme charged in the indictment. This amounted to $1,012.50. His total known income was $4,044.50. His personal expenditures were more than twice as much, namely, $8,354.24. In 1893, his salary had not been increased, but dividends and interest had increased to $6,720, and his total known income was therefore $9,752; and his total expenditures, $14,982.74. In 1894, his salary remained unchanged, his dividends and interest had in-

creased from $6,420, to $13,491, his total known income was $15,-523.17; his total expenditures now amount to $14,410.88. In 1895, there was no increase in salary, but his dividends, interest, and rents aggregated $27,363.34. His personal expenditures had also increased more than $5,000, but they were now less by more than $7,000 than his income. His outlay was $20,113.92. In 1896 his salary and commutation had increased a little more than $100. It was now about $3,140.88. But this slender pay of an army officer, added to his other sources of income, amounted to $31,458.85. Independent of his salary he now had an income of $28,317.97, and he expended that year, $28,611.67. For four months of 1897 his salary was $1,077.32. his total income for the same period was $10,610.68. At this rate it would have been over $30,000 for the full year. His total expenditures for the four months were $7,566.75. At this rate, had it continued, it would have exceeded the expenditure of the previous year, which was more than $28,000. It will suffice, for the purposes of your duty, for the jury to understand that from 1890 to April, 1897, he had received as salary and commutation for his pay as an army officer a total sum of $21,399.77. This was his pay as an officer. In 1891, his income from interest, dividends, and so forth, amounted to only $125, according to the evidence submitted. To April, 1897, this source of income in the aggregate amounted to $82,844.86. During the same period, his personal expenditures amounted to $104,244.63, or an average for the entire period of about $17,370.77. This estimate of increase in Carter's expenditures is not denied.

What is the probative effects of this evidence? The science of the law and the rules of evidence do not exclude from the province of the jury the power to make those deductions, which the triors, men of practical knowledge, experienced in the affairs of life, would reasonably or obviously make from facts like those just recounted. The obvious inquiry follows, whence came this rapid increase of income? The explanation afforded by the government which it asks the jury to accept, is based upon the following evidence:

When the connection of Carter was severed with the engineer office in Savannah, in an oaken case belonging to the government there was found a large mass of letter-press copy books showing his official and personal correspondence; many stub books, memoranda, and other indicia in the nature of evidence. This was taken charge of by the court-martial. Certain letters of a purely personal character were restored to Carter. The other evidence thus found was regarded as legitimately within the possession of the government to be used for the purposes of enforcing the law against those who, by its alleged violation, it is now insisted, have despoiled the public treasury of large sums. This evidence has been carefully preserved. In no respect is its authority questioned. It was kept under seal, and in the control of trusted officials of the government; brought to this city under like protection, and has been carefully guarded by the custodian appointed by the court for that purpose. It has been open to the inspection of the counsel for the prosecution and for the defense,

and all that seemed pertinent to either has been submitted for the consideration of the jury. It was evidence accumulated and left by Carter himself. In part, from indicia thus furnished, it is contended by the government that it has been enabled to trace the sums paid by the defendants on trial to Carter as his reward for the alleged betrayal of the government in their interest as the result of the conspiracy charged.

An expert accountant, Mr. Johnson, was commissioned by the Treasury Department for the purpose of tracing the public funds thus alleged to have been diverted. A large number of books of certain banks, brokers, and trust companies in New York were examined. They constitute an immense volume of evidence. They are before the court. The statements taken therefrom, and verified by the bank officers, officers of trust companies, and others having knowledge of the books for the purpose of convenience, have been offered in evidence and considered by the court, counsel, and the jury; but the original books and entries are all here and subject to inspection and verification by the parties concerned and their counsel, and by the members of the jury. The expert accountant charged with this important duty has carefully prepared and submitted for the consideration of the jury a series of tabular statements, 32 in number. By these, and by the evidence offered in support of each statement, in the form of checks, bank deposits, and the like, the government contends that it has traced the disbursing checks of the engineer officer, Carter, issued on all the contracts with which the defendants on trial were concerned from 1891, when it is alleged the scheme to defraud was formed, until the alleged final distribution of the alleged illegitimate profits in July, 1897. From the consideration of this evidence, thus tabulated for convenience and clearness of reason, it is also contended that the jury must draw the conclusion that such profits were divided between Benjamin D. Greene, John F. Gaynor, the defendants on trial, and Oberlin M. Carter. It is further contended by the government that the evidence shows that for most of this period the division was practically by thirds; one-third of the profits being paid to each of the accused just named. This exhibit is called 319. It would be unjustifiable for the court to attempt its complete recapitulation. Only one sheet will be read, in order to refresh the memory of the jury as to the manner in which the statement is framed. It will be borne in mind that these statements were spread on a large easel before the jury. The government expert, Mr. Johnson, who is also a bank examiner of the Treasury Department, called and pointed out to the jury each item of the account set forth by the sheet; and for each item positively stated in the entire 32 great sheets which were gone over before the jury with the intent to account for the payment, investment, and final distribution of the vast sum involved in this trial, astonishing as the statement may seem, he was enabled, with the prompt and capable assistance he received, almost instantly to produce the original evidence in the nature of a check, deposit slip, and the like, as each was needed, in verification thereof. None of the evidence thus produced is questioned. No one questioned the authen-

ticity of it. The deduction he makes, and the manner in which he arrived at the apparent results pointed out by him have been questioned and criticised by the evidence of an expert retained by the defense, a Mr. McPherson. The comparative correctiveness of the opposing statements is a matter exclusively for the determination of the jury. The statement which will be read is No. 9, and the jury will have it before them, and if they think proper may examine the blue print from which this is copied, and all the others explained by Mr. Johnson and criticised by Mr. McPherson, if they deem that this is essential to a proper understanding of the issues they are to determine. This is the sheet:

### Description of Checks Divided.

Date of check: August 3, 1893.
Number of check: 224,449.
In whose favor: Atlantic Contracting Company.
On whom drawn: Assistant Treasurer of the United States, New York.
Amount of check: $39,075.

### How Deposited for Division.

Bank in which deposited: American Exchange National Bank, New York.
Date of deposit: August 7, 1893.
In whose account deposited: William T. Gaynor.
Exhibit showing deposit: No. 246.
Amount of deposit: $39,075.
Less arbitrary allowance, trip Carter to New York, $75.
Amount for division: $39,000.

### How Divided.

Carter's whereabouts: New York.
Exhibits showing same: Nos. 300 and 301.
Column of thirds: One-third, $13,000; allowance, $75.
Certain Checks Between the Parties at or About Corresponding Dates.
Drawer of check: William T. Gaynor.
Date paid: August 7, 1893, favor of unknown
Exhibit number: 248.
Amount of check: $13,075.

### Certain Deposits at or About Corresponding Dates.

See testimony of Franklin Ford, pages 1902 and 1904.
Deposit in account of O. M. Carter with Reed & Flagg, subsequently transferred to the account of R. T. Westcott.
Date of deposit: August 9, 1893.
Exhibit number: 238½, 239.
Description of deposit: Currency.
Amount of deposit: $13,000.

### How Invested.

Date of purchase: August 10, 1893.
Through whom bought: Reed & Flagg.
In whose name: R. F. Westcott.
Exhibit number: 239.
Description of securities: 10 Delaware & Hudson, Pennsylvania Division, 7 per cent. bonds.
Numbers: 82, 83, 293, 528, 593, 840 to 842, 1648, 1649.
Par value: $10,000.
Cost: $12,825.

Paid for Viz.:

See testimony of Franklin Ford (record pages 1902–1904), that in connection with Carter's visit to the office of Reed & Flagg the following deposits were made:

| | |
|---|---|
| August 9, 1893, currency................................................ | $13,000 |
| 3 per cent. premium on sale of $13,000, currency, check........... | 390 |
| Total .................................................................... | $13,390 |

Less:

| | |
|---|---|
| August 10, 1893, Reed & Flagg, check: Deposit by O. M. Carter in the Union Trust Company, New York...................... | 565 |
| | $12,825 |

Exhibits: 239, 238½, 239, 239, 238½, 239, 239, 251.

Disposition.

Description of securities: 10,000 Delaware & Hudson, Pennsylvania Division 7 per cent. bonds.

Numbers: 82, 83, 293, 528, 593, 840 to 842, 1648, 1649.

Par value: $10,000.

Original cost: $12,825.

Carter's receipt to Westcott, date: October 29, 1897.

Exhibit number: 272.

Coupons and Dividends.

Dates of deposit tickets, showing Carter's collection of coupons and dividends:

September 1, 1893.
March 2, 1896.
October 8, 1896.
March 6, 1897.
Exhibit number: 251.

The government undertakes to show a division of money between the defendants on trial from December, 1891, to July 6, 1897. The compilation just read brings into juxtaposition the evidence relating to what is termed by the expert, Mr. Johnson, the ninth "division." As stated, there are 32 so-called divisions, which he has illustrated by the same method. Of course the reference of this witness to "divisions," checks "divided," how "divided," etc., only relates to the method he has adopted to illustrate the evidence, and cannot be considered as his opinion that such divisions, if any, were the result of an alleged conspiracy; or that the money was unlawfully divided with Carter, if divided at all. It is for the jury to determine from all the evidence relating to this topic, whether or not there was the division of money charged in the indictment, whether this is the proper inference to be drawn from the evidence brought into juxtaposition by the compilation of Mr. Johnson, considered in connection with all the other evidence, particularly that of the expert accountant, Mr. McPherson, offered by the defense.

Under the head of "Division, January 3, 1893," also called the second division on Exhibit 319, four checks are considered. They were issued by Capt. Carter in December, 1892; three are payable to E. H. Gaynor, and one to the Atlantic Contracting Company. They aggregate $65,-632.62, which sum was deposited January 3, 1893, in the account of J. F. Gaynor. There appears on the exhibit referred to the following

entry: "Subtract valuation of working plant, Greene & Gaynor, Exhibit No. 265, $26,932.50." Reference is made to the minutes of the Atlantic Contracting Company of August 5, 1892, to the effect that "the said John F. Gaynor and Benjamin D. Greene are willing to sell and transfer the whole of said property for the sum of $26,932.50." It otherwise appears that Greene and Gaynor owned practically all the stock of the Atlantic Contracting Company; that it was organized in August, 1892, and secured some contracts soon thereafter, notably the contract of October 22, 1892. These checks, as appears from their face, were issued for work done in improving Savannah Harbor and Cumberland Sound, making the deduction stated under the heading, "Amount for division," is placed $38,700.12, and under the column "one-third," $12,900.04. Carter, according to the evidence, was in New York at this time, January 3, 1893. On the same day Gaynor apparently draws five checks, and Greene one; and on the 5th another check, and on the 17th another. On January 3d there was a deposit by Carter in the Union Trust Company, bills, $3,550, deposit ticket being made out in Carter's handwriting; and on the same day there was a deposit by him with C. H. Van Deventer, a broker, currency, $9,350—a total of $12,900, or four cents less than the amount placed in the column of one-third of "amount to be divided."

On January 3d and 4th certain bonds were purchased by Carter in his own name, through Van Deventer. They are known as Erie, Reading, and Wabash bonds, and amount to $14,437.50. According to the evidence, they were paid for in part by the sum of $9,350 just alluded to, and it is claimed that the balance was derived from proceeds of Chesapeake & Ohio bonds which Carter had previously purchased, as shown in division 1; that is, $3,981.25. The accounts, statements, checks, and so forth, referred to in the compilation, have been exhibited to the jury. According to this evidence, the bonds were delivered to Carter January 4th and February 10th. From the record of the Garfield Safe Deposit Company, it appears that Carter visited his safe deposit box on January 4th. From the deposit ticket it appears that on May 2, 1895, there was deposited to Carter's credit coupons on the five Wabash bonds amounting to $125. These bonds, it further appears, were sold on May 19, 1897, and the proceeds dealt with in a later division known as Division No. 31, where the purchase of certain Orange, New Jersey, bonds is described. The Erie and Reading bonds were sold on April 18th and 19th, in the account of R. F. Westcott.

Following the method adopted by the expert accountant, Mr. Johnson, and considering the evidence he has grouped under "Division No. 3, of February 10, 1893," the checks dealt with are three disbursing checks and one check of Gaynor drawn on the Merchants' National Bank of Savannah, a depositary of the United States. These aggregate $48,000. This amount was deposited in the American Exchange National Bank, of New York, February 10, 1893, in the account of John F. Gaynor. One-third is $16,000. Carter's whereabouts is put down as in New York, and a deposit ticket of February 10, 1893, is offered in evidence of that fact. On this day it appears from the

account of John F. Gaynor that he drew a check, the name of the payee not appearing on the account, for $16,000. On February 10, 1893, there was deposited by Carter in the Union Trust Company, in bills, $5,850, deposited by him with Van Deventer, in currency, $5,000; and on the 11th, with Watson & Gibson, cash, $5,000; making a total of $16,850. The exhibits showing these transactions have been submitted to the jury.

On February 11, 1893, it appears that there was bought from Watson & Gibson for account of O. M. Carter 5,000 Chesapeake & Ohio bonds, and on February 11, 1893, there was bought through Watson & Gibson for account of O. M. Carter, 5,000 Erie bonds, and on February 13, 1893, there was purchased through Van Deventer in the name of O. M. Carter, 5,000 Wabash, Detroit, etc., bonds, and there was purchased on the same day 5,000 Chicago & East Illinois bonds; the total purchases amount to $20,656.25. To pay for these bonds, checks of Carter on the Union Trust Company are submitted. These, together with the three deposits by Carter, aggregate $20,-656.25.

It is contended by the government that Carter did not always make an immediate investment of the money received by him in the manner charged, and that for this reason portions of such money are necessarily carried from one division to another; the money uninvested being in the meantime kept in a bank to his credit. In the transaction just referred to, it is insisted that the balance necessary to pay for the bonds was drawn from his account in the Union Trust Company. From exhibits which the jury have examined, it appears that the bonds were turned over to Carter on February 13 and March 16, 1893. It also appears from exhibits submitted that on May 2, 1893, Carter was given credit for five coupons on the bonds of Chesapeake & Ohio, $125. This appears from deposit slip. It also appears from deposit slip, stated to be in the handwriting of Carter, that on May 10, 1897, coupons on the same bonds were credited to Carter's account.

As has been several times referred to in the evidence and arguments, on October 29, 1897, it is testified that Westcott delivered to Carter a great many bonds and other securities, taking Carter's receipt therefor. This is known as Exhibit 272. It appears from this receipt that the Chesapeake & Ohio bonds, the identical numbers being the same, were turned over to Carter. There is evidence as to the collection of coupons by Carter on the Wabash, and so forth, bonds, and they are also included in the bonds turned over by Westcott to Carter October 29, 1897. The Erie bonds, it appears, were sold on April 19th, in the name of R. F. Westcott. The proceeds, $4,818.75, are considered later in connection with another alleged investment. The other bonds, 5,000 Chicago & East Illinois, it appears, were sold in the name of Westcott June 25, 1897, and the proceeds are considered in connection with Orange, New Jersey, property.

"Division 5, of April 14, 1895." Four disbursing checks drawn by Carter, one on Merchants' National Bank of Savannah, and three

on Assistant Treasurer, New York, amounting to $62,154.34. This sum deposited in the American Exchange National Bank, New York, April 14th, in account of John F. Gaynor. Carter is in New York, as appears from deposit ticket in his handwriting. One-third is $20,718.11. It appears from exhibits in evidence that on April 14, 1893, the American Exchange National Bank paid check of John F. Gaynor for $27,387.23, which check it appears was deposited in the same bank to the credit of B. D. Greene. On the same day, it appears, check of Gaynor was paid by the same bank, in favor of person unknown, $8,450, and that on the same day by same bank check of Greene for $6,550. Four other checks in favor of unknown parties, dated within the next few days, are paid by the same bank and charged to Gaynor's account. On April 14, 1893, there was deposited by O. M. Carter in the Union Trust Company bills, $400. Same day and bank, account of R. F. Westcott, bills, $14,500, and deposited on April 15th, by Carter in same bank, bills, $3,000. On April 11th and 14th, there was purchased through Van Deventer, in the name of Carter, 15,000 bonds at cost of $19,756.25. A part payment on these bonds, it appears, was a check of Westcott on the Union Trust Company for $14,500. The jury will recall this amount, in bills, was deposited by Westcott in that bank on the 14th of April. A letter is offered from Carter, dated April 11, 1893, to Van Deventer, requesting him to "buy for my account ten more gilt-edge bonds," etc. "I shall be in New York Monday night." According to the evidence, Carter collected coupons on these bonds. Fifteen of the bonds, it appears from the receipt, were turned over to Carter by Westcott on October 29, 1897. Five bonds were afterwards sold, others bought in Westcott's name, Carter collected interest coupons at certain periods, and these bonds were turned over to Carter on October 29, 1897.

In "Division July 6, 1897, No. 23," two checks drawn by Carter on the Assistant Treasurer of the United States, New York, in payment for work done under contracts of October 8, 1896, are considered. These checks aggregate $575,749.90. It appears that during a large part of the period before July 1, 1897, there was no money available to pay contractors, and that they were paid by these checks in July. These checks have been referred to several times heretofore. On July 6, 1897, there was deposited in Knickerbocker Trust Company, to credit of Greene, $575,749.90. From this is deducted a number of checks to W. T. Gaynor and E. H. Gaynor, as explained by the accountant. There is also deducted $75, arbitrary allowance to Carter for trip to New York. There is another deduction, stated to be "stockholders' advancement made to carry on work, $132,850." After giving a list of checks of Greene & Gaynor, a number of checks are enumerated as advances by Carter or by Westcott at Carter's request. The latter amount to $50,000. The amount left, as stated by the accountant, is $380,075. Greene testified, the jury will remember, that Westcott made a loan to him of $50,000. Westcott testified that he turned the money over to Greene at Carter's request, that

146 F.—56

Carter made it good, and that it was not his (Westcott's) transaction.

Referring to the exhibits, the accountant testifies:

"If Carter was entitled to one-third interest; Carter's advances, $50,000; one-third as above, $126,691.67, allowance, $75, amount of Carter's interest, $176,766.67."

Evidence is offered to show that the $50,000 which Greene received from Westcott was in part derived from the sale of bonds which Carter had acquired previously, and in part of a check from Carter himself. The check for $21,000, which Greene testified was a part payment of the loan of $50,000 made Westcott, the government insists from the evidence was deposited to the credit of Westcott, but used to pay part of Carter's Orange, New Jersey, investment.

The jury will remember that Greene testified that he received about $170,000, that John F. Gaynor received about the same, and that $150,000 of bonds, costing $172,500, were bought and were to be disposed of, and the proceeds were to be used in carrying on the work in Savannah; but that, the work being discontinued, the bonds were divided between him and Gaynor in November.

The government insists that the evidence shows that Carter made advances to carry the work on, and that he received the bonds purchased by Greene. The jury may inquire if these bonds were Carter's, and that he subsequently turned them over to Greene and Gaynor, and that Greene failed to turn over these bonds with those which Westcott testified he turned over to him, and for which Carter subsequently receipted.

They may further inquire if there was any reason, such as the pendency of investigation by the board of inquiry, which might cause them to adopt such a course as to these particular bonds.

The amount of disbursing checks issued, according to Mr. Johnson's compilation, commencing with 1892, and up to August 3, 1897, was $3,176,908.86, and the total amount claimed to have been divided was $2,172,309. From the same exhibit it appears that to May 12, 1896, there was an aggregate of "thirds" of $611,836.35; an aggregate of cash, bills, and currency, deposited of $570,499.86; and aggregate of investments claimed by the government to have been made by Carter, $569,132.16. As stated, the accuracy of this accounting is entirely a question for the jury. It has been bitterly assailed by the defendant's counsel, and by the defendant's expert. The expert of the government has also been denounced in terms of bitterness. The invectives of counsel, however, do not and should not control the right determination of a cause, unless the conduct and testimony of the witness merit such severity. The question is: Is the exhibit true? Did Carter receive this money? Was it a share of the profits which he obtained as the result of fraudulent conspiracy?

In walking from this hall to your jury room, you traverse the corridor which the architect of .is beautiful structure has laid with mosaic pavement. There are innumerable fragments of stone of different size incorporated in the smooth surface. Before the task was completed, the fragments were each as insignificant as pebbles

on Tybee's strand. In the sports of childhood they might have been thrown away and scattered by little hands. But when by the workmen's skill they are placed in juxtaposition and pressed down in the tenacious and enduring cement, they harden into a compact and enduring surface which may bear the hurrying footsteps of generations yet unborn. And so the evidence in this case. Much, if considered out of its relation, might possess little significance. If it appears that the incidents, which have been for so long and so sedulously placed together by one great controlling fact which demonstrates in the minds of those charged as joint offenders the existence and presence of those motives of self-aggrandizement and pecuniary greed with which courts have so often to deal, if considered with all the evidence it is explanatory, illustrative, satisfactory, decisive upon the issues formed on the indictment. This is a matter for the jury to determine in connection with these defendants. The jury will also determine whether or not it was strengthened and buttressed in every particular by the original evidence produced from the banks and trust companies, upon which the government relies. If this evidence taken as an entirety is deemed by the jury to be clear, convincing, and satisfactory, it is evidence of the first importance. If therefrom it is in the opinion of the jury satisfactorily proven that Carter shared in the large profits from the government contracts with Greene and Gaynor, which it was his duty to supervise, and that each of the other defendants on trial received a share of the profits accumulated in the manner charged in the indictment and otherwise described in the proof, they would be justified, in view of all the other evidence in the case, in returning a verdict of conviction on the appropriate indictments and the counts thereof as they may find. If, however, the evidence is deemed unsatisfactory, uncertain, and unreliable, after its close and just consideration, if the minds of the jury honestly and conscientiously hesitate as to whether or not they should accept these compilations, the deductions to which they point, and the other evidence oral and documentary in support thereof, and if the contentions of the government are not supported by other proof that a share of the profits did in fact go to Carter, they would be, in the opinion of the court, justified in returning a verdict of acquittal.

While it is contended by the government, generally speaking, that Carter received one-third of the profits of these contracts, it will support the charges of the indictment if the proof shows that as a result of the fraudulent conspiracy with Greene and Gaynor, while acting as engineer officer, he received anything of pecuniary gain whatever for assisting them in securing contracts and in making large profits from such contracts.

You will next inquire, gentlemen, whether there is evidence in this case corroborating the evidence classified and the deductions pointed out in the exhibits prepared by the expert accountant, Mr. Johnson, which I have just attempted to explain. In other words, is there satisfactory evidence to show that Carter really shared in the profits of the government contracts of which the evidence treats?

It may, in the opinion of the jury, be relevant to a consideration

whether Carter shared in the distribution of these profits to consider the following evidence in proof which is not denied: It relates to the circumstances of his visit to Washington, about the time of the large payment. He left Savannah June 30, 1897, according to the testimony of Sterly the day before the money was available. He took with him two blank checks, one filled out with the exception of the date, and the other blank, as to the amount. He directed Sterly to telegraph him the amount the following day. One check was for $345,000, and the other $230,947.90. He made requisition for money to be placed in the Treasury in New York. When he left, the claim for the last month's work for the Savannah Harbor, aggregating a large sum, had not been approved by him when the check was issued. These circumstances, like many others in this case, may in themselves be innocent enough; but in the light of the charges in the indictment, and the other evidence which I have in part recounted, the jury may consider whether they indicate that Carter had a personal interest in the proceeds of the checks. It is further in proof that Carter was in New York at the time, and in person turned over these checks to Gaynor.

It is insisted, however, for the defense, that Westcott, and not Carter, was the beneficiary of a large share of the profits on the government contracts of this district. Mr. Westcott was Carter's father-in-law. Carter's wife it appears had died in December, 1892. It appears from the evidence that Westcott was a man of large affairs. It is contended by the defense that he was the intimate associate of some of the first and most influential of the great financiers of this country. According to the testimony of his counsel, H. L. Stimson, of New York, he was a man of perfectly sound mind, of strong, dominating character. "I regarded him," said Mr. Stimson, "as a man who was to an exceptionally high degree a man of force and intelligence, one of the most so of his age that I have ever met." It otherwise appears from Mr. Stimson's testimony that Westcott was a man in vigorous health the day of his death, which resulted from an accident. It appears from the proof that Mr. Westcott had great confidence in Carter, and from the time of the latter's marriage with his daughter was sincerely attached to him. Westcott stated that he would have trusted Carter with his life. He received large sums of money which he testifies he kept for Carter. They had mutual investments. At times Carter deposited his own money in his attorney account for Westcott, but Westcott bitterly denies that he had any connection whatever with the Georgia contracts, or that he had any knowledge of, or was a participant.

As previously stated, by the humanity of the national law, Greene is permitted to be a witness in his own behalf. Under the law of this state he would not be permitted to do more than make a statement not under oath. Here he testifies as any other witness, and the weight of his testimony is entirely a matter for the jury. He denied all charges of collusion and conspiracy with Carter, and states that he did not see Carter much after 1890. He met Westcott at the University Club. Westcott had retired from active business in 1888.

He said that Westcott claimed to have great influence with influential people in New York, especially those connected with the New York Central Railroad. He said that Westcott said to him: "I kept William H. Vanderbilt out of jail once, what do you think of that?" He further stated that he and Gaynor were anxious to get established with one of the great railroads, such as the New York Central. He said that in the fall of 1892, at the Horse Show, Mr. Westcott spoke to him of the work at Savannah. I now use the language of the witness:

"He asked me how I would regard his having some interest in the profits here in this work, or these works. That didn't strike me as anything remarkable. He was doing a great deal for us, or trying to do a great deal, and it was a matter, perhaps of $100,000. It strengthened us financially, and I told him I would consult with Col. Gaynor and see. As far as I was concerned, I thought we would do it. I felt favorably disposed towards it."

At that time the Atlantic Contracting Company had the contract known as the 1892 contract for the Savannah River and Harbor. Greene testified that his contemplated profits were $400,000 to $450,000. After that Greene testified that he visited Westcott several times. In one of these interviews he told him that Col. Gaynor agreed that he should have a share in the profits, an interest in the profits of these works here. In the following January, he stated, he began paying him a share of the profits, he did not know Carter in the transaction at all. He said: "I did not need him to help me in any way." The amount paid Westcott as profits on the 1892 contract was largely in excess of the amount anticipated. He had no written contract with Westcott. Consideration of his pay was "anticipation of future work, confidence, and expectation." He testified that he paid Westcott about $450,000 or $500,000 as his profits on his one-third interest. Westcott is now dead, but when in life he testified before Commissioner Shields in New York and denied positively that he had ever received a cent of profits on the Georgia contracts from Greene or any other person. The comparative credibility of these witnesses is a matter for the jury. Apply to it your intelligence as men of affairs. Is it probable that Greene would have paid in the neighborhood of half a million dollars to Westcott on the possible contingency of securing work for him and Gaynor thereafter? The jury must determine whether or not this story is, per se, credible.

The government seeks to impeach the testimony of Greene on this point. It is by proof of contradictory statements. This is one of the methods of impeaching a witness. It was proven that when Greene appeared before the board of inquiry in Carter's case he was asked this question:

Q. "Has R. F. Westcott, within your knowledge, ever derived any benefit from any government contract in which you were interested?"
A. "He has not, nor from any other contract in which I have been interested."

Greene testified, however, that when he was before the court of inquiry, that when the question was read he did not think he fully comprehended its scope. In rebuttal of this statement, Col. H. M.

Adams, an officer of the rank of colonel, engineer corps, United States army, testified that he was a member of the board of inquiry, and that:

"The questions were written out, the questions were in writing, and were read to Capt. Greene deliberately and clearly, and he took time to consider them. He answered them positively, as stated in that record."

Greene further stated before the same board:

"I will demonstrate to the satisfaction of the board, if Capt. Carter's defense depends upon it, that neither he nor Mr. Westcott ever received a dollar of this money."

Greene testified before the court-martial. He was now under oath. He spoke of the profits of the Atlantic Contracting Company and said: "Nobody but Col. Gaynor and myself to pay it to, it didn't require much notice."

Westcott testified that he met Carter at his house in New York City, 33 West 53d street, a day or two after Carter's return from London in 1897. This was pending investigation of the charges against Carter which were acted upon by the court-martial and which were subsequently presented by the indictment now under consideration. Westcott testified that some time afterward he went to Washington in response to a telegram from Carter. He stated that Carter "wanted me for company. He had the blues, or something of that kind." They returned to New York. Westcott says Carter stated he expected to be arrested when he got back from London, and immediately went to the safe deposit company and took out all his securities and took them up to Mr. Greene and Gaynor at the Hoffman House; that he said he was sorry he had done so, sort of premature, and wanted to know if I would take charge of the bonds. "After much persuasion," he says, "I consented to do it, and he told me that Mr. Greene or Gaynor, or both of them, would bring these bonds up to me the next day at 10 o'clock." They did not bring them, Westcott stated, and he telephoned, and "they said they had changed their minds and wasn't going to bring them." Mr. Gaynor said that. The next day at 10 o'clock, Mr. Greene put in an appearance with the bonds. He brought them to 33 West 53d street, my house. He says:

"Of course, I took possession of them, and I got Greene to go down with us. I was very much surprised at the quantity. I got Greene to go down to the safe deposit because I was afraid I might lose them, until I looked them up. I did not check them up or anything, but from the bulk of them I should think there was a large amount of bonds."

They were put in Box 142 Broadway, New York Safe Deposit Company.

Westcott further testified that when Carter wanted him to go before the board of inquiry and testify that Westcott had furnished him all the money he had spent for the last six or seven years, he replied: "Well, I told him I couldn't do it, because I didn't care to go down there and lie, or swear to a lie, either one." He testified that Greene visited him at Richfield Springs. In the conversation, Greene stated Westcott was a partner, but that later "he admitted that I was not."

He further testified that "Mr. Greene asked me to turn over some bonds to Capt. Carter." This was done, and a receipt taken dated October 11, 1897. Shortly after that he testified he turned over the balance of the bonds to Carter, because, as Westcott states, he (Westcott) was going to leave the country. This was October 29, 1897. He checked them up in the presence of Westcott's counsel, H. L. Stimson, and Mr. Solley, and Carter gave a receipt in evidence. He testified that Carter claimed the bonds.

As we have seen, the testimony of Greene is contradictory in several respects to this statement of Mr. Westcott. This is particularly true with regard to the delivery of bonds to Westcott by Greene, and also with regard to the interview between Greene and Westcott at Richfield Springs, where Westcott stated that Greene admitted that Westcott was not a partner with him. Rose, one of the counsel for Carter, and another lawyer named Thacher, were present at this interview. Greene testifies that both of these men are living, but neither of them was produced as a witness. H. L. Stimson, of New York, came before the jury and testified in person. Mr. Meldrim referred to this gentleman in his argument as a distinguished lawyer, a partner of that other distinguished lawyer, the present Secretary of State. Whether this is true or not, certainly his testimony is uncontradicted.

I have recounted a portion of his testimony as to the characteristics of Westcott. He stated he was present in October when Westcott turned the securities in question over to Carter. It was at Mr. Stimson's office. He testified that Solley, Westcott, and Carter were there. He said Dr. Solley and Mr. Westcott made out a list of securities which they brought in. "I personally did not check it over. They made up such a list from which this receipt was made, as a copy by my stenographer. Carter took the receipt as prepared, went over the securities with it, said it was all right and went away with the securities." And he further states, to use his language:

"After Mr. Carter had taken these securities, and had gathered them up, and was putting them into a bag, I think that he had there, I remember that he took some of them in his hand and said, substantially, 'Daddy, I wish you would take these,' words to that effect; and that Mr. Westcott either said, 'No, no,' or made some gesture of repudiation of the offer made by Carter."

I feel it, gentlemen, my duty to instruct you that if you believe from this evidence that Solley and Westcott brought the securities there, that Carter was also there, that Solley, the son-in-law of Westcott, and Westcott, counted the securities and checked them over and turned them over to Carter, that a receipt was made to be signed by Carter; that Carter, after checking the securities, signed the receipt and offered to give a portion of them to his father-in-law, and, when this offer was rejected, put the securities in a bag and took them off; that, in the absence of proof overcoming the presumption, it would be a lawful conclusion that the title of the securities was in Carter.

If, then, you further believe from the evidence that these securities in whole or in part were the identical securities traced to Carter on

which he collected the interest coupons as stated in Exhibit 319, and otherwise by the evidence offered in support of said certificate, and according to Exhibit 319, all these securities were purchased with funds traced to Carter, the execution of the receipt and the delivery of the securities, in the absence of satisfactory proof to the contrary, may be regarded as a closing and settlement of any accounting which may have existed between Westcott and Carter before that time.

It is insisted for the defendants that the prosecution against them is barred by the statute of limitations. This will require a brief inquiry at your hands. The law is as follows:

"No person shall be prosecuted, tried, or punished for any offense, not capital, except as provided in section 1046, unless the indictment is found, or the information is instituted within three years next after such offense shall have been committed. But this act shall not have effect to authorize the prosecution, trial or punishment for any offense barred by the provisions of existing laws."

Section 1046 provides:

"Nothing in the two preceding sections shall extend to any person fleeing from justice."

The several conspiracy counts in indictments Nos. 322 and 371 charge that the defendants on trial and the alleged co-conspirators confederated and agreed together on or about January 1, 1897, to defraud the government in the manner set out in the several counts of the said indictments. Some evidence has been submitted on the part of the United States tending to show that there was a new meeting of minds on or about January 1, 1897, brought about by the necessity of providing funds for the execution of the contracts of October 8, 1896, for Cumberland Sound and Savannah Harbor; that about one-third of the money used in the execution of these contracts was supplied by Westcott or Carter, as the case may be, to Greene, and this two-thirds was put into the local banks for use in the construction of the works; and that about another third was supplied by John F. Gaynor in the name of the younger Gaynors, which went towards the execution of work done on these contracts during the period running from January 1, 1897, to June 30, 1897. If the jury believe from the evidence that a corrupt scheme to defraud, such as is averred in the conspiracy counts of the indictments, had been in operation by and between the defendants for several years, and that there was a new meeting of minds between the said defendants to the indictments on or about January 1, 1897, looking to the fraudulent execution of the work under these 1896 contracts, they might infer that there was a renewal of the conspiracy on or about January 1, 1897.

Again, it is charged in these conspiracy counts that certain overt acts were done after January 1, 1897, in pursuance of the conspiracy charged, such, for instance, as the acts charged in relation to the supplemental contract with forged signatures, charged to have been forwarded to Washington by Carter on March 17, 1897, and which is set out as an overt act under some of the conspiracy counts, such as the presentation of certain false claims or accounts on or about July 1,

1897, and the issue of Carter's disbursing checks on or about July 1st, 1897. If the jury believe that these overt acts were committed in pursuance of the conspiracy under which they are charged, and that these acts were done through the co-operation of these defendants, it would amount in law to a renewal of the conspiracy at the date of the conclusion of the overt acts charged, and the statute of limitations would not commence to run until the last overt act charged under such conspiracy be counted and proven.

This is a well-established rule. It has been held:

"But, as each new overt act in furtherance of a common purpose becomes in law a new conspiracy, the time of the conspiracy may be laid within the period of the statute of limitations if the overt act was within that period; the prior combination, if established, and the later overt act being evidence from which a jury might infer the conspiracy."

Such is the language of the Supreme Court of the United States.

If the jury, therefore, should come to the conclusion that there was a corrupt agreement and conspiracy as charged in the several counts of the indictments, and that such conspiracy was kept alive and renewed by overt acts committed as late as July 1 or July 6, 1897, the defendants could not avail themselves of the three-year statute of limitations before July 1 or July 6, 1900, and could not avail themselves of it then, if, prior to July 1 or July 6, 1900, as the case may be, the defendants had become persons fleeing from justice, within the meaning of section 1045 of the Revised Statutes of the United States, which takes away from persons fleeing from justice the right to plead the statute of limitations.

The government has put in evidence indictment No. 322, which shows that the grand jury of this court returned into court on December 8, 1899, indictment No. 322 against these defendants, naming them, in which conspiracy to defraud and presenting false accounts were charged. As this indictment was found within a less period than the expiration of three years after the overt acts charged: If the jury believe from the evidence that the conspiracy is proven, and that the overt acts charged were proven to have been committed at the times charged, the defendants would not be entitled to any exemption on account of the statute of limitations in regard to that indictment.

The government has also put in evidence a complaint made before Commissioner Shields in New York, charging the defendants with having committed within the Southern district of Georgia the same offenses whch were charged in indictment No. 322, and to which complaint a certified copy of that indictment was attached. And, also, the government has introduced the entry on the said complaint made by the commissioner, showing that the defendants were arrested and brought before the commissioner on said complaint on or about the 14th day of December, 1899, for the purpose of their removal to the Southern district of Georgia, to answer to the charges set out in said indictment and in said complaint. It also appears from the said proceeding before the commissioner, in evidence, that the defendants, Benjamin D. Greene and John F. Gaynor, demanded examination, and by the adoption of various dilatory proceedings in the

court succeeded in successfully avoiding submitting themselves to the jurisdiction and processes of the courts in the Southern district of Georgia for over two years, although they were fully apprised of the pending charges against them in the Southern district of Georgia. It further appears from the documentary evidence in the case that the defendants fought the removal proceedings instituted against them, after the commissioner had decided the case against them, before the District Judge in New York, before the Circuit Court of the United States in New York, and before the Supreme Court of the United States, and would not submit themselves to the jurisdiction and processes of the courts in the Southern district of Georgia until they had finally lost in all the proceedings instituted by them for the purpose of preventing their removal to the Southern district of Georgia.

If the jury believe from the evidence that the defendants, Benjamin D. Greene and John F. Gaynor, were from and after December 14, 1899, avoiding the jurisdiction and processes of the United States Court for the Southern District of Georgia, it would make no difference that when they originally left Georgia they had no intent to flee. It is sufficient that, having committed a crime in the Southern district of Georgia, they are found in the Southern district of New York, and when found that they resisted their removal to the Southern district of Georgia, with intent to avoid the jurisdiction and processes of the court in the Southern district of Georgia. It would make no difference that through bad legal advice they thought that such resistance might be legally effective. It is the intent to avoid the jurisdiction and processes of the courts in the judicial district in which the crime is charged to have been committed which takes away from the person charged the privilege of pleading the statute of limitations. It would be abhorrent to the principles of justice that these defendants, for instance, could through the adoption of dilatory proceedings in the courts of New York resist for two or three years removal to Georgia, so that the statute of limitations could run in their favor, and then, for some technical defect, have the court rule on demurrer, as it did in this case, that two of the counts of the old indictments were bad, and then to hold that the government could not supply these counts or obtain additional indictments which the dilatory tactics adopted may render appropriate. If these defendants became persons fleeing from justice on or about December 14, 1899, they lost from that time the right to plead the statute of limitations, and their status as such persons fleeing from justice would not have been altered until they entered into the recognizances given by them on January 20, 1902, in the sum of $40,000 each, to submit to the jurisdiction of the court in the Southern district of Georgia. If the jury find from the evidence that these defendants were resisting submission to the processes and jurisdiction of the United States District Court for the Southern District of Georgia from December 14, 1899, to January 20, 1902, they cannot avail themselves of the plea of the statutes of limitations under indictment 371, which was returned by the grand jury into this court on February 28, 1902, provided the jury believe

from the evidence that the conspiracies charged in indictment No. 371 are proven, and that the concerted overt acts charged under said conspiracy in said indictment as having been committed in March, 1897, and on July 1 or July 6, 1897, as the case may be, were actually committed. This follows because the time during which a defendant is a person fleeing from justice cannot be counted in his favor in reckoning the three years' exemption.

What has been stated in this respect in regard to the conspiracy count applies with equal force to the counts for presenting fraudulent claims, and also to the later indictment for embezzlement, although that indictment was not returned until after the defendants were extradited from Canada. If a defendant is a fugitive from justice because of one charge pending against him, he forfeits his privilege of pleading the statute of limitations to any and all charges which might be made against him, even though no indictment be pending against him for such other charges. Indeed, the Supreme Court of the United States in the case of Streep, 160 U. S. 128, 16 Sup. Ct. 244, 40 L. Ed. 365, has held that, if a defendant flees from a prosecution in the state courts, he forfeits the privilege of pleading the statute of limitations in a federal court in the same district.

The jury have before them certain evidence tending to show that the defendants after entering into the recognizances on January 20, 1902, to appear before this court at the February term, 1902, did appear at the February term, 1902, and after interposing certain pleas and demurrers to indictment 322, and after the court had decided in their favor, sustaining the demurrer to two counts in the indictment, and after being informed of the new indictment, No. 371, fled to Canada and forfeited their recognizances on March 7, 1902. The defendant Greene has testified that he considered himself a fugitive from justice at that time. However, the facts are all before the jury, and if the jury believe that the defendants on or about March 7, 1902, fled to Canada for the purpose of avoiding the jurisdiction and processes of the court for the Southern district of Georgia, they became persons fleeing from justice, and forfeited whatever right they had to have counted in their favor from and after their flight to Canada, the time which elapsed after that date.

It is true that, under the treaty between the United States and Great Britain, it is provided that extradition from the Dominion of Canada shall be had in accordance with the laws of Canada, and that the laws of Canada provide that the defendants have a right to oppose by legal proceeding their extradition; and that under these laws the defendants, as it appears, did adopt dilatory proceeding which delayed their extradition for about three years. Although the treaty, which is a law of the United States ranking next to the Constitution of the United States, recognized the right of the defendants when in Canada to take all legal proceedings which the laws of Canada provided they might take, the court charges you that the time consumed by the defendants by such dilatory proceedings, with intent to avoid their submission to the processes and jurisdiction of the United States court for the Southern district, cannot be counted in their favor on the question of the

statute of limitations. And for precisely the same reason the court charges you that the time consumed by the defendants on dilatory proceedings had in the courts of New York, and on the appeals taken therefrom, if you find that such proceedings were adopted by the defendants to avoid the processes and jurisdiction of this court, cannot be counted in favor of the defendants. Indeed, the rule is established that, where a defendant has acquired the status of a person fleeing from justice, he has forfeited his privilege of pleading the statute of limitations, and he can only regain that privilege by submitting himself to the jurisdiction of the court, and continue his submission so that he would at least have been subject to the jurisdiction of the court for full three years after the crime is committed.

An exceedingly bitter assault has been made in behalf of the prisoners upon three of the witnesses for the government. These are Mr. Johnson, the expert accountant, who testified for the government, Mr. Westcott, the aged father-in-law of Carter, and Maj. Gillette, the successor of Carter, as the result of whose discoveries the investigation which culminated in these indictments was brought.

The jury will pass upon the question whether this treatment of these witnesses is justified by the evidence before the court. They will look carefully to the evidence to ascertain if there is any sort of justification for criticism so severe. It is true it was stated that Mr. Johnson and Mr. Erwin, the District Attorney, were rivals for the honors of this prosecution. I recall no evidence of that character. It was asserted that Mr. Johnson had strong motives to desire the conviction of the accused. If he had such motives, I recall no proof to disclose them. As to the accuracy of his compilation, the jury must determine. An attorney from LaCrosse, Mich., who, according to his testimony, at times devotes himself to the labors of an accountant, criticised the Exhibit 319 as prepared by Mr. Johnson, and insisted that the proof did not support his deductions. But experts may differ in accounting as in every other branch of science without imputing perjury and moral turpitude to either. In the enormous financial operations which the government of the United States is compelled to supervise and at times to investigate, the official services of men of Mr. Johnson's qualifications and training are indispensable. That he has been detailed to this work indicates no prejudice on his part. He was acting under his superiors. It is not true, as stated, that he is the prosecutor in this case. The prosecutor is the United States of America. His testimony, in the opinion of the court, should be weighed by the jury like the testimony of any other witness, and, unless it is supported by proof, with but little regard to the invective of which he has been made the object.

The aged father-in-law of Carter, Mr. Westcott, has passed beyond the reach of such language as was directed at his memory. It falls unheeded on the dull, cold ear of death. It will be proper, however, for the jury in estimating the weight of the testimony of Mr. Westcott to determine what motives he could have had to have falsified and perjured himself in the testimony taken in the examination in New York, and which was admitted in evidence here. If

the testimony of Greene is true, and Westcott was afraid of prosecution himself, how would it have strengthened him to surrender to his son-in-law in the presence of witnesses a half million of values which if guilty he might rea.iiy have used for his defense? If, as insisted, he was seeking to get rid of the evidence of his guilt, would he likely have done this in the presence of a high-minded lawyer, and of his two sons-in-law, and would he have taken a receipt which made a record in detail of the transaction?

But it is said his action was cowardly, that it was injurious to Carter. How could it have been injurious? But how was it possible for Westcott to compel Carter to accept these securities if the latter did not choose to do so? According to the testimony of Mr. Stimson and the evidence of the receipt, he received them, offered to give a portion of them to his aged father-in-law, and, when this was refused, took them away with him. There was no protest on his part, in the presence of Stimson, that the securities were not Carter's, but were the property of Westcott. If they were evidences of guilt, Carter, if innocent, knew he was under investigation then, and was under no obligation to accept them in the presence of witnesses and to give his receipt therefor and to.take them away. Therefore, if Westcott was guilty, the surrender of the securities could not help him. If Carter was innocent, the acceptance of the securities with guilty knowledge on his part that Westcott was a party to the alleged conspiracy and these were the fruits, would make him the receiver of property embezzled, if you consider for the sake of this statement that they were embezzled as charged by the government, and would make him a participant in the crime. The jury will inquire what motive, then, did Westcott have for turning over the securities, worth in the neighborhood of a half million dollars, if in point of fact he did not know that they belonged to Carter, and what motive did Carter have to receive them if he did not know and recognize that they were his own. These are matters for close and careful inquiry by the jury. There can be no doubt of the facts as to the checking, the delivery, and the taking off, for the receipt is in evidence signed by Carter, and Mr. Stimson, of whose character Mr. Meldrim speaks in the highest terms, testified to those facts.

What, then, was the situation? The jury will recall Stimson's testimony, that as he was leaving, Carter took a bundle of the securities in his hand and offered them to his father-in-law, and said: "Daddy, you will at least take these." The old man said, "No, no," or made a gesture of repudiation. Was that the conduct of a guilty man, or was it the conduct of an aged financier, a man of affairs who knew the value of honor and integrity, a man who had discovered that the once loved husband of his beloved daughter, now dead, was involved in charges of crime, of character the most serious, and who had used him (Westcott) as the receiver and custodian of enormous values unlawfully acquired?

Indeed, the defense themselves have introduced an exhibit which has close relation to this particular issue. It appears from this evidence that Carter went to Europe about two months before the date of this

interview with Westcott, Solley, and Stimson, in Stimson's office, and that prior to his departure for Europe he collected all the coupons and dividends upon the entire batch of securities for which he gave Westcott the receipt just mentioned, and deposited the same in his individual account. From this the jury may, if they think proper, presume that Carter had possession of these securities before he went to Europe.

The court does not state that these were the conditions, but, in view of the charges made against the witness Westcott, suggests them, as it is his right, for the consideration and determination of the jury. And the jury will inquire if there is evidence to justify the unsparing assault upon the character and conduct of Maj. Cassius E. Gillette. If Gillette discovered when he succeeded Carter that the circumstances surrounding these important government contracts, the vast sums expended in their execution, and the condition of the office of which he was now to become responsible, not only was it his duty to report it at once for investigation; but if, with the knowledge of the facts, he had suppressed them and gone forward with the work without notifying his superior officers, he himself would have become responsible and would have been himself liable had they been subsequently discovered. Was an investigation demanded? The head and front of his offending was that he caused an investigation to be made. If it be true, as stated by Rees, that Gillette felt himself responsible officially, personally, and socially for the truth of the charges which were presently investigated by the court of inquiry, was it unnatural that he should fight for his own character and for his status in the army? It being obligatory upon him to make the charges, was it not then obligatory upon him to repel unjustifiable assaults made upon him?

Aside from the question of guilt or innocence of the prisoners on trial, was an investigation needed? To hold otherwise is to condemn the court of inquiry, the court-martial, the District Court of the United States for the Southern District of New York, the Circuit Court of the United States where Judge Lacomb presided, three grand juries of the Southern District of Georgia, the Supreme Court of the United States, all the Canadian courts as in successive applications their action was sought, and the great Privy Council of England, a body of advisers of the Sovereign holding office for life, whose judicial functions are performed by a committee headed by the Lord Chief Justice and composed of the most eminent judges and lawyers of the British Empire. None of these tribunals pronounced these defendants guilty, but the action of all is corroborative of the fact that an investigation here was essential, and to bring this about in discharge of his duty was what Gillette did.

It was declared by the prisoners' counsel in the presence of the jury that Savannah had ostracised Gillette. I recall no testimony of that fact, except perhaps an indignant expression by Gillette himself. "Ostracised"—the word has no place in the vocabulary of American jurisprudence. It is derived from the Greek word "ostrakon," a shell, and, when the fickle populace of Athens desired to get rid even of their

bravest and best, they voted with the ostrakon, and expelled him from the borders of the city of the violet crown. It is related of Aristides, that great Athenian statesman and one of the noble generals who fought against the countless hordes of the Persians,

> "Where the mountains look on Marathon,
> And Marathon looks on the sea,"

—that a jealous rival was attempting to procure his banishment by ostracism. A rustic citizen happened to be near Aristides himself in the public assembly which was about to decree his banishment, and turning to him, without knowing who he was, asked him how to write the name Aristides upon the shell with which he was going to vote. "Has Aristides injured thee?" inquired the great Athenian. "No," answered the voter, "but I am tired of hearing him called 'Aristides the Just.'" And Aristides was ostracised. But on fuller knowledge of his character his fellow citizens reversed the decree of banishment.

You have been several times told by counsel for the defense during the progress of the argument, that a verdict at your hands against the accused would be equivalent to imprisonment for life. This statement is unwarranted either by law or by the facts, and the matter of punishment is for the court.

I am aware that these observations are somewhat unusual, but such assaults upon witnesses are also unusual in these courts, and what I have said I have said from a sense of duty. The credit of each and all of these witnesses is, however, exclusively for the jury. They must determine upon their veracity and the weight and value to be attached to the testimony. The case, and the whole case, is clearly within the province of this jury. In the long and weary months of labor and solicitude I have appreciated the fact that, as I needed all the light of which the case was capable, you might need all the help the court could give you; but as I said in the beginning, so I say in the end, it is offered to aid and assist you, and not to control you, for I yield to no man in my respect and admiration for the time-honored right and privilege of trial by jury which is embedded in our Constitution, and which, ever protected by fearless hearts and if need be by the blood of the brave, has come down to us from the time whereof the memory of man runneth not to the contrary.

A great deal has been said in the arguments of counsel about the comparative strength of the government when contrasted with the weakness of the accused. Such suggestions are fallacious and misleading in their effect. It is obviously true that in a certain sense a government like ours where the people have of their own volition concentrated their united power in the three great co-ordinate departments, legislative, executive, and judicial, is stronger than any individual. Was this not true the motive which have induced men from the earliest times of which history gives an account to form themselves into governments, would be a fraud, a delusion, and a snare. But, while our government is strong, it is not strong in an oppressive sense. Our people enjoy the largest share of liberty, consistent with safety, of any other known to man. It is the embodiment of justice and humanity to those who are accused of crime. They

are informed of the nature of the accusation against them. They are given a speedy and impartial trial, by an impartial jury, in the district wherein the crime is committed. They are given compulsory process to obtain the presence and testimony of their witnesses, and, if unable to pay the expense of securing their attendance, the government will pay it for them. They are given the privilege of counsel. They cannot be deprived of life, liberty, or property without due process of law, and due process of law comprehends in cases like this not only a rigid compliance with all of those rights which are secured by the Constitution, but the right, in case error is committed in a court of original trial, to appeal to courts whose jurisdiction is appellate and corrective, and in cases of peculiar importance to that tribunal, the Supreme Court of the United States, which concentrates in its jurisdiction the loftiest juridicial power of any court on earth. The prisoner is at no disadvantage. He may challenge the array of the grand jury. While the government has three peremptory challenges, he is accorded ten. While he has appeal, the government has none. The verdict of a jury against the government in criminal cases is final. The verdict of a jury against the accused may be readily set aside if it is contrary to law or evidence, or if in the conduct of the trial reversible error has been committed by the court.

Nor are the sentences imposed by the national law unmerciful, nor are the national courts unmerciful. Indeed, both are infinitely more humane and tolerant to the frailties of mankind than any other laws, or any other courts, of which I have knowledge. You should not, therefore, gentlemen, be guided or influenced by such considerations. Let the evidence be your guide, and the law, which has for its foundation the very basis of civilized government; the law which "has for its .throne the bosom of God, and for its voice the harmonies of the world;" the law which, if we accept the teachings of the old time religion our · fathers and mothers loved, amid the thunders of Sinai, was given to man by the hand of Omnipotence Himself.

With brief instructions as to the form of your verdict as you may find, to-morrow morning at the opening hour, the case will be committed to your hands. The court will be at recess until 10 o'clock to-morrow morning.

Court met pursuant to adjournment.

I have now, gentlemen, the remaining duties to advise you as to the form of your verdict. If you find generally for the government on each and all of the indictments which are now before you, your verdict will be: We, the jury, find the defendants, Benjamin D. Greene, and John F. Gaynor, guilty as charged, and write this verdict on each indictment, and your foreman will sign it.

If you find the defendants guilty on one or more indictments, and not guilty on another or other indictments, you will write your verdict accordingly; writing the appropriate verdict of guilty or not guilty on each indictment as you may find, and your foreman will sign it.

If you find the defendants guilty on one count of either indictment, and not guilty on another or other counts of that indictment, the

form of your verdict will be: We, the jury, find the defendants guilty on ———— count, filling in the number, and you will supply the number; and not guilty on ———— count or counts, supplying the number or numbers, and this verdict will be written on the indictment to which the finding may apply.

If you find generally that the defendants on trial are not guilty, you will write your verdict as follows: We, the jury, find the defendants, Benjamin D. Greene and John F. Gaynor, not guilty, and write this verdict on each indictment as you may find.

There is another finding which you can, if you think proper under the evidence and the instructions of the court, as I have given you, express by your verdict. A conspiracy is charged in certain indictments before you. If only two men are charged with conspiracy, both must be convicted, if at all, because, from the nature of the offense, at least two are essential to its commission. To acquit one, when only two are indicted, is to acquit the other also, although the jury may deem him guilty. In this case, however, other persons not on trial are indicted as joint conspirators with the defendants on trial. These persons are Oberlin M. Carter, W. T. Gaynor, E. H. Gaynor, and Michael A. Connolly. Now, it is competent for you, if you think the proof justifies it, to find either one of these defendants now on trial, namely, Benjamin D. Greene and John F. Gaynor, guilty, and the other not guilty, provided you find that the conspiracy as charged existed between him and either or all of the other alleged conspirators, although they are not on trial; and, likewise, you may, if you think proper from the evidence, acquit the other defendant on trial.

There are two counts in indictment No. 371 for presenting false claims. On one or both of these counts you may, if you think proper from the evidence, convict both of the defendants, even though you may not think them guilty of conspiracy; and you may also, on one or both of these counts, convict one and acquit the other.

There is also an indictment for embezzlement. This is No. 476. This is not necessarily a joint offense, and even though you may find that the defendants have not been proven guilty of conspiracy, if you find that they were parties to Carter's embezzlement, if he was guilty of embezzlement, you may yet find them, or either of them, if you think from the evidence, in view of the instructions I have given you in charge, guilty of embezzlement; and upon the same conditions you may convict one and acquit the other of this charge.

The jury retired.

April 12, 1906, at 1:45 p. m., the jury returned the following verdicts:

"Indictment 322. For conspiracy. We, the jury, find the defendants, Benjamin D. Greene and John F. Gaynor, guilty as charged.

"Hope Thomas, Foreman."

"Indictment 371. Conspiracy, presenting false claims, etc. We, the jury, find the defendants, Benjamin D. Greene and John F. Gaynor, guilty as charged.                                        "Hope Thomas, Foreman."

"Indictment 476. For embezzlement. We, the jury, find the defendants, Benjamin D. Greene and John F. Gaynor, guilty as charged.

"Hope Thomas, Foreman."

Court adjourned until 10 o'clock a. m., Friday, April 13, 1906.

Court met pursuant to adjournment. In imposing sentence, Judge SPEER said: ·

The most painful judicial duty is the imposition of a sentence to penal servitude. ·This is peculiarly true when those convicted are men of fine intelligence, men of affairs, men who have had the opportunities of education, or who have been trained by the teachings of experience. Peculiarly painful is that duty when the convicted have filled positions of responsibility, of honor, and of trust. All of these conditions are present in the duty before me. One of the prisoners has been distinguished by his state; has been an important official of one of its great political parties; a man of large acquaintance, perhaps with multitudes of earnest friends. The other is a graduate of distinction of our great military academy at West Point, and he was, at one time, a captain of that famous· corps of engineers whose roster bears such names as Robert E. Lee, and George Gordon Meade—a corps whose record was stainless before the occurrences which have been developed in evidence here.

I am told that it has been cynically said by a famous New Yorker that no man who has a million dollars can be convicted of a crime in America. The verdict of this jury, of plain, clearsighted, honest Americans has falsified such· pessimism. Of that jury it may be said that there is perhaps not a man who cannot trace his ancestry to a patriot of the Revolution which established American independence. It is true, as I have often declared, that to the homogeneous Americanism of these Southern States, when the jurors are plainly shown their duty, our country may ever look with confidence for the enforcement of its laws and for the maintenance of its institutions. Nor can it be questioned that those institutions are in jeopardy if such flagrant spoliation of the public Treasury, as proven in this case, could go unwhipped of justice. The settled policy of our national Legislature to appropriate large sums for the improvement of the avenues of interstate and foreign commerce, which are under the express control of that body, makes it supremely important that such appropriations should be honestly expended and guarded with that rigid fidelity with which our government has ever defended the moneys of the people gathered into the coffers of the Treasury by the exercise of the taxing power of the Constitution. The successful and unpunished spoliation of the public treasury is perhaps the surest sign of national decadence.

For your personal suffering, merited as it is, you have my earnest sympathy. To some, no doubt, who are imbued with the belief that all they can get from the government is "honest graft," your conviction may excite indignation, astonishment, and, perhaps, not a little alarm. It seems indeed that the public should awaken to the prevalence of this dangerous inclination. In this case itself, I am sure, without serious reflection, an exception has been noted by counsel to remarks made by the court to the jury to the effect that the people should have the same concern for the security of the money in the Treasury at Washington, or appropriated by Congress, as for the funds collected

by county taxation in a particular state. The sentiment which prompts such exception seems distinctly provincial. The magnificent contributions from the national Treasury, made by Congress for the welfare of the people, for the erection of public buildings, for the construction of a great navy, for defensive works at assailable points, for great reservoirs and canals for the irrigation of arid lands, for such projects as the improvement of the noble harbor here, and our other fine harbors, the deepening of the channel of great rivers, making them available for cheap transportation, the construction of the interoceanic canal and many similar projects, all imperatively call for a lesson, in thunder tones, to faithless, conniving, unprincipled representatives of the government and to unscrupulous contractors or other persons who would conspire to plunder the public Treasury. Most unhappily for you, but most happily for the country and our future as a law-respecting people, that lesson has come in the verdict of the honest men who gave three months of dutiful and arduous labor to the mighty record which has established your guilt.

Nor should the lesson of our government's conduct in this great case go unheeded. No necessary expense has been spared, no necessary exertion avoided. To bring to the bar of public justice those charged with the spoliation of the Treasury, the Supreme Court of the United States and the Privy Council of England—the loftiest tribunals of the English-speaking race—have contributed their solemn judgments. It is pardonable if I add that these great tribunals have approved the first and only declaration or opinion expressed by the presiding judge of this court anterior to this trial, namely, that the accused must be brought to trial at the bar of the court having jurisdiction of their offenses.

Let the evil-disposed then learn that no land, however distant, no administration of obstructive technicalities, wherever found, will deter the government of our country from asking the justice of its courts against those who have violated its laws. It will be well also for our governmental authorities to reflect that unless the obstructive construction placed upon our removal statutes which delayed this case so long, shall be avoided, as recommended by the President and the Attorney-General, it will be wholly impossible to have the speedy trial of criminal cases. The greater the crime and the more powerful and richer the accused, the greater will be the difficulty of bringing him to trial. Ours is a country already consisting of 45 distinct states, without taking account of the territories and insular possessions. If, then, the government must take its witnesses to each district in which persons, indicted for conspiracy or other joint crime, may seek refuge, and be compelled to ignore the efficacy of the indictment and to make out the case anew, it will result in a paralysis in the administration of criminal justice. Though lawless combinations in restraint of trade may have reduced the people to beggary, though conspirators have designed the assassination of the Chief Magistrate himself, if the indictments of grand juries, and the bench warrants of courts having jurisdiction are to count for nothing, how incomparable is the advantage of a criminal who can choose his own forum, and seek his own city of refuge. Had the

assassination of President McKinley been the result of conspiracy, and had many conspirators each taken refuge in different states, how powerless, in view of that construction of the law, would have been the bench and bar of the country to have won the honor and the gratitude so richly bestowed upon them by the people of the United States for the swiftness, dignity, and moderation of the memorable trial which brought Czolgosc to justice.

Notwithstanding the gravity of your offense, it is not deemed necessary to impose upon you the extreme penalty of the law by cumulative sentences. Such sentences might aggregate 17 years' imprisonment at hard labor, and $595,749.90 fines. On the contrary, believing that it is the certainty and not the severity of punishment which deters criminals, I will attempt to approximate, in measuring your term, that imposed by his brother officers upon Carter, the late engineer officer, without whose aid and connivance the crimes in this case would have been impossible.

I recognize that you have been in jail for more than a year, that both of you are elderly men, both of you are educated men, accustomed to a life of comparative luxury, and to the comforts of home. Any sentence to you, therefore, is far more severe than a much greater sentence if imposed upon those who commit offenses which demonstrate their savagery and that they are brutes without discourse of reason.

Your terms of imprisonment will aggregate, as expressed technically in the sentence, four years in the United States penitentiary at Atlanta, Ga.

In view of your conviction for embezzlement I deem it my duty, in obedience to the statute relating to that crime, to impose on you a fine equivalent to the amount embezzled. This will be, on each, $575,-749.90.

I may add, however great your mortification now, your case is by no means hopeless. The sanitary conditions and food secured by the humane management of that great prison, will be far better than that to which you are accustomed. In each year you will have about three months diminution of your sentence for good behavior. In the aggregate this will amount to a year. So it depends upon yourselves whether the sentence is for three or four years.

I trust that you will come from your imprisonment restored in health and in strength, and that for the rest of your lives you will recall the words and cherish the teachings of the psalmist:

"The little that the righteous man hath is better than the riches of many wicked."